**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SOUTHEASTERN FISHERIES ASSOCIATION, INC.<br>653 West 23rd Street, Suite 235<br>Panama City, FL 32405<br><br>SLASH CREEK WATERWORKS, INC.<br>57198 Islington Court<br>Hatteras, NC 27943<br><br>STRAWBERRY, INC.<br>2628 Brookridge Circle<br>Greenville, NC 27858<br><br>JEFFREY ODEN<br>57198 Islington Court<br>Hatteras, NC 27943<br><br>JACK COX, JR.<br>2628 Brookridge Circle<br>Greenville, NC 27858<br><br>ANTONIO GIAMBANCO<br>2323 Middlecoff Court<br>Titusville, FL 32780<br><br>*Plaintiffs*<br><br>v.<br><br>HOWARD LUTNICK, in his official capacity as<br>Secretary of Commerce<br>U.S. Department of Commerce<br>1401 Constitution Ave NW<br>Washington, DC 20230<br><br>NATIONAL MARINE FISHERIES SERVICE<br>1315 East-West Highway<br>Silver Spring, MD 20910<br><br>*Defendants* | Case No. 26-cv-1533 |

1

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      This case challenges an illegal fishery management action taken by Defendants Howard Lutnick, in his official capacity as Secretary of Commerce, and the National Marine Fisheries Service ("NMFS"). Specifically, on or about May 1, 2026, Defendants issued so-called "exempted fishing permits" to the states of Florida, Georgia, South Carolina, and North Carolina, which would allow a massive amount of recreational fishing for South Atlantic red snapper in 2026 and beyond.

2.      The factual record establishes that under the challenged permits, red snapper landings in 2026 will substantially exceed the stock's annual catch limit. The record also establishes that under the challenged permits, fishing mortality in 2026 will be so high as to cause overfishing on South Atlantic red snapper. Furthermore, the record establishes that actual recreational landings of red snapper in 2026 will not even come close to following the stock's governing allocation ratio.

3.      Preventing overfishing, managing stocks under annual catch limits, and ensuring fair and equitable allocations are core requirements of the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1891d ("Magnuson-Stevens Act" or "the Act").

4.      The Magnuson-Stevens Act nowhere allows Defendants to waive the statutory requirements for annual catch limit management, preventing overfishing, and fair and equitable allocations—whether through the use of "exempted fishing permits" or otherwise.

5.      Excessive catch of South Atlantic red snapper in 2026 will harm the stock. Stock abundance and biomass will be depleted, and its rebuilding progress will be set back.

6. Plaintiffs in this case are a commercial fishing association, commercial fishing companies, and individual commercial fishermen. Defendants' illegal action will impact Plaintiffs' ability to harvest red snapper, and therefore their revenues. It also will damage an important natural resource and ocean health, upon which they depend for their livelihoods and way of life. It further will undermine the community of commercial fishing in the South Atlantic, which is a key source of support for Plaintiffs and which they work hard to maintain.

7. Pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA"), as well as the Declaratory Judgment Act, 28 U.S.C. § 2201, the All Writs Act, 28 U.S.C. § 1651, the provision for injunctive relief in the Magnuson-Stevens Act, 16 U.S.C. § 1861(d)(1), and this Court's equitable authority, Plaintiffs respectfully request the Court preliminarily enjoin or stay the challenged permits, vacate them, declare them to be contrary to law, and provide further relief as necessary.

## JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction over this case pursuant to the Magnuson-Stevens Act, which provides that the "district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under" the Act. 16 U.S.C. § 1861(d).

9. Subject matter jurisdiction also is provided under the federal question provision of the Judicial Code, as U.S. District Courts have "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

10. The Magnuson-Stevens Act provides procedures for judicial review in certain situations—specifically, for regulations promulgated under the Act, and actions taken under fishery management plan regulations:

(1) Regulations promulgated by the Secretary under this Act and actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, [the APA], if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable; except that—

(A) section 705 of such title is not applicable, and

(B) the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of such title.

(2) The actions referred to in paragraph (1) are actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing.

. . .

(4) Upon a motion by the person who files a petition under this subsection, the appropriate court shall assign the matter for hearing at the earliest possible date and shall expedite the matter in every possible way.

*Id.* § 1855(f).

11.    As noted above, the Magnuson-Stevens Act's grant of jurisdiction to Federal district courts is broad, encompassing "any case or controversy arising under" the Act whatsoever. 16 U.S.C. § 1861(d). By contrast, the Act's judicial review provision at Section 1855(f) is narrower, covering only a specific subset of cases arising under the Act.

12.    Given this structure, there are cases and controversies that arise under the Act yet fall outside the scope of Section 1855(f). *See, e.g.*, *Kāpa'a v. Trump*, No. 25-cv-209-MWJS-WRP, Slip Op. at 24 n.5 (D. Haw. 2025) (discussing this structure, and noting "[t]here are many classes of claims left untouched by § 1855(f)" (internal quotation omitted)).

13.    To the extent such cases involve challenges to agency actions, the claim for judicial review is provided by the APA. *See, e.g.*, *id.* at 24 ("Even when Section 1855(f) does not apply, judicial review of a Magnuson Act claim may be available under the APA, which authorizes judicial review of final agency action 'for which there is no other adequate remedy in a court.'" (quoting 5 U.S.C. § 704)); *see also N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 21

(D.C. Cir. 2008) (noting, with respect to an action by NMFS falling outside the scope of Section 1855(f), that "APA review would appear to suffice").

14.    Plaintiffs here challenge four exempted fishing permits that were issued by Defendants on or about May 1, 2026, to the four states that comprise the South Atlantic region: Florida, Georgia, South Carolina, and North Carolina (collectively, "the Exempted Fishing Permits").

15.    The Exempted Fishing Permits were issued by Defendants under general nationwide regulations located at 50 C.F.R. § 600.745(b).

16.    The Exempted Fishing Permits were not issued by Defendants under Snapper-Grouper Fishery Management Plan regulations, which are located at 50 C.F.R. Part 622, Subpart I (i.e., sections 622.170 to 622.194).

17.    Because the Exempted Fishing Permits are not actions "taken by the Secretary under regulations which implement a fishery management plan," 16 U.S.C. § 1855(f)(2), the Magnuson-Stevens Act's specific judicial review provision at Section 1855(f) does not apply.

18.    Instead, the claim in this case arises directly from the APA, and ordinary APA procedures govern. *See Kāpa'a*, Slip Op. at 24; *see also N.C. Fisheries Ass'n*, 550 F.3d at 21.

19.    This case was filed on May 5, 2026, and therefore is timely under the applicable statute of limitations. *See* 28 U.S.C. § 2401(a) (six-year statute of limitations under APA). *Cf.* 16 U.S.C. § 1855(f) (thirty-day statute of repose under Magnuson-Stevens Act).

20.    This Court has remedial jurisdiction to issue declaratory relief under the Declaratory Judgment Act. *See* 28 U.S.C. § 2201. Procedures for issuing declaratory relief are provided by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 57.

21.     This Court has remedial jurisdiction to vacate the Exempted Fishing Permits under the APA. *See*  5 U.S.C. § 706(2).

22.     This Court has remedial jurisdiction to issue preliminary injunctive relief and/or a stay of the Exempted Fishing Permits under the APA, *see id.* § 705.  It further has remedial jurisdiction to issue injunctive relief under the Magnuson-Stevens Act, *see* 16 U.S.C. § 1861(d)(1), as well as pursuant to its inherent equitable powers and the All Writs Act. *See* 28 U.S.C. § 1651. Procedures for issuing injunctive relief are provided by the Federal Rules of Civil procedure. *See* Fed. R. Civ. P. 65.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (e)(1)(A)–(B), and 5 U.S.C. § 703, because the Federal Defendants reside in this judicial district, and because a substantial part of the events or omissions giving rise to the claims occurred in the District of Columbia.

## PARTIES

24.     Plaintiff Southeastern Fisheries Association, Inc. ("SFA") is a nonprofit trade association organized under the laws of Florida, with its principal place of business in Panama City, Florida. SFA was founded in 1952, and is tax-exempt as a 501(c)(6) business league. Its mission is to defend, protect, and enhance the commercial fishing industry in the southeastern United States for present participants as well as future generations, while maintaining healthy and sustainable stocks of fish in American waters. SFA is a leader in advocating for the American seafood industry, and works to ensure that commercial fisheries receive fair and equal treatment from federal and state regulatory agencies. With a broad-based membership, SFA represents commercial fishermen, processors, markets, restaurants, packers, and transportation

6

providers—as well as the millions of American consumers who rely upon the commercial fishing industry for fresh, sustainable seafood. SFA members harvest and sell South Atlantic red snapper. SFA has a strong interest in sustainable management of the red snapper stock, as well as in maintaining a viable commercial Snapper-Grouper fishery into the future.

25.     Plaintiff Slash Creek Waterworks, Inc. ("Slash Creek") is a corporation organized under the laws of North Carolina and located in Hatteras, North Carolina. Slash Creek was established in 1982, and holds a South Atlantic Snapper-Grouper limited entry permit. In the course of its business operations, Slash Creek fishes for, lands, and sells various snapper-grouper species including red snapper. Slash Creek has been constrained in its landing of red snapper for many years now, due to the stock's rebuilding plan. Slash Creek has a strong interest in seeing the South Atlantic red snapper stock be rebuilt and managed sustainably, and in ensuring that the commercial fishing industry stays alive in the region.

26.     Plaintiff Strawberry, Inc. ( "Strawberry") is a corporation organized under the laws of North Carolina and located in Washington, North Carolina. Strawberry is a commercial fishing business that holds at least one South Atlantic limited entry Snapper-Grouper permit. Strawberry was established in 1992, and since then has been an active permit-holder and participant in the South Atlantic Snapper-Grouper fishery. Red snapper is one of the species available for harvest under the permits held by Strawberry, and Strawberry earns a portion of its annual revenue from catching and selling red snapper. Similar to Slash Creek, Strawberry has been constrained in its harvesting of red snapper due to restrictive trip limits under the rebuilding plan. And Strawberry too has a strong interest in the rebuilding of South Atlantic red snapper and sustainable management of the stock—as well as in maintaining a sufficiently-functioning commercial fishing industry in the South Atlantic.

27.    Plaintiff Jeffrey Oden ("Oden") is a commercial fisherman from Hatteras, North Carolina, and one of the owners of Slash Creek. Oden has fished for snappers and groupers, including red snapper, for 48 years off the coast of North Carolina. Oden currently captains the F/V Second Wind, a 42-foot long commercial fishing vessel, and he primarily employs bandit reel gear to target red snapper and other Snapper-Grouper species. Over the years, Oden has been a consistent voice in support of the commercial fishery, participating at the South Atlantic Fishery Management Council as a member of the Snapper-Grouper Advisory Panel, and providing public testimony and written comments. He also is a member of SFA. Oden has watched commercial fishing change from a vibrant industry to a nearly-extinguished way of life along the North Carolina coast. He is committed to keeping our nation's fish stocks healthy and maintaining a viable commercial fishing industry into the future.

28.    Plaintiff Jack Cox, Jr. ("Cox") is a commercial fisherman from Morehead City, North Carolina, and the sole owner of Strawberry. Cox has fished for snappers and groupers, including red snapper, since 1978.  He has fished extensively off the South Atlantic states, as well as in the broader Caribbean region. Cox also has worked as a seafood wholesaler, brokering the sale of fish from his own as well as other Snapper-Grouper vessels for a number of years. Cox has served on the North Carolina Marine Fisheries Commission, as well as the Snapper-Grouper Advisory Panel of the South Atlantic Fishery Management Council, and he has advocated consistently over the years for accountability in fishery management. He is a current member of SFA. In addition to being a commercial fisherman, Cox is an avid diver.  He is strongly invested in healthy ocean ecosystems, as well as in ensuring that the commercial fishing industry stays intact and functioning such that a new generation of fishermen may enter.

8

29.     Plaintiff Antonio Giambanco ("Giambanco") is a commercial fisherman from Titusville, Florida. Giambanco fishes commercially throughout the South Atlantic region, primarily using bandit gear, rod and reel, and electric reel gear to target Snapper-Grouper species. He lands and sells red snapper, earning a portion of his income from this activity. He also serves as a broker and wholesaler, buying and selling commercially-caught fish including red snapper. Giambanco is an active member of SFA. During his time in commercial fishing, he has watched the industry struggle under regulatory constraints, while at the same time the recreational fishery has remained open-access and has exploded in both participation and fishing power. He believes very strongly in responsible fishing—which means catching only as much as you know you can eat or sell, while leaving some in the water for another day. At the management level, Giambanco believes in and advocates for sustainable management of fish stocks in the Southeast, as well as for ensuring a future for the commercial fishing industry.

30.     Plaintiffs are harmed in several ways by the illegal Exempted Fishing Permits challenged in this case.

31.     First, on a straightforward economic level, current commercial trip limits for red snapper are extremely low, and these low trip limits are necessitated by the stock's rebuilding plan. Because the challenged agency action will breach the Annual Catch Limit and inflict overfishing on South Atlantic red snapper, it will reduce stock abundance and biomass, and accordingly will set back the stock's rebuilding plan. This means Plaintiffs will be regulated under more years of low red snapper trip limits than otherwise would be the case. Red snapper has a relatively high ex-vessel value, so enduring more years of restrictive trip limits will directly harm Plaintiffs through lower revenues and reduced economic viability of their businesses.

9

32.    Second, Defendants' actions will damage a natural resource that Plaintiffs depend on and to which they are intimately connected. There is no real dispute that the challenged Exempted Fishing Permits will result in overfishing of South Atlantic red snapper, with population impacts that ripple out for decades. This kind of destruction of the resource affects Plaintiffs because their long-term interests—and the survival of their way of life—depend on healthy oceans and robust fish populations. Plaintiffs and other commercial fishermen are tied to the natural world in a way that very few other people are, and as such, they feel it keenly when arbitrary damage is inflicted on one of our nation's fish stocks.

33.    Third, Defendants are attempting an end-run around the Magnuson-Stevens Act to allow excessive mortality on red snapper. If successful, this will inflict a real demoralization cost on commercial fishermen including Plaintiffs, and will damage the community fabric of the commercial fishery. Plaintiffs and other commercial fishermen have watched for decades as managers have failed, over and over, to provide accountability for dead discards of red snapper, which overwhelmingly originate in the recreational sector. All the while, Plaintiffs and their commercial colleagues have been subjected to layer upon layer of regulatory constraints, which eat away at revenues and push people out of business. Commercial fishermen like Plaintiffs depend on each other for knowledge and information sharing, safety at sea, and morale and support. And Plaintiffs specifically work to maintain connections, keep morale up, and repair the tattered fabric of community within the commercial industry—so that they can depend on the community when they need to, and so that it is available for a new generation of fishermen. For Plaintiffs and other commercial fishermen who are hanging on and trying to keep the space open for future entrants, it is a punch in the gut to see Defendants break the law and allow the resource to be damaged. This kind of arbitrary, illegal, and destructive action—taken by the very

managers that Plaintiffs depend on—damages the fishing industry and undermines Plaintiffs' work to maintain it.

34.     Defendant Howard Lutnick, the United States Secretary of Commerce, is the highest-ranking official within the Department of Commerce and, in that capacity, has formal responsibility for the administration and implementation of the Magnuson-Stevens Act, as well as for compliance with all other federal laws applicable to the Department of Commerce. Lutnick, through his designee NMFS, as described below, approved and issued the exempted fishing permits at issue in this case. He is sued in his official capacity.

35.     Defendant NMFS is a federal agency within the Department of Commerce, with the responsibility of protecting and managing the fish, marine mammals, and other marine resources of the United States. NMFS has been delegated authority from the Secretary of Commerce to implement and enforce the Magnuson-Stevens Act. NMFS is the government agency primarily responsible for ensuring that the requirements of the Magnuson-Stevens Act are followed and enforced, including the requirement to manage fisheries through the use of annual catch limits and accountability measures, as well as the requirement to prevent overfishing. NMFS took the challenged action in this lawsuit by approving and issuing the Exempted Fishing Permits.

## LEGAL BACKGROUND

**The Magnuson-Stevens Fishery Conservation and Management Act**

36.     Congress enacted the Magnuson-Stevens Act in 1976, in order "to conserve and manage the fishery resources found off the coasts of the United States." 16 U.S.C. § 1801(b)(1).

37.     The Act asserts sole United States jurisdiction over, and sovereign rights to, all fish and fishery management authority within the Exclusive Economic Zone ("EEZ")—an area commencing with the outside boundary of state waters, and extending to a line 200 nautical miles offshore of the United States. *Id.* §§ 1811(a), 1802(11); *see also* Presidential Proclamation 5030, 97 Stat. 1557 (Mar. 10, 1983).

38.     There are a few exceptions to the Act's assertion of sovereignty over fishery resources within the EEZ, but they are not relevant to this case. *See, e.g.*, *id.* § 1812.

39.     To govern the fishery resources in the EEZ, the Magnuson-Stevens Act establishes eight Regional Fishery Management Councils, each with a distinct geographical jurisdiction. *Id.* § 1852(a). One of these councils is the South Atlantic Fishery Management Council, which is charged with managing fisheries in the federal waters off North Carolina, South Carolina, Georgia, and the east coast of Florida. *Id.* § 1852(a)(1)(C).

40.     The councils are tasked with preparing fishery management plans and amendments for each fishery within their geographic areas of authority, *id.* § 1852(h)(1), as well as with recommending regulations to implement such plans and amendments, *id.* § 1853(c).

41.     The Secretary of Commerce, acting through NMFS, reviews all submitted plans, plan amendments, and regulations, *id.* § 1854(a)–(b), and upon approval, promulgates regulations and otherwise implements the plans and plan amendments, *id.* §§ 1854(b)(3), 1855(d).

42.     The Act requires that all fishery management plans, plan amendments, and implementing regulations be consistent with ten "National Standards" for fishery conservation and management. *Id.* § 1851(a).

43.     National Standard 1 requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery . . . ." *Id.* § 1851(a)(1). Optimum yield is defined in the Act, *see id.* § 1802(33), but it is not relevant to the claims at issue in this case.

44.     The Act defines the terms "overfishing" and "overfished" to mean "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." *Id.* § 1802(34). Regulatory guidelines promulgated by NMFS clarify that "overfishing" refers to the rate of removals from a fish stock (i.e., the act of fishing at an unsustainable rate), whereas "overfished" refers to when a stock's biomass or reproductive potential falls below the level at which it can produce maximum sustainable yield on a continuing basis (i.e., the state of being depleted). *See* 50 C.F.R. § 600.310(e)(2)(i).

45.     Other National Standards address science, coordination, allocational fairness, efficiency, contingency planning, costs, fishing communities, bycatch, and safety of human life at sea. *Id.* § 1851(a)(2)–(10).

46.     In addition to the National Standards, the Magnuson-Stevens Act provides specific requirements applicable to all fishery management plans. One such requirement is to contain management measures that are "necessary and appropriate for the conservation and management of the fishery to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(1)(A).

47.     Another fishery management plan requirement is to "specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished (with an analysis of how the criteria were determined and the relationship of the criteria to the reproductive potential of stocks of fish in that fishery), and, in the case of a fishery which the

13

Council or the Secretary has determined is approaching an overfished condition or is overfished, contain conservation and management measures to prevent overfishing or end overfishing and rebuild the fishery." *Id.* § 1853(a)(10).

48.    Other fishery management plan requirements include assessing and specifying maximum sustainable yield and optimum yield, *id.* § 1853(a)(3), examining data needs and data collection requirements, *id.* § 1853(a)(5), and identifying essential fish habitat, *id.* § 1853(a), among other things.

**Annual Catch Limits**

49.    At the turn of the 21st Century, nearly thirty years into federal management, overfishing remained a problem in many fisheries. Even after Congress strengthened the Magnuson-Stevens Act's sustainability requirements in 1996—adding measures like mandatory rebuilding plans and habitat protection—NMFS and the Councils continued to struggle with ending overfishing.

50.    Congress responded in 2006, amending the Act to add a new requirement that fundamentally changed federal fisheries management: annual catch limits. All fishery management plans from that point forward were required to "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." Pub. L. No. 109–479, § 104(a)(10), 120 Stat. 3575, 3584 (Jan. 12, 2007), *codified at* 16 U.S.C. § 1853(a)(15).

51.    Annual catch limits are numerical limits on the allowable catch for each fish stock, set every year at a level below the overfishing threshold. The idea is to set a science-based limit on allowable catch ahead of time, and stay accountable to that limit. This sounds simple,

but it represented a radical change for many federal fisheries, which for decades had been managed with no meaningful accountability.

52.    Congress made its intent clear that annual catch limits should be treated as actual limits—meaning caps that are not to be exceeded. *See, e.g.*, 151 Cong. Rec. S12840, S12850 (daily ed. Nov. 15, 2005) (statement of Sen. Ted Stevens) ("[T]his bill mandates the use of annual catch limits which shall not be exceeded."); S. Rep. No. 109–229, at 7 (2006) (describing annual catch limit requirement as "scientifically established annual catch limits be[ing] set and adhered to in each managed fishery"); *id.* at 21 ("The Committee expects that if a sector is likely to exceed its annual catch limit, the Council will restrict that sector's harvest to ensure the sector stays within its annual catch limit."); *accord* National Marine Fisheries Service, National Standard Guidelines, 74 Fed. Reg. 3178, 3183 (Jan. 16, 2009) ("NMFS decided, that since Congress called for annual catch limits to be set, that the ACL should be considered a true limit—a level not to be exceeded.").

53.    The annual catch limit requirement, and the accountability it created, was intended to finally operationalize the Act's long-standing mandate to prevent overfishing. This was stated directly in the text of the Act, which requires annual catch limits to be set "at a level such that overfishing does not occur." 16 U.S.C. § 1853(a)(15). It also is underscored by the legislative history. *See, e.g.*, S. Rep. No. 109–229, at 6-7 (2006) (pointing out that "overfishing is still occurring in a number of fisheries, even those fisheries under a rebuilding plan," and stating "[t]he Committee intends that these annual catch limits, taken with the existing overfishing and rebuilding authorities, will ensure full compliance with the Magnuson-Stevens Act"); *accord* 50 C.F.R. § 600.310(f)(4)(i) (NMFS reiterating in regulatory guidelines that annual catch limits "must prevent overfishing" when measured against a stock's status determination criteria).

54.     Congress did not exempt any fisheries or sectors from the annual catch limit mandate. "Catch," as used in the annual catch limit requirement, means all fish killed by fishing activity, whether the fishing is recreational or commercial in nature, and whether the fish are retained or discarded. *See, e.g.*, S. Rep. No. 109–229, at 23–24 (2006) ("Catch of all species, whether targeted or taken as bycatch, whether retained or discarded, count toward the annual catch limits, and fisheries are closed when these limits are reached."); *accord* 50 C.F.R. § 600.310(f)(1)(i) (NMFS regulatory guidelines defining catch as "the total quantity of fish, measured in weight or numbers of fish, taken in commercial, recreational, subsistence, tribal, and other fisheries," and specifying that "[c]atch includes fish that are retained for any purpose, as well as mortality of fish that are discarded.").

55.     After 2006, overfishing rates across U.S. fisheries dropped significantly as annual catch limit management was adopted. As one court subsequently observed, the new legal mandate "fundamentally altered American fishing regulation by requiring [managers] to set hard, science-based caps on how many fish could be caught each year and by demanding that accountability measures be triggered when fishermen exceeded those caps." *Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 254, 266 (D.D.C. 2014) (citations omitted).

**Experimental Permitting Process**

56.     In addition to the National Standards and requirements for fishery management plans, the Magnuson-Stevens Act assigns some direct responsibilities to NMFS. As a practical matter, the bulk of these direct responsibilities pertain to reviewing proposed fishery management plans and regulations, 16 U.S.C. § 1854(a)–(b); preparing secretarial plans or amendments when necessary, *id.* § 1854(c); and dealing with a handful of other contingencies and specific management situations, *id.* §§ 1854(d)–(i), 1855(a)–(d).

16

57. One minor statutory responsibility for NMFS is to establish and fund a "Cooperative Research and Management Program." *Id.* § 1867. This requirement is located in Section 1867, which was added to the Act in 2006. *See* Pub. L. No. 109-479, § 204, 120 Stat. 3575, 3614–15 (Jan. 12, 2007). Section 1867 describes the program to be established, and addresses eligibility, funding, and other similar topics. *See* 16 U.S.C. § 1867(a)–(f).

58. Within Section 1867, Congress included a subsection instructing NMFS to create a standardized permitting process for experimental fishing permits:

> (d) EXPERIMENTAL PERMITTING PROCESS.— . . . the Secretary, in consultation with the Councils, shall promulgate regulations that create an expedited, uniform, and regionally-based process to promote issuance, where practicable, of experimental fishing permits.

*Id.* § 1867(d).

59. In response to this instruction from Congress, NMFS revised its nationwide regulations regarding exempted fishing permits. *See* 72 Fed. Reg. 72,657 (Dec. 21, 2007) (proposed rule); 74 Fed. Reg. 42,786 (Aug. 25, 2009) (final rule), *codified at* 50 C.F.R. §§ 600.10, 600.745.

60. NMFS addressed Section 1867(d) in the rulemaking, interpreting it as a directive from Congress to update and clarify its existing procedures around scientific research, exempted fishing, and educational activities, in light of new conservation mandates that had been added to the law in 1996 and 2006. Specifically, Congress had enacted requirements to rebuild stocks, minimize bycatch, protect essential fish habitat, and use annual catch limits, and because "[t]hese new [conservation] requirements resulted in an increased interest in fisheries research," NMFS stated, an update to the regulations was needed. 72 Fed. Reg. at 72,657.

61. Among other things, NMFS in the rulemaking made changes to certain definitions at 50 C.F.R. § 600.10, and revised 50 C.F.R. § 600.745, which is the section of NMFS's

nationwide regulations dealing with scientific research, exempted fishing, and educational activities. *See* 74 Fed. Reg. at 42,792–96.

62.    The agency stated its belief that the term "experimental," which Congress had used in Section 1867, was synonymous with its own regulatory term "exempted":

> *Exempted or experimental fishing* means fishing from a vessel of the United States that involves activities otherwise prohibited by this chapter VI, but that are authorized under an exempted fishing permit (EFP). The regulations in § 600.745 refer exclusively to exempted fishing. References elsewhere in this chapter to experimental fishing mean exempted fishing under this part.

74 Fed. Reg. at 42,793, *codified at* 50 C.F.R. § 600.10 (italics in original).

63.    NMFS further asserted, in the rulemaking, that its concept of "exempted" fishing permits allowed for fishing activity "outside prescribed fishing regulations." 72 Fed. Reg. at 72,658.

64.    The agency did not address what sort of fishery management regulations it believed could be waived, through the use of an "exempted" fishing permit. *See id.* at 72,657–64 (proposed rule); 74 Fed. Reg. at 42,786–96 (final rule).

**The Administrative Procedure Act**

65.    The APA sets forth basic process requirements for federal rulemaking, including public notice and opportunity to comment, and required timelines for making a final rule effective. *See* 5 U.S.C. § 553. It also provides a cause of action in judicial review for "[any] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," *id.* § 702, as well as judicial remedies such as preliminary relief and vacatur of agency actions, *id.* §§ 705, 706(2).

66.    In judicial review cases under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." *Id.* § 706(2)(A). Courts also must set aside any agency action that is taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C).

67.     An agency action violates APA Section 706(2)(A) "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

68.     An agency action violates APA Section 706(2)(C) if the underlying statute, properly construed, does not authorize the challenged action. *See, e.g.*, *Am. Fed. Gov't Empls. v. Shinseki*, 709 F.3d 29 (D.C. Cir. 2013); *Cmty. Health Sys., Inc. v. Burwell*, 113 F. Supp. 3d 197 (D.D.C. 2015).

## FACTUAL BACKGROUND

**Red Snapper and the Historical Snapper-Grouper Fishery**

69.     Red snapper (*Lutjanus campechanus*) is a highly valued marine fish whose primary distribution in U.S. waters extends from the Gulf of Mexico to Cape Hatteras, North Carolina. Red snapper live on the continental shelf, with juveniles inhabiting shallow nearshore waters and adults occupying deeper waters generally in the 60-300 foot depth range. Adults tend to live in areas with structured bottom habitat such as rocky reefs, though they also may be found over sandy or muddy bottom areas at times. Red snapper can live for over fifty years, and grow to a size of 40 inches and 50 pounds. Females reach reproductive maturity between 1 and 3 years

of age, but reproductive output increases with age such that older adults are significantly more productive than younger ones.

70.     People have fished for snappers and groupers for centuries, in the area now known as the U.S. Southeast. The first commercial landings were recorded in 1880. Through the remainder of the 1800s and the first few decades of the 1900s, commercial landings stayed at relatively modest levels—such that they are assumed to have not significantly impacted the stock. *See, e.g.*, Southeast Data, Assessment, and Review, SEDAR 73: South Atlantic Red Snapper Stock Assessment Report, Section II at 24 (Mar. 2021) ("SEDAR 73") (discussing model initialization), *available at* https://sedarweb.org/documents/sedar-73-stock-assessment-report-south-atlantic-red-snapper.

71.     By the 1950s, however, vessel power and navigational systems had improved, and commercial fishing capacity for snappers and groupers increased substantially. *See generally* South Atlantic Fishery Management Council, Fishery Management Plan, Regulatory Impact Review, and Final Environmental Impact Statement for the Snapper-Grouper Fishery of the South Atlantic Region, at 29-32 (Mar. 1983) ("Snapper-Grouper FMP"), *available at* https://safmc.net/documents/snapper-grouper-fishery-management-plan.

72.     From 1950 through the early 1980s, South Atlantic red snapper commercial landings generally stayed in the range of 300,000–600,000 pounds per year. *See* Southeast Fisheries Science Center, Update of SEDAR 73 Assessment: Stock Assessment of Red Snapper off the Southeastern United States, at 32 (Dec. 2024) ("SEDAR 73 Update") (Table 12), *available at* https://sedarweb.org/documents/sefsc-2024-update-to-sedar-73-south-atlantic-red-snapper-assessment. Recreational landings were starting to ramp up in a significant way during

this period, however, and with pressure from both sectors on the resource, it was time for a management plan.

**Early Federal Management of Red Snapper**

73.     Federal management of red snapper formally began in 1983, when the recently-formed South Atlantic Fishery Management Council drafted and adopted the original Snapper-Grouper Fishery Management Plan (FMP). Under the FMP, red snapper are managed along with fifty-odd other species of snappers, groupers, basses, porgies, grunts, tilefishes, triggerfishes, wrasses, and jacks that inhabit federal waters in the South Atlantic region. *See generally* Snapper-Grouper FMP, at 1–7.

74.     Red snapper was understood to already be subject to overfishing (i.e., the rate of fishing was unsustainably high), at the time the Snapper-Grouper FMP was adopted. *See id.* at vii-viii. The FMP provided a minimum size limit for red snapper of 12 inches, in an attempt to reduce mortality rates for the stock. *Id.* at viii.

75.     High red snapper landings continued through the 1980s, however, and the stock declined to a low abundance by 1990. *See* SEDAR 73 Update, *supra* ¶72, at 72 (Figure 14). NMFS and the Council introduced a handful of further management measures for red snapper in 1991, including an increased size limit, bag limits, and certain gear prohibitions, and established a rebuilding time period of 15 years, intended to restore the stock to healthy levels by 2006. *See* South Atlantic Fishery Management Council, Final Amendment Number 4, Regulatory Impact Review, Initial Regulatory Flexibility Analysis and Environmental Assessment (Apr. 1991), *available at* https://safmc.net/documents/snapper-grouper-amendment-4.

76.     Population analyses during the 1990s found that red snapper continued to be subject to overfishing, and the stock accordingly was listed as "overfished" in NMFS's first

Status of Stocks Report. *See* National Marine Fisheries Service, Status of Fisheries of the United States: Report to Congress, at PDF 5 (Sept. 1997), *available at* https://repository.library.noaa.gov/view/noaa/15601.

77. New management measures were introduced in the late 1990s, including an aggregate bag limit, limited entry commercial permits, and a commercial capacity reduction program—which required (and still requires today) a 2-for-1 exchange of permits any time a permit transfer is made. *See* South Atlantic Fishery Management Council, Final Amendment 8 to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region (July 1997), *available at* https://safmc.net/documents/snapper-grouper-amendment-8.

**The Rise of Recreational Snapper-Grouper Fishing**

78. Recreational offshore fishing in the U.S. Southeast was a modest affair in the immediate postwar years. Anglers used relatively small wooden vessels, equipped with simple navigational aids. Catch was naturally constrained by the difficulty of accessing offshore fishing grounds, and coastal population in the region remained at moderate levels. *See, e.g.*, Rusty Hudson, Atlantic Red Snapper (*Lutjanus campechanus*) Fishing History Timeline, SEDAR41-DW23, at 4–6 (Jul. 21, 2014) (describing early red snapper fishing off Florida's east coast), *available at* https://sedarweb.org/documents/s41dw23-atlantic-red-snapper-lutjanus-campechanus-fishing-history-timeline.

79. By the 1960s, however, Florida's population had more than doubled and the other states were starting to increase as well. Fiberglass boats and more reliable outboard motors revolutionized the saltwater angling experience, and participation surged. As a consequence, recreational landings of offshore species like red snapper jumped, often rivaling commercial

landings. *See, e.g.*, SEDAR 73 Update, *supra* ¶72, at 32 (Table 12) (showing comparable landings by weight through the 1960s).

80.     From the 1970s through the 1990s, recreational saltwater angling boomed—transforming from a hobby for locals into a multi-billion dollar industry. Composite fishing vessels proliferated, and powerful outboard motors allowed access to offshore fishing grounds that previously were out of reach. Electronic navigational aids became more common, and tackle evolved to be stronger and more efficient. *See, e.g.*, Hudson, SEDAR41-DW23, *supra* ¶78, at 10–12; Loren McClenachan, Recreation and the "Right to Fish" Movement: Anglers and Ecological Degradation in the Florida Keys, 18 Env. Hist. 76, 77 (2012) (noting technological changes in this period that increased recreational fishing power).

81.     By the time the Snapper-Grouper FMP was adopted, recreational red snapper landings in the South Atlantic routinely were exceeding commercial landings—and often by large amounts. *See* SEDAR 73 Update, *supra* ¶72, at 32 (Table 12) (showing recreational landings in the millions of pounds per year for much of this period, with commercial landings in the hundreds of thousands of pounds per year).

82.     Toward the end of the 20th Century, the recreational sector started to organize and consolidate the political power that comes with being a multi-billion dollar industry. This involved forming advocacy groups, both nationally and in the South Atlantic region. Groups included the American Sportfishing Association (formed in 1994), South Atlantic chapters of the Coastal Conservation Association (early 1990s), and the Recreational Fishing Alliance (established 1996 and recently wound down), as well as generalist groups like the Congressional Sportsmen's Foundation (1989) and the Theodore Roosevelt Conservation Partnership (2002).

83.     These recreational advocacy groups rolled out a "right to fish" campaign, in which they aggressively opposed any limitation on recreational angling, such as time or area closures, permitting systems, or catch limits. *See, e.g.*, McClenachan, 18 Env. Hist. at 82–84 (noting ideological development). The groups also moved into legislative lobbying, pushing for changes to state law as well as the Magnuson-Stevens Act. *See id.* at 83 & n.30 (describing state legislative efforts); Center for American Progress, The Rise of the Recreational Fishing Lobby (Mar. 19, 2018), https://www.americanprogress.org/article/rise-recreational-fishing-lobby; *cf.* Grant S. McCall, A Political Ecology of Fisheries Regulation and Community Resilience in the Coastal Mississippi River Delta, Southeast Louisiana, U.S.A., 2025 Water 3187, at 16 (noting similar and slightly earlier development in Gulf of Mexico region, involving a strong "rise in the political influence" of the recreational sector).

84.     From 2000 to today, the factors driving growth of recreational angling have only increased. Coastal population continues to rise, with strong year-over-year growth. *See, e.g.*, J. Kevin Craig et al., Ecosystem Status Report for the U.S. South Atlantic Region, NOAA Tech. Memo. No. NMFS-SEFSC-753, at 89 (Nov. 2021) (Figure 9.1b), *available at* https://repository.library.noaa.gov/view/noaa/33280. And there continue to be new "technological (vessel size, engine displacement, GPS and other technology) and social (communication through social media) innovations that continue to increase recreational fishing power." *Id.* at 114.

**Escalating Recreational Dead Discards of Red Snapper**

85.     With ever-increasing recreational fishing power, recreational catch has become the primary driver of stock status for South Atlantic red snapper. Through the 1980s and 1990s, catch was primarily in the form of landings. Since then, it has shifted to be predominately dead

discards. Red snapper dead discards occur because recreational anglers continue to fish for other co-occurring species throughout the year, even when red snapper is closed (i.e., it cannot be landed). As they fish for co-occurring species, anglers bring up—and discard—hundreds of thousands of red snapper each year.

86.     The dominance of recreational catch, and the shift from landings to dead discards, was noted as early as 2008, when NMFS conducted a new stock assessment for South Atlantic red snapper. The agency again found the stock subject to overfishing (i.e., fish were being removed from the population too rapidly) and overfished (i.e., the population size was too small). *See* Southeast Data, Assessment, and Review, SEDAR 15 Stock Assessment Report 1 (SAR 1): South Atlantic Red Snapper, Section I at 12 (Mar. 2009), *available at* https://sedarweb.org/documents/sedar-15-stock-assessment-report-south-atlantic-red-snapper. The new assessment noted that "[t]he bulk of landings of red snapper come from the recreational fishery, which have exceeded the landings of the commercial fishery by 2-3 fold over the assessment period," and also that the existing 12-inch size limit was "believed to have caused an increase in discarding." *Id.*

87.     NMFS and the South Atlantic Council responded to the new stock assessment with Amendment 17A to the Snapper-Grouper FMP. That amendment, adopted in 2010, acknowledged the stock had failed to rebuild by its deadline of 2008, and established a new rebuilding timeframe for red snapper of 35 years. This meant the red snapper stock now would be fully rebuilt and healthy by the year 2044. *See* South Atlantic Fishery Management Council, Amendment 17A to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region, at S-1 to S-20 (July 2010), *available at* https://safmc.net/documents/snapper-grouper-amendment-17a.

88.     Shortly thereafter, a new stock assessment for red snapper was released. The new assessment again found red snapper to be subject to overfishing (i.e., the fishing mortality rate was too high), and overfished (i.e., the remaining population was too small). *See* Southeast Data, Assessment, and Review, SEDAR 24 Stock Assessment Report: South Atlantic Red Snapper, Section I at 8 (Oct. 2010), *available at* https://sedarweb.org/documents/sedar-24-stock-assessment-report-south-atlantic-red-snapper. The assessment noted that "[r]ecreational fleets dominate the total [fishing mortality]" for red snapper, *id.* at 11, and found that dead discards had comprised a significant portion of total red snapper catch in recent years, *id.* at 15.

89.     NMFS and the South Atlantic Council made several adjustments to red snapper management over the next decade, all of which were ineffectual at constraining catch of the stock. *See, e.g.*, 77 Fed. Reg. 51,939 (Aug. 28, 2012) (temporary rule allowing harvest); 78 Fed. Reg. 44,461 (July 24, 2013) (Amendment 28 final rule, establishing new system for catch limits); 82 Fed. Reg. 50,839 (Nov. 2, 2017) (temporary rule, departing from said system in order to allow harvest).

90.     Another stock assessment was conducted mid-decade, which once again concluded that South Atlantic red snapper was subject to overfishing (i.e., the rate of removals was too high) as well as overfished (i.e., the population remaining was too small). *See* Southeast Data, Assessment, and Review, SEDAR 41 Stock Assessment Report Revision 1: South Atlantic Red Snapper, Section VII (Apr. 2017), *available at* https://sedarweb.org/documents/sedar-41-stock-assessment-report-south-atlantic-red-snapper-revision-1-april-2017. NMFS determined the stock assessment represented the best available science, and published a Federal Register notice confirming that South Atlantic red snapper had again been found to be subject to overfishing and overfished. *See* 82 Fed. Reg. 18,434 (Apr. 19, 2017).

26

91.     By this point it was well-understood that "the majority of the estimated fishing mortality [for red snapper] occurred from estimated dead discards." 82 Fed. Reg. at 50,840; *see also* 82 Fed. Reg. 1720, 1720 (Jan. 6, 2017) ("Discard mortality, particularly from the recreational sector, continues to be a significant source of overall mortality for red snapper."); 83 Fed. Reg. 22,938, 22,939 (May 17, 2018) ("[M]ost of the catch is now discarded . . . ."); 83 Fed. Reg. 35,428, 35,428 (July 26, 2018) ("[A] large majority of the estimated fishing mortality was attributed to very large and uncertain dead discard estimates . . . ."); South Atlantic Fishery Management Council, Amendment 43 to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region, at D-1 (Nov. 20, 2017) ("Since 2010, estimates of dead discards have accounted for most of the total removals (92%), likely a result of incidental catch of red snapper while fishermen targeted co-occurring species."), *available at* https://safmc.net/documents/snapper-grouper-amendment-43.

92.     In response to the new stock assessment, NMFS and the South Atlantic Council passed Amendment 43 to the Snapper-Grouper FMP. Amendment 43 originally was described as a package that would include management measures to deal with dead discards. *See* 82 Fed. Reg. at 1720 (notice of intent to prepare EIS) ("[T]he Council is considering methods to reduce discard mortality in Amendment 43 including spatial and temporal closures . . . changes to allowable fishing gear types (e.g., circle hooks), and requiring the use of descending devices and/or venting tools for released fish.").

93.     Under substantial political pressure, however, NMFS and the Council dropped such measures from the scope of Amendment 43 and deferred them to some undefined point in the future. *See* 82 Fed. Reg. 37,441 (Aug. 10, 2017) (revised notice of intent to prepare EA) ("[T]he Council decided to reduce the scope of actions considered in Amendment 43. . . . The

27

Council may consider [] other actions . . . in a future amendment."). No such measures were ever adopted.

94.    In 2021, another stock assessment was completed for South Atlantic red snapper, which—yet again—found red snapper to be subject to overfishing (i.e., fish were being killed too rapidly) and overfished (i.e., the spawning stock biomass was too low). *See* SEDAR 73, *supra* ¶70. NMFS deemed the new stock assessment best available scientific information, and published in the Federal Register a notice stating that South Atlantic red snapper again had been determined to be "both subject to overfishing and overfished." 86 Fed. Reg. 41,022, 41,023 (July 30, 2021).

95.    The new stock assessment confirmed that overfishing was being driven by recreational dead discards. *See* SEDAR 73, *supra* ¶70, Section II at 10 (noting that "the primary driver of overfishing is recreational discards," while also observing progress toward rebuilding spawning stock biomass, due to higher than expected recruitment); *id.* at 113 (Figure 27, showing relative contributions to fishing mortality on red snapper); *id.* at 64, 66 (Tables 20 and 22, reflecting that in the terminal years of the assessment (2017–2019), an average of 85% of catch by weight came from dead discards).

96.    In response to the new determination of overfishing, NMFS eventually issued a secretarial amendment to the Snapper-Grouper FMP. *See* 90 Fed. Reg. 24,527, 24,531 (June 11, 2025) (final rule); National Marine Fisheries Service, Amendment 59 to the Fishery Management Plan for the Snapper-Grouper Fishery of the South Atlantic Region (May 15, 2025) ("Amendment 59"), *available at* https://repository.library.noaa.gov/view/noaa/71119.

97.    NMFS conducted a stock assessment update in conjunction with its secretarial amendment. That assessment update—referred to as the SEDAR 73 Update—is the most recent

28

stock assessment for South Atlantic red snapper to date. *See* SEDAR 73 Update, *supra* ¶72. NMFS deemed it to be the best scientific information available. *See* Amendment 59, *supra* ¶96, at H-1; 90 Fed. Reg. at 24,532.

98.    The SEDAR 73 Update showed South Atlantic red snapper to be, yet again, subject to overfishing. *See* SEDAR 73 Update, *supra* ¶72, at 8; Amendment 59, *supra* ¶96, at S-1; 90 Fed. Reg. at 24,528. And, yet again, the update concluded that vast majority of fishing mortality was coming from dead discards. *See id.* ("The primary driver of overfishing remains general recreational discards."); Amendment 59, *supra* ¶96, at S-1 ("Red snapper overfishing is primarily attributed to dead discards in the recreational sector . . . ."); 90 Fed. Reg. at 24,528 ("Most of the red snapper fishing mortality is attributed to dead discards in the recreational sector.").

99.    In Amendment 59, NMFS made a minor adjustment to the red snapper annual catch limit, but did nothing to address the problem of recreational dead discards. The agency initially proposed a time/area closure that would have meaningfully reduced dead discards, but—under extreme political pressure—abandoned the plan. *Compare id.* at 15 (section heading "Action 3. Consider Reducing Dead Discards and Set Red Snapper Annual Catch Limits") *with* 90 Fed. Reg. at 24,531 ("NMFS decided to remove these actions from further consideration in the amendment.").

100.    Rather than deal with the problem, NMFS instead changed the reference point that defines overfishing for South Atlantic red snapper. Specifically, Amendment 59 raised the proxy for the fishing rate at maximum sustainable yield ($F_{MSY}$) to a value that happened to match the most recent level of fishing mortality. *See id.* at 24,529 (explaining that the new $F_{MSY}$ proxy "would be $F_{2021-2023}$ [i.e., the level of fishing mortality that occurred during the years 2021–

2023], and the red snapper stock would no longer be classified as undergoing overfishing

($F_{CURRENT}/F_{2021-2023} = 1.0$)").

## THE CHALLENGED AGENCY ACTION

**Planning to Sidestep the Magnuson-Stevens Act**

101.    Recreational advocacy groups began meeting with state agencies and supportive members of Congress in 2024, with the goal of increasing access to South Atlantic red snapper for recreational anglers. *See, e.g.*, North Carolina Division of Marine Fisheries, Application for Exempted Fishing Permit, at PDF 4 (Jan. 23, 2026) ("NC Application") (describing process in which "recreational angler groups reached out to the South Atlantic states"), *available at* https://www.fisheries.noaa.gov/s3/2026-02/North-Carolina_NCDMF_EFP-application_January-2026.pdf; South Carolina Department of Natural Resources, Application for Exempted Fishing Permit, at PDF 5 (Jan. 23, 2026) ("SC Application") ("These [Exempted Fishing Permit] applications are the result of numerous meetings between July 2024 and August 2025 between the South Atlantic states and recreational fishing interest groups . . . ."), *available at* https://www.fisheries.noaa.gov/s3/2026-02/South-Carolina_SCDNR_EFP-application_January-2026.pdf.

102.    Eventually the state agencies, advocacy groups, and elected officials converged on an approach, which was to ask NMFS for a huge increase in recreational fishing days for South Atlantic red snapper, combined with various "test[s]" of recreational data collection approaches. NC Application, supra, at PDF 4; *see also* Georgia Department of Natural Resources, Application for Exempted Fishing Permit, at 2 (Jan. 23, 2026) ("GA Application") (similar), *available at* https://www.fisheries.noaa.gov/s3/2026-02/Georgia_GADNR_EFP-

30

application_January-2026.pdf; Florida Fish & Wildlife Conservation Commission, Application for Exempted Fishing Permit, at 2–3 (Jan. 23, 2026) ("FL Application") (offering to "test two methods for use in recreational data collection," including one already-used method and one voluntary reporting method), *available at* https://www.fisheries.noaa.gov/s3/2026-02/Florida-EFP-Application_January-2026.pdf.

103.    Major recreational fishing corporations apparently were involved as well, and volunteered to underwrite the effort. *See, e.g.*, North Carolina Division of Marine Fisheries, Press Release: North Carolina Recreational Red Snapper Season Will Open for 62 Days (May 4, 2026) (noting Yamaha Motors sponsorship), *available at* https://www.deq.nc.gov/news/press-releases/2026/05/04/north-carolina-recreational-red-snapper-season-will-open-62-days; Georgia Department of Natural Resources, Press Release: NOAA Approves Red Snapper EFP, Two-Month Season Set for 2026 (May 1, 2026) (similar, including a quote from Yamaha U.S. Marine Business Unit executive), *available at* https://gadnr.org/News/260501RedSnapper.

104.    The key to this effort was asking NMFS to bless and implement the proposals via exempted fishing permit, thereby avoiding the usual council-based management process under the Magnuson-Stevens Act. Not only were the advocacy groups and their allies unlikely to secure South Atlantic Council approval for their proposals, but they also clearly were asking for far more recreational catch of red snapper than would be allowed under the Act.

105.    The states submitted their final applications for exempted fishing permits to NMFS on January 23, 2026, and the agency published them in the Federal Register for public comment. *See* 91 Fed. Reg. 6827 (Feb. 13, 2026).

**NMFS Issues the Exempted Fishing Permits**

31

106.    NMFS issued the challenged Exempted Fishing Permits to each of the four South Atlantic states, on or about May 1, 2026.

107.    Specifically, NMFS issued an exempted fishing permit to Florida that purports to allow the state to set a 39-day open season for recreational red snapper fishing in federal waters off Florida, starting on May 22, 2026.

108.    And NMFS issued one exempted fishing permit each to Georgia, South Carolina, and North Carolina, each of which purports to allow the state to set a 62-day open season for recreational red snapper in federal waters off each state, starting on July 1, 2026.

**Consequences of the Exempted Fishing Permits**

109.    There are a few factual consequences that flow from NMFS's issuance of the Exempted Fishing Permits.

110.    First, under the Exempted Fishing Permits, South Atlantic red snapper landings will not be managed to stay under the stock's annual catch limit in 2026.

111.    The current Recreational Annual Catch Limit for red snapper is 22,797 landed fish. *See* 90 Fed. Reg. at 24,529. Last year, this amount of fish covered a bit less than two days of open season for the recreational sector. *See id.* at 24,530 (establishing 2-day season); Ellie Corbett & Chloe Ramsay, Florida Fish & Wildlife Conservation Commission, Recreational Effort, Catch, and Biological Sampling in Florida During the 2025 South Atlantic Red Snapper Season, F-5573-23-F2, at 7, 14 (Dec. 3, 2025) (estimating a total of 24,885 recreationally-landed red snapper in Florida alone during the 2-day open season), *available at* https://myfwc.com/media/ez0i1lof/atlantic-red-snapper-2025.pdf.

112.    So last year the Recreational Annual Catch Limit allowed for a 2-day consolidated open season off all four states, yet this year the Exempted Fishing Permits would

32

allow a 39-day open season off Florida and a 62-day open season off Georgia, South Carolina, and North Carolina.

113. There is no credible argument that red snapper landings under these extended open seasons will stay below the Recreational Annual Catch Limit. To the contrary, recreational landings under the Exempted Fishing Permits will exceed—many times over—the Recreational Annual Catch Limit.

114. NMFS effectively acknowledges as much in the Exempted Fishing Permits, as the agency purports to waive the application of 50 C.F.R. § 622.193(y), which is the regulatory provision implementing the statutory requirement for annual catch limits and accountability measures, with respect to South Atlantic red snapper.

115. The second factual consequence to note is that under NMFS's action, the South Atlantic red snapper stock will be subject to overfishing in 2026.

116. The Maximum Fishing Mortality Threshold is the level of fishing mortality above which overfishing occurs on a stock. *See* 50 C.F.R. § 600.310(e)(2)(i)(C). For South Atlantic red snapper, this level recently was reset to equal the fishing mortality rate that the stock had been experiencing in the most recent years of available data (i.e., 2021–2023). *See* 90 Fed. Reg. at 24,529 (Amendment 59 final rule); *see generally supra* ¶¶94–100 (describing Amendment 59 process).

117. What this means is that in recent years, the South Atlantic red snapper stock has been experiencing the exact maximum amount of fishing mortality that is possible without overfishing occurring. Phrased differently, it means that *any increase in fishing mortality at all*, relative to 2021–2023, constitutes overfishing for South Atlantic red snapper.

118. Fishing mortality is comprised of mortality from both landings and dead discards. As discussed above, the majority of South Atlantic red snapper fishing mortality comes from recreational dead discards that occur out of season (i.e., when the directed season is closed, and anglers are fishing for other species that co-occur with red snapper). *See generally* ¶¶85–98 (describing ongoing problem of dead discards). There is no reason to believe the per-day rate of these out-of-season dead discards will change, under NMFS's action. Nor is there any reason to believe that commercial landings or dead discards will change.

119. The only change that will occur under NMFS's action is that a certain number of closed-season days will be changed to open-season days, for the recreational sector.

120. The available evidence indicates—unsurprisingly—that this change leads to a substantial increase in the catch of red snapper per day. *See* Florida Fish & Wildlife Conservation Commission, FWC Atlantic Red Snapper EFP Project: Year 1, at 14 (Dec. 2025) (slides) (showing total landings plus discards increasing, when comparing a day of closed season to a day of open season for two different experimental fleets—and this being the case even without discounting discards by the discard mortality rate), *available at* https://safmc.net/wp-content/uploads/document-blocks/2025/12/16f50cc6-4af8-4263-8642-54c1d1ce307a-SG_A3a_EFP-Year-1-Update_SAFMC-December-2025.pdf.

121. So changing a number of closed-season days into open-season days, pursuant to the Exempted Fishing Permits, will result in a distinct increase in the total catch of South Atlantic red snapper. This, again, is unsurprising.

122. Because recreational catch will increase markedly under the extended open seasons, and South Atlantic red snapper already is at its maximum possible level of fishing mortality, there is no way to avoid the conclusion that overfishing will occur.

34

123.    The third factual consequence to understand is that with NMFS's action, the actual landings of South Atlantic red snapper in 2026 will diverge sharply from the governing allocation ratio.

124.    The allocation ratio for South Atlantic red snapper is 71.93% recreational, and 28.07% commercial. This ratio was established in 2012, through Amendment 12 to the Snapper-Grouper FMP. *See* South Atlantic Fishery Management Council, Comprehensive Annual Catch Limit (ACL) Amendment for the South Atlantic Region, at 53 (Table 2-23) (Oct. 2011), *available at* https://safmc.net/documents/comprehensive-annual-catch-limit-amendment-2012; *see also* 77 Fed. Reg. 15,916 (Mar. 16, 2012) (final rule).

125.    The commercial sector's share of the South Atlantic red snapper annual catch limit is 102,951 pounds, or approximately 11,202 fish. *See* 90 Fed. Reg. at 24,529 (allocating the red snapper annual catch limit to the sectors, according to the governing allocation ratio); *see also* 50 C.F.R. § 622.193(y) (codifying allocation of the red snapper annual catch limit).

126.    The commercial sector generally ends up landing its full annual catch limit of red snapper each year because NMFS tracks landings on an ongoing basis, and the agency closes the commercial season when that sector approaches its limit.

127.    Commercial management will proceed in the ordinary way for 2026, so there is no reason to expect commercial landings to overshoot or undershoot meaningfully the sector's allocation.

128.    The recreational sector's share of the South Atlantic red snapper annual catch limit is 22,797 fish, or approximately 263,815 pounds. *See* 90 Fed. Reg. at 24,529; 50 C.F.R. § 622.193(y)(2).

129. As noted above, under the Exempted Fishing Permits, the recreational sector in 2026 will wildly exceed its allocation of landings, as codified in the Recreational Annual Catch Limit.

130. Because of the sharp uptick in recreational landings in 2026, the actual allocation of South Atlantic red snapper for that year will skew heavily in favor of the recreational sector— far beyond that sector's 71.93% share under the governing allocation ratio.

**CLAIM FOR RELIEF:**
**DEFENDANTS LACK THE AUTHORITY TO ISSUE EXEMPTED**
**FISHING PERMITS FOR SOUTH ATLANTIC RED SNAPPER**
**THAT VIOLATE STATUTORY REQUIREMENTS AND/OR**
**DOING SO HERE WAS ARBITRARY AND CAPRICIOUS**

131. Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

132. The challenged agency action in this case is the Exempted Fishing Permits, which were issued on or about May 1, 2026.

133. This lawsuit was filed on May 5, 2026, rendering it timely under any relevant statute of limitations or repose.

134. Under the Exempted Fishing Permits, South Atlantic red snapper landings in 2026 will overshoot—likely many times over—the stock's annual catch limit.

135. The Magnuson-Stevens Act requires Defendants to manage all federal fisheries using "a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." 16 U.S.C. § 1853(a)(15).

136. Thus under the Exempted Fishing Permits, Defendants will be managing the fishery in direct conflict with the statutory requirement at 16 U.S.C. Section 1853(a)(15).

36

137.    Under the Exempted Fishing Permits, fishing mortality on South Atlantic red snapper in 2026 will exceed the threshold for overfishing by a substantial margin.

138.    The Magnuson-Stevens Act requires Defendants to prevent overfishing in all federal fisheries. 16 U.S.C. §§ 1851(a)(1), 1853(a)(1)(A).

139.    Thus under the Exempted Fishing Permits, Defendants will be managing the fishery in direct conflict with the statutory requirement at 16 U.S.C. Sections 1851(a)(1) and 1853(a)(1)(A) (and elsewhere, as the requirement to prevent overfishing is embedded throughout the Act).

140.    Under the Exempted Fishing Permits, the actual ratio of landings between the recreational sector and the commercial sector will depart significantly from the governing allocation ratio.

141.    The Magnuson-Stevens Act requires Defendants to acknowledge and analyze all allocations and reallocations, ensuring among other things that they are "fair and equitable." 16 U.S.C. § 1851(a)(4)(A). For this reason, unacknowledged, tacit, or de facto reallocations are not permitted under the Act. *See, e.g.*, *Guindon v. Pritzker*, 31 F. Supp. 3d 169, 200–01 (D.D.C. 2014).

142.    Thus under the Exempted Fishing Permits, Defendants will be managing the fishery in direct conflict with the statutory requirement at 16 U.S.C. Section 1851(a)(4) (and associated case law).

143.    Defendants do not have the power, under the Magnuson-Stevens Act, to waive application of statutory requirements to a fishery.

144.    Phrased differently, the Magnuson-Stevens Act does not allow Defendants to do anything through the challenged Exempted Fishing Permits that they would not be able to do otherwise in ordinary fishery management under the Act.

145.    Yet the Exempted Fishing Permits purport to allow the states to set recreational red snapper open seasons that NMFS itself never would be able to set, under the conservation requirements of the Act.

146.    Because Defendants lacked authority to issue the Exempted Fishing Permits, their actions were "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

147.    Alternatively, Defendants' actions in issuing the Exempted Fishing Permits were "arbitrary, capricious . . . or otherwise not in accordance with law." *Id.* § 706(2)(A).

148.    Commercial fishermen including Plaintiffs have suffered for years now under increasingly restrictive trip limits for red snapper, caused by the recreational sector's dead discards problem.

149.    By allowing an unprecedented binge of overfishing, the Exempted Fishing Permits will set back the red snapper stock's rebuilding progress. This will require Plaintiffs and other commercial fishermen to remain under restrictive trip limits for more years than otherwise would be the case. And that in turn will result in lower revenues and reduced viability for their fishing businesses.

150.    Plaintiffs have spent their lives on the water, and they care deeply about the health of our nation's oceans and natural resources. Defendants' action will damage the red snapper stock, resulting in a meaningful blow to Plaintiffs and commercial fishermen. The arbitrary harm inflicted on South Atlantic red snapper may not be restored in the lifetimes of some Plaintiffs,

and it undercuts their ability to pass the resource on in good condition to the next generation of fishermen.

151.    More broadly, commercial fishing has been severely marginalized in the South Atlantic region, and many snapper-grouper fishermen, buyers, and processors—including Plaintiffs—are barely getting by. Plaintiffs actively work to maintain the social fabric of the fishing industry, because they depend on it for safety, support, and community. Defendants' politically driven end-run around the Magnuson-Stevens Act, taken to benefit recreational fishing lobbyists, undermines the commercial fishing community that Plaintiffs and others work so hard to support.

152.    Remedial action from this Court, as requested below, will address these harms because it will prevent Defendants from breaking the law, damaging the red snapper resource, and further marginalizing Plaintiffs and other commercial fishermen.

153.    For these reasons, Defendants' legal violations will harm Plaintiffs, unless and until these violations are remedied by this Court.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully request that this Court:

1.    Stay the Exempted Fishing Permits pursuant to 5 U.S.C. § 705, and/or enjoin Defendants preliminarily to withdraw them pursuant to 16 U.S.C. § 1861(d)(1);

2.    Declare pursuant to 28 U.S.C. § 2201 that Defendants violated the APA as described above when they issued the Exempted Fishing Permits;

3.    Vacate and set aside the Exempted Fishing Permits pursuant to 5 U.S.C. § 706(2);

4.    Provide further injunctive relief as necessary to protect this Court's jurisdiction;

5.    Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 28 U.S.C.

§ 2412; and

6.    Provide Plaintiffs such additional and further relief as may be appropriate.

Dated:  May 5, 2026                          Respectfully submitted,

/s/ Seth Atkinson
Seth L. Atkinson (Bar ID CA00190)
Quillback Consulting
540 Meder Street
Santa Cruz, CA 95060
(203) 331-2792
seth@quillbackconsulting.com

*Attorney for Plaintiffs*