**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SOUTHEASTERN FISHERIES ASSOCIATION, INC., et al., | ) ) ) ) | |
| *Plaintiffs* | ) ) | |
| v. | ) ) | Case No. 26-cv-1533 |
| HOWARD LUTNICK, in his official capacity as Secretary of Commerce, et al., | ) ) ) | |
| *Defendants* | ) ) ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR STAY**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

STATUTORY AND REGULATORY CONTEXT ....................................................................2

I.      The Magnuson-Stevens Fishery Conservation and Management Act................................2

          A.     Annual Catch Limits and Accountability .................................................4

          B.     Experimental Permitting Process................................................................6

II.     The Administrative Procedure Act ...................................................................................7

FACTUAL CONTEXT ........................................................................................................8

I.      Early Years of Management and Stock Decline................................................................8

II.     Chronic Overfishing Driven by Recreational Dead Discards ...........................................9

III.    The Exempted Fishing Permits at Issue ........................................................................13

STANDARD OF REVIEW..................................................................................................16

ARGUMENT.....................................................................................................................18

I.      This Case Falls Outside 16 U.S.C. § 1855(f) and Proceeds Under Regular APA Judicial Review.........................................................................................................18

II.     Plaintiffs Are Likely to Succeed on the Merits ..............................................................23

          A.     The Record Reflects that Recreational Catch of South Atlantic Red Snapper Will Increase Dramatically Under the Exempted Fishing Permits.......................24

          B.     This Massive Increase in Recreational Catch Would Not Be Legal as an Ordinary Management Action Under the Magnuson-Stevens Act.......................28

               1.     The Exempted Fishing Permits Will Cause Overfishing..........................28

2.    The Exempted Fishing Permits Will Wildly Overshoot the
Stock's Annual Catch Limit .........................................................................30

3.    The Exempted Fishing Permits Will Create a De Facto
Reallocation ...................................................................................................31

C.    NMFS Has No Authority to Exempt Itself From the Substantive
Requirements of the Magnuson-Stevens Act ........................................................32

III.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief .....................................35

A.    Defendants' Action Will Inflict Unrecoverable Economic Losses
on Plaintiffs...............................................................................................................36

B.    Defendants' Action Will Harm the Red Snapper Stock, to Which
Plaintiffs Are Connected Through Livelihood and Way of Life............................37

C.    Defendants' Action Will Damage the Commercial Fishing Community,
Which Plaintiffs Actively Work to Maintain .........................................................40

IV.    The Balance of Equities and Public Interest Favor Injunctive Relief ...............................42

CONCLUSION .................................................................................................................................43

**INTRODUCTION**

This case challenges four permits issued by Defendants Howard Lutnick (in his official capacity as Secretary of Commerce) and National Marine Fisheries Service ("NMFS").

Defendants' permits will allow for a massive increase in recreational fishing effort for South Atlantic red snapper—causing overfishing, exceeding the stock's annual catch limit, and creating a de facto reallocation of harvest privileges. None of these are legal outcomes under the Magnuson-Stevens Act, 16 U.S.C. § 1801 *et seq.*

Because the action quite clearly would be illegal under the Act, Defendants have packaged it in the form of "exempted fishing permits," which they apparently believe provides an escape hatch from the substantive requirements of the Magnuson-Stevens Act.

The Act, however, does not authorize Defendants to exempt themselves from the statutory requirements in the Act. Congress did not provide such authority, and Defendants' "exempted fishing permits" are merely regulatory creations—based on the thinnest of statutory reeds, if anything at all.

At the end of the day, the Magnuson-Stevens Act does not allow Defendants to do anything through "exempted fishing permits" that they would not be able to do otherwise, in ordinary fishery management under the Act. Thus the challenged permits are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Alternatively, they are "arbitrary, capricious . . . or otherwise not in accordance with law" *id.* § 706(2)(A).

Plaintiffs Southeastern Fisheries Association, Inc., Slash Creek Waterworks, Inc., Strawberry, Inc., Jeffrey Oden, Jack Cox Jr., and Antonio Giambanco seek a preliminary

injunction or stay of the permits because absent such relief, starting less than two weeks from now an immense amount of fishing mortality will be inflicted on South Atlantic red snapper.

Overfishing and harming the red snapper stock will injure Plaintiffs and other commercial fishermen, who rely on healthy oceans and robust fish stocks for their way of life. The balancing of equities and public interest favor compliance with the law, and overall, preliminary relief is warranted.

## STATUTORY AND REGULATORY CONTEXT

### I.    The Magnuson-Stevens Fishery Conservation and Management Act

Congress enacted the Magnuson-Stevens Fishery Act in 1976, in order "to conserve and manage the fishery resources found off the coasts of the United States." 16 U.S.C. § 1801(b)(1). The Act asserts sole United States jurisdiction over, and sovereign rights to, all fish within the Exclusive Economic Zone ("EEZ")—an area commencing with the outside boundary of state waters, and extending to a line 200 nautical miles offshore of the United States. *Id.* §§ 1811(a), 1802(11); *see also* Presidential Proclamation 5030, 97 Stat. 1557 (Mar. 10, 1983).

To govern fishery resources in the newly-established federal waters, the Act established eight Regional Fishery Management Councils, each with a distinct geographical jurisdiction. *Id.* § 1852(a). One is the South Atlantic Fishery Management Council, which is charged with managing fisheries in the federal waters off North Carolina, South Carolina, Georgia, and the east coast of Florida. *Id.* § 1852(a)(1)(C).

Under the Act, the councils are tasked with preparing fishery management plans and amendments for each fishery within their geographic areas of authority, *id.* § 1852(h)(1), and with recommending regulations to implement such plans and amendments, *id.* § 1853(c). The Secretary of Commerce, acting through NMFS, reviews all submitted plans, plan amendments,

and regulations, *id.* § 1854(a)–(b), and upon approval, promulgates regulations and otherwise implements the plans and plan amendments, *id.* §§ 1854(b)(3), 1855(d).

All fishery management plans, plan amendments, and implementing regulations promulgated under the Act must be consistent with ten "National Standards" for fishery conservation and management. *Id.* § 1851(a).

National Standard 1 requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery . . . ." *Id.* § 1851(a)(1). Optimum yield is defined in the Act, *see id.* § 1802(33), but it is not relevant to the claims at issue in this case.

The Act defines the terms "overfishing" and "overfished" to mean "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." *Id.* § 1802(34). Regulatory guidelines promulgated by NMFS clarify that "overfishing" refers to the rate of removals from a fish stock (i.e., the act of fishing at an unsustainable rate), whereas "overfished" refers to when a stock's biomass or reproductive potential falls below the level at which it can produce maximum sustainable yield on a continuing basis (i.e., the state of being depleted). *See* 50 C.F.R. § 600.310(e)(2)(i).

National Standard 4 provides that "If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; [and] (B) reasonably calculated to promote conservation . . . ." 16 U.S.C. § 1851(a)(4). Other National Standards address science, efficiency, contingency planning, costs, fishing communities, bycatch, and safety of human life at sea. *Id.* § 1851(a)(2)–(3), (5)–(10).

In addition to the National Standards, the Magnuson-Stevens Act provides specific requirements applicable to all fishery management plans. One such requirement is to contain

3

management measures that are "necessary and appropriate for the conservation and management of the fishery to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(1)(A).

Another fishery management plan requirement is to "specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished (with an analysis of how the criteria were determined and the relationship of the criteria to the reproductive potential of stocks of fish in that fishery), and, in the case of a fishery which the Council or the Secretary has determined is approaching an overfished condition or is overfished, contain conservation and management measures to prevent overfishing or end overfishing and rebuild the fishery." *Id.* § 1853(a)(10).

Other fishery management plan requirements include assessing and specifying maximum sustainable yield and optimum yield, *id.* § 1853(a)(3), examining data needs and data collection requirements, *id.* § 1853(a)(5), and identifying essential fish habitat, *id.* § 1853(a).

## A.    Annual Catch Limits and Accountability

At the turn of the 21st Century, nearly thirty years into federal management, overfishing remained a problem in many fisheries. Even after Congress strengthened the Act's sustainability requirements in 1996—adding measures like mandatory rebuilding plans and habitat protection—NMFS and the Councils struggled with ending overfishing.

Congress responded in 2006, amending the Magnuson-Stevens Act to add a new requirement that fundamentally changed federal fisheries management: annual catch limits. All fishery management plans from that point forward were required to "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the

fishery, including measures to ensure accountability." Pub. L. No. 109–479, § 104(a)(10), 120 Stat. 3575, 3584 (Jan. 12, 2007), codified at 16 U.S.C. § 1853(a)(15).

Annual catch limits are numerical limits on the allowable catch for each fish stock, set every year at a level below the overfishing threshold. *See* 50 C.F.R. § 600.310(f)(1)(iii). The idea is to set a science-based limit on allowable catch ahead of time, and stay accountable to that limit. *See, e.g.*, S. Rep. No. 109–229, at 21 ("The Committee expects that if a sector is likely to exceed its annual catch limit, the Council will restrict that sector's harvest to ensure the sector stays within its annual catch limit."). This sounds simple, but it represented a radical change for many federal fisheries, which for decades had been managed with no meaningful accountability. *See, e.g.*, *id.* at 6-7.

This new requirement, and the accountability it created, was intended to finally operationalize the Act's long-standing mandate to prevent overfishing. Congress said as much directly in the text of the Act—because annual catch limits must be set "at a level such that overfishing does not occur." 16 U.S.C. § 1853(a)(15). Congress also made it clear through legislative history. *See, e.g.*, S. Rep. No. 109–229, at 6-7 (2006) (pointing out that "overfishing is still occurring in a number of fisheries, even those fisheries under a rebuilding plan," and stating "[t]he Committee intends that these annual catch limits, taken with the existing overfishing and rebuilding authorities, will ensure full compliance with the Magnuson-Stevens Act"); *accord* 50 C.F.R. § 600.310(f)(4)(i) (NMFS reiterating in regulatory guidelines that annual catch limits "must prevent overfishing" when measured against a stock's status determination criteria).

After 2006, overfishing rates across U.S. fisheries dropped significantly under the new annual catch limits mandate. As one court subsequently observed, the new legal mandate "fundamentally altered American fishing regulation by requiring [managers] to set hard, science-

5

based caps on how many fish could be caught each year and by demanding that accountability measures be triggered when fishermen exceeded those caps." *Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 254, 266 (D.D.C. 2014) (Boasberg, J.) (citations omitted).

## B.    Experimental Permitting Process

At roughly the other end of the importance spectrum, Congress also in the 2006 amendments instructed NMFS to establish and fund a "Cooperative Research and Management Program." 16 U.S.C. § 1867; *see* Pub. L. No. 109-479, § 204, 120 Stat. at 3614–15. In this section of the Act, Congress described the program to be established, and addressed eligibility, funding, and other similar topics. 16 U.S.C. § 1867(a)–(f). Congress also included a subsection instructing NMFS to create a standardized permitting process for experimental fishing permits:

> (d) EXPERIMENTAL PERMITTING PROCESS.—  . . . the Secretary, in consultation with the Councils, shall promulgate regulations that create an expedited, uniform, and regionally-based process to promote issuance, where practicable, of experimental fishing permits.

*Id.* § 1867(d).

In response to this instruction from Congress, NMFS revised its nationwide regulations regarding exempted fishing permits. *See* 72 Fed. Reg. 72,657 (Dec. 21, 2007) (proposed rule); 74 Fed. Reg. 42,786 (Aug. 25, 2009) (final rule), *codified at* 50 C.F.R. §§ 600.10, 600.745.

NMFS addressed Section 1867(d) in the rulemaking, interpreting it as a directive from Congress to update and clarify its existing procedures around scientific research, exempted fishing, and educational activities, in light of new conservation mandates that had been added to the law in 1996 and 2006. Specifically, Congress had enacted requirements to rebuild stocks, minimize bycatch, protect essential fish habitat, and use annual catch limits, and because "[t]hese new [conservation] requirements resulted in an increased interest in fisheries research," NMFS stated, an update to the regulations was needed. 72 Fed. Reg. at 72,657.

6

Among other things, NMFS in the rulemaking made changes to certain definitions at 50 C.F.R. § 600.10, and revised 50 C.F.R. § 600.745, which is the section of NMFS's nationwide regulations dealing with scientific research, exempted fishing, and educational activities. *See* 74 Fed. Reg. at 42,792–96.

The agency stated its belief that the term "experimental," which Congress had used in Section 1867, was synonymous with its own regulatory term "exempted":

> *Exempted or experimental fishing* means fishing from a vessel of the United States that involves activities otherwise prohibited by this chapter VI, but that are authorized under an exempted fishing permit (EFP). The regulations in § 600.745 refer exclusively to exempted fishing. References elsewhere in this chapter to experimental fishing mean exempted fishing under this part.

74 Fed. Reg. at 42,793, *codified at* 50 C.F.R. § 600.10 (italics in original).

NMFS further asserted that its concept of "exempted" fishing permits allowed for fishing activity "outside prescribed fishing regulations." 72 Fed. Reg. at 72,658. The agency did not address, however, what sort of fishery management regulations it believed could be waived through the use of its "exempted" fishing permit. *See id.* at 72,657–64 (proposed rule); 74 Fed. Reg. at 42,786–96 (final rule).

## II.    The Administrative Procedure Act

The APA provides a cause of action in judicial review for "[any] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. An "agency action" includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id*. § 551(13).

In reviewing agency actions under the APA, a court must examine whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), as well as whether it was taken "in excess of statutory jurisdiction, authority, or

7

limitations, or short of statutory right," *id.* § 706(2)(C). If so, the court must "hold unlawful and set aside [the] agency action. *Id.* § 706(2).

**FACTUAL CONTEXT**

Red snapper (*Lutjanus campechanus*) is a highly valued marine fish whose distribution in U.S. waters extends from the Gulf of Mexico to Cape Hatteras, North Carolina. Red snapper live on the continental shelf, with juveniles inhabiting shallow nearshore waters and adults occupying deeper areas of structured bottom. Individuals can live for over fifty years, and grow to a size of 40 inches and 50 pounds.

## I.    Early Years of Management and Stock Decline

Federal management of South Atlantic red snapper began in 1983, when NMFS approved the original Snapper-Grouper Fishery Management Plan. *See* South Atlantic Fishery Management Council, Fishery Management Plan, Regulatory Impact Review, and Final Environmental Impact Statement for the Snapper-Grouper Fishery of the South Atlantic Region, at 29-32 (Mar. 1983), *available at* https://safmc.net/documents/snapper-grouper-fishery-management-plan.

At that time, red snapper already was understood to be subject to overfishing (i.e., the rate of fishing was unsustainably high), so the original management plan provided a minimum size limit in an attempt to reduce mortality rates. *See id.* at vii-viii.

High landings continued through the 1980s, however, and the stock declined to a low population level by 1990. *See* Southeast Fisheries Science Center, Update of SEDAR 73 Assessment: Stock Assessment of Red Snapper off the Southeastern United States, at 72 (Dec. 2024) ("SEDAR 73 Update") (Figure 14) (Exhibit 17).

8

The South Atlantic Council and NMFS introduced further measures in 1991, and set a time period of 15 years for rebuilding—aiming to have red snapper at healthy levels by 2006. *See* South Atlantic Fishery Management Council, Final Amendment Number 4, Regulatory Impact Review, Initial Regulatory Flexibility Analysis and Environmental Assessment, at 10 (Apr. 1991), *available at* https://safmc.net/documents/snapper-grouper-amendment-4.

New management measures were introduced in the late 1990s, including an aggregate bag limit, limited entry commercial permits, and a commercial capacity reduction program— which required (and still requires today) a 2-for-1 exchange of permits any time a permit transfer is made. *See* South Atlantic Fishery Management Council, Final Amendment 8 to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region (July 1997), *available at* https://safmc.net/documents/snapper-grouper-amendment-8.

## II.    Chronic Overfishing Driven by Recreational Dead Discards

As the recreational sector steadily grew in the second half of the 20th Century, recreational catch became the primary driver of stock status for South Atlantic red snapper. Through the 1980s and 1990s catch was primarily in the form of landings; since then it has shifted to be predominately in the form of dead discards.

Discarding happens in the recreational fishery because even when the red snapper season is closed (i.e., red snapper cannot be landed), recreational anglers continue to fish for other species that co-occur with red snapper. As anglers send down hooks intended for other species, they bring up—and discard—somewhere in the range of hundreds of thousands to millions of red snapper each year. Some proportion of those discarded fish die, due to barotrauma, hooking, predation, or other reasons.

9

The dominance of recreational catch was noted as early as 2008, when NMFS conducted a new stock assessment for South Atlantic red snapper. The agency again found the stock subject to overfishing (i.e., fish were being removed from the population too rapidly) and overfished (i.e., the population size was too low). *See* Southeast Data, Assessment, and Review, SEDAR 15 Stock Assessment Report 1 (SAR 1): South Atlantic Red Snapper, Section I at 12 (Mar. 2009), *available at* https://sedarweb.org/documents/sedar-15-stock-assessment-report-south-atlantic-red-snapper. The new assessment noted that "[t]he bulk of landings of red snapper come from the recreational fishery, which have exceeded the landings of the commercial fishery by 2-3 fold over the assessment period." *Id.* It also noted that the existing 12-inch size limit was "believed to have caused an increase in discarding." *Id.*

Because the red snapper stock had failed to rebuild by its original target date, NMFS and the South Atlantic Council established a new rebuilding timeframe for red snapper of 35 years, meaning the rebuilding plan now would extend out to the year 2044. *See* 75 Fed. Reg. 76,874 (Dec. 9, 2010) (Amendment 17A final rule).

Several cycles of stock assessment went by, with each assessment finding South Atlantic red snapper to be overfished (i.e., population level too low) and subject to overfishing (i.e., rate of removal too high), followed by ineffectual management responses. *See, e.g.*, Southeast Data, Assessment, and Review, SEDAR 24 Stock Assessment Report: South Atlantic Red Snapper, Section I at 11, 15 (Oct. 2010) (noting that "[r]ecreational fleets dominate the total [fishing mortality]" for red snapper, and dead discards comprised a significant portion of total catch in recent years), *available at* https://sedarweb.org/documents/sedar-24-stock-assessment-report-south-atlantic-red-snapper; Southeast Data, Assessment, and Review, SEDAR 41 Stock Assessment Report Revision 1: South Atlantic Red Snapper, Section VII (Apr. 2017) (same),

*available at* https://sedarweb.org/documents/sedar-41-stock-assessment-report-south-atlantic-red-snapper-revision-1-april-2017; *see also* 82 Fed. Reg. 18,434 (Apr. 19, 2017) (status determination notice).

By this point it was well-understood that "the majority of the estimated fishing mortality [for red snapper] occurred from estimated dead discards." 82 Fed. Reg. 50,839, 50,840 (Nov. 2, 2017) (temporary rule for 2017 season); *see also* 82 Fed. Reg. 1720, 1720 (Jan. 6, 2017) (notice of intent to prepare EIS) ("Discard mortality, particularly from the recreational sector, continues to be a significant source of overall mortality for red snapper."); 83 Fed. Reg. 22,938, 22,939 (May 17, 2018) (Amendment 43 proposed rule) ("[M]ost of the catch is now discarded . . . ."); 83 Fed. Reg. 35,428, 35,428 (July 26, 2018) (Amendment 43 final rule) ("[A] large majority of the estimated fishing mortality was attributed to very large and uncertain dead discard estimates . . . ."); South Atlantic Fishery Management Council, Amendment 43 to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region, at D-1 (Nov. 20, 2017) ("Since 2010, estimates of dead discards have accounted for most of the total removals (92%), likely a result of incidental catch of red snapper while fishermen targeted co-occurring species."), *available at* https://safmc.net/documents/snapper-grouper-amendment-43.

In 2021, another stock assessment was completed for South Atlantic red snapper, which—yet again—found red snapper to be subject to overfishing (i.e., fish were being killed too rapidly) and overfished (i.e., the spawning stock biomass was too low). *See* Southeast Data, Assessment, and Review, SEDAR 73 Stock Assessment Report: South Atlantic Red Snapper, at Section II Page 10 (Mar. 2021) (noting "the primary driver of overfishing is recreational discards," while also observing progress toward rebuilding spawning stock biomass due to higher than expected recruitment), *available at* https://sedarweb.org/documents/sedar-73-stock-

11

assessment-report-south-atlantic-red-snapper; *see also id.* at 64, 66 (Tables 20, 22) (showing that in the terminal years of the assessment (2017–2019), an average of 85% of catch by weight came in the form of dead discards).

And most recently, at the end of 2024, NMFS conducted a stock assessment update. The update once again showed South Atlantic red snapper to be subject to overfishing and overfished. *See* SEDAR 73 Update, at 8 (Exhibit 17). Again, the vast majority of fishing mortality was coming from dead discards. *See* 90 Fed. Reg. 24,527, 24,528 (Amendment 59 final rule) ("The primary driver of overfishing remains general recreational discards."); *id.* ("Most of the red snapper fishing mortality is attributed to dead discards in the recreational sector.").

Concurrent with the SEDAR 73 Update, NMFS issued a secretarial amendment to the Snapper-Grouper Fishery Management Plan intended to end overfishing. *See* National Marine Fisheries Service, Amendment 59 to the Fishery Management Plan for the Snapper-Grouper Fishery of the South Atlantic Region (May 15, 2025) ("Amendment 59") (Exhibit 18). In the amendment, NMFS made a minor adjustment to the red snapper annual catch limit but did nothing to address the problem of recreational dead discards. The agency initially proposed a time/area closure that would have meaningfully reduced dead discards, but abandoned the plan under extreme political pressure. *See* 90 Fed. Reg. at 24,531 ("NMFS decided to remove these actions from further consideration in the amendment.").

Rather than deal with the problem, NMFS changed the reference point that defines overfishing for South Atlantic red snapper. Specifically, Amendment 59 raised the proxy for the fishing rate at maximum sustainable yield ($F_{MSY}$), which serves as the overfishing threshold, to a value that happened to match the most recently-observed level of fishing mortality. *See id.* at 24,529 (explaining that the new $F_{MSY}$ proxy "would be $F_{2021–2023}$ [i.e., the level of fishing

mortality that occurred during the years 2021–2023], and the red snapper stock would no longer be classified as undergoing overfishing ($F_{CURRENT}/F_{2021–2023} = 1.0$)").

### III.    The Exempted Fishing Permits at Issue

Having successfully avoided accountability for the ongoing dead discard problem, recreational advocacy groups began meeting with state agencies and supportive members of Congress, with a new goal: increasing the amount of red snapper landings available to the recreational sector. *See, e.g.*, North Carolina Division of Marine Fisheries, Application for Exempted Fishing Permit, at PDF 4 (Jan. 23, 2026) ("North Carolina Application") (Exhibit 9) (describing process in which "recreational angler groups reached out to the South Atlantic states"); South Carolina Department of Natural Resources, Application for Exempted Fishing Permit, at PDF 5 (Jan. 23, 2026) ("South Carolina Application") (Exhibit 8) ("These [Exempted Fishing Permit] applications are the result of numerous meetings between July 2024 and August 2025 between the South Atlantic states and recreational fishing interest groups . . . .").

Eventually the state agencies, advocacy groups, and elected officials converged on an plan, which was to ask NMFS for a huge increase in recreational open season days for South Atlantic red snapper, combined with various "test[s]" of recreational data collection approaches. North Carolina Application, at PDF 4 (Exhibit 9); *see also* Georgia Department of Natural Resources, Application for Exempted Fishing Permit, at 2 (Jan. 23, 2026) ("Georgia Application") (Exhibit 7) (similar); Florida Fish & Wildlife Conservation Commission, Application for Exempted Fishing Permit, at 2–3 (Jan. 23, 2026) ("Florida Application") (Exhibit 6) (offering to "test two methods for use in recreational data collection," including one already-used method and one voluntary reporting method).

Major recreational fishing corporations also apparently were involved, volunteering to underwrite the effort. *See, e.g.*, North Carolina Division of Marine Fisheries, Press Release: North Carolina Recreational Red Snapper Season Will Open for 62 Days (May 4, 2026) (noting Yamaha Motors sponsorship), *available at* https://www.deq.nc.gov/news/press-releases/2026/05/04/north-carolina-recreational-red-snapper-season-will-open-62-days; Georgia Department of Natural Resources, Press Release: NOAA Approves Red Snapper EFP, Two-Month Season Set for 2026 (May 1, 2026) (same, including quote from a Yamaha executive), *available at* https://gadnr.org/News/260501RedSnapper.

The key to this plan was getting NMFS to implement the proposals via exempted fishing permits, thereby avoiding the usual council-based management process under the Magnuson-Stevens Act. Not only were the advocacy groups and their allies unlikely to secure South Atlantic Council approval for their proposals, but they also were asking for far more recreational fishing for red snapper than would be allowed under the Act, given that the stock remains just on the edge of being subject to overfishing.

The states initially submitted their applications for exempted fishing permits to NMFS in late 2025, and after minor revisions, re-submitted them to the agency on January 23, 2026. The agency subsequently published them in the Federal Register for public comment. *See* 91 Fed. Reg. 6827 (Feb. 13, 2026).

Finally, as requested, NMFS issued exempted fishing permits to each of the four South Atlantic states, allowing for dramatic increases in the recreational open season for red snapper:

- NMFS issued an exempted fishing permit to Florida, allowing the state to set a 39-day open season for recreational red snapper fishing in federal waters off Florida, starting on May 22, 2026. *See* National Marine Fisheries Service, Permit No. 26-

14

SERO-01: Exempted Fishing Permit to Test a State-Based Data Collection and Management System for the Recreational Harvest of Red Snapper off Florida for 2026 (May 1, 2026) ("Florida Permit") (Exhibit 1).

- NMFS issued an exempted fishing permit to Georgia, allowing the state to set a 62-day open season for recreational red snapper in federal waters off Georgia, starting on July 1, 2026. *See* National Marine Fisheries Service, Permit No. 26-SERO-02: Exempted Fishing Permit to Test a State-Based Data Collection and Management System for the Recreational Harvest of Red Snapper off Georgia for 2026 (May 5, 2026) ("Georgia Permit") (Exhibit 2).

- NMFS issued an exempted fishing permit to South Carolina, allowing the state to set a 62-day open season for recreational red snapper in federal waters off South Carolina, starting on July 1, 2026. *See* National Marine Fisheries Service, Permit No. 26-SERO-03: Exempted Fishing Permit to Test a State-Based Data Collection and Management System for the Recreational Harvest of Red Snapper off South Carolina for 2026 (May 4, 2026) ("South Carolina Permit") (Exhibit 3).

- NMFS issued an exempted fishing permit to North Carolina, allowing the state to set a 62-day open season for recreational red snapper in federal waters off North Carolina, starting on July 1, 2026. *See* National Marine Fisheries Service, Permit No. 26-SERO-04: Exempted Fishing Permit to Test a State-Based Data Collection and Management System for the Recreational Harvest of Red Snapper off North Carolina for 2026 (May 5, 2026) ("North Carolina Permit") (Exhibit 4).

These permits collectively are referred to herein as the (capitalized) "Exempted Fishing Permits." They are the subject of challenge in this lawsuit.

15

## STANDARD OF REVIEW

"A party seeking a preliminary injunction must make a clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (cleaned up). *See also Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20–22 (2008). In cases where preliminary relief is sought against the government, "the last two factors merge" because "the government's interest is the public interest." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (cleaned up). *See also Nken v. Holder*, 556 U.S. 418, 435 (2009) (same).

"The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (Howell, J.) (citations omitted). *See also Save Long Beach Isl. v. Dep't of Commerce*, No. 25-cv-2214-CJN, Slip Op. at 5–6 (D.D.C. Oct. 24, 2025) (Nichols, J.) (same).

Preliminary relief often is described as an "extraordinary" remedy, and as such, a plaintiff "must make a 'clear showing' that [the] four factors, taken together, warrant relief. *Pursuing Am. Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016) (quoting *Winter*, 555 U.S. at 20, 22).

To the extent a district court consolidates a motion for preliminary relief with the merits under Federal Rule of Civil Procedure 65(a)(2), the court generally converts the plaintiff's motion into a motion for summary judgment. *See, e.g.*, *Home Care Ass'n of Am. v. Weil*, 78 F. Supp. 3d 123, 124 (D.D.C. 2015) (Leon, J.) (consolidating motion for preliminary injunction with merits, and "construing plaintiffs' emergency motion as a motion for summary judgment on the merits"); *Ark Initiative v. Tidwell*, 895 F. Supp. 230, 233 (D.D.C. 2012) (Boasberg, J.) ("[T]he Court consolidated the preliminary-injunction hearing with a hearing on the merits,

16

making Plaintiffs' Motion for a Preliminary Injunction akin to a motion for summary judgment.").

In this situation, the equitable factors drop out and the only thing to analyze is actual success on the merits (rather than likelihood of success). *See, e.g.*, *Norwich Pharm., Inc. v. Becerra*, 703 F. Supp. 3d 1, 18 (D.D.C. 2023) (Moss, J.) (observing that upon consolidation, "the Court need not pause to consider [the plaintiff's] likelihood of success on the merits or any of the other preliminary injunction factors"); *PhRMA v. Dep't Health & Human Servs.*, 43 F. Supp. 3d 28, 34 (D.D.C. 2014) (Contreras, J.) (noting when court decides merits directly under Rule 65(a)(2), "it need not decide the preliminary injunction").

Summary judgment in the APA context means "the district court [is] sit[ting] as an appellate tribunal, to decide as a matter of law whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Norwich Pharm.*, 703 F. Supp. 3d at 14 (cleaned up). *See also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (similar).

The APA standard of review is familiar. An agency action violates Section 706(2)(A) "if [it] has . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And an agency action violates Section 706(2)(C) if the underlying statute, properly construed, does not authorize the

challenged action. *See, e.g.*, *Am. Fed. Gov't Empls. v. Shinseki*, 709 F.3d 29 (D.C. Cir. 2013); *Cmty. Health Sys., Inc. v. Burwell*, 113 F. Supp. 3d 197 (D.D.C. 2015).[1]

When, as in this case, the primary issue is whether the agency had authority to take the challenged action, the inquiry is one of direct statutory interpretation. *See, e.g.*, *Am. Fed'n of Gov't Emps. v. Shinseki*, 709 F.3d 29, 33 (D.C. Cir. 2013) (noting, in 706(2)(C) case, "[a]s always, we begin with the text of the statute"); *PhRMA v. FTC*, 44 F.Supp.3d 95, 111–12 (D.D.C. 2014) (Howell, J.) ("[T]he court applies the traditional tools of statutory construction." (internal quotation omitted)). No particular deference is given to the agency's view of the statute; the court "must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).

## ARGUMENT

### I.    This Case Falls Outside 16 U.S.C. § 1855(f) and Proceeds Under Regular APA Judicial Review

The first matter to address is why the prohibition on preliminary relief in 16 U.S.C. Section 1855(f) does not apply to this case—because if it did, it would bar Plaintiffs' request for an injunction or stay of the Exempted Fishing Permits. For the reasons that follow, Plaintiffs' challenge to the Exempted Fishing Permits rests on an ordinary APA cause of action (and its associated procedures, including preliminary relief) rather than on the specific judicial review provisions at Section 1855(f).

The APA allows review of all "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704. This "embodies the basic presumption of judicial review" being

---

[1] There is some overlap between these two prongs of APA review. *See, e.g.*, *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) ("In the absence of statutory authorization for its act, an agency's action is plainly contrary to law and cannot stand.").

available. *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967); *see also Bowen Labs. v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986) ("We begin with the strong presumption that Congress intends judicial review of administrative action.").

From this default position, Congress can modify or withdraw the availability of judicial review via legislation. *See id.* at 672–73 (noting "Congress can, of course, make exceptions" to the general baseline that APA review is available); 5 U.S.C. § 701(a)(1) (confirming APA review is not available where other statute has specifically "preclude[d] judicial review").

Such withdrawals and modifications, however, are construed narrowly. The Supreme Court has admonished that " 'only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review.'" *Id.* at 671 (quoting *Abbott Labs.*, 387 U.S. at 141 (further internal quotation omitted)). What this means is that under a statutory scheme, even when Congress has weighed in specifically—perhaps narrowing the scope of judicial review in certain areas, and expressly precluding it in others—the general assumption is that APA review remains available for all other unaddressed situations. *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 175 (1997) (dismissing notion that specific provisions for review provided by Endangered Species Act "are exclusive, supplanting those provided by the APA"); *Bowen Labs.*, 476 U.S. at 674 ("As a general matter, '[t]he mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others. The right to review is too important to be excluded on such slender and indeterminate evidence of legislative intent.'" (quoting *Abbott Labs.*, 387 U.S. at 141 (further quotation omitted))).

The Magnuson-Stevens Act expressly provides for judicial review of "regulations promulgated" under the Act and "actions that are taken" under fishery management plan regulations. 16 U.S.C. § 1855(f). In those defined situations, a tailored form of judicial review

applies, rather than general APA review. Specifically, Congress added a 30-day statute of repose,

provided for expedition upon request, removed the ability of litigants to request preliminary

relief, and narrowed the grounds for review:

> (1) *Regulations promulgated by the Secretary* under this Act and actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, [the APA], if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable; except that—
>> (A) section 705 of such title is not applicable, and
>> (B) the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of such title.
>
> (2) The actions referred to in paragraph (1) are *actions that are taken by the Secretary under regulations which implement a fishery management plan*, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing.
>
> . . .
>
> (4) Upon a motion by the person who files a petition under this subsection, the appropriate court shall assign the matter for hearing at the earliest possible date and shall expedite the matter in every possible way.

16 U.S.C. § 1855(f) (emphasis added). *See also Blue Water Fishermen's Ass'n v. Nat'l Marine

Fisheries Serv.*, 158 F. Supp. 2d 118, 124 (D. Mass. 2001) (noting Section 1855(f) "trades

preliminary relief for expedited review").

As indicated by the italicized text in paragraphs (1) and (2) above, however, Section

1855(f) only covers judicial review of regulations and actions taken under regulations that

implement a fishery management plan. It does not address judicial review of other types of final

agency action arising under the Magnuson-Stevens Act, such as agency inaction, or actions taken

under non-fishery-management-plan authority. *See, e.g.*, *Kapa'a v. Trump*, No. 25-cv-209-

MWJS-WRP, Slip Op. at 23 (D. Haw. Aug. 8, 2025) (examining challenged action in that case,

noting it was "neither a 'promulgated' regulation nor an action taken under one," and concluding

it was not within the terms of Section 1855(f)).

The scope and contents of Section 1855(f) make sense in terms of the overall statutory framework. The Magnuson-Stevens Act establishes a comprehensive system for management of fishery resources in federal waters. The starting point is fishery management councils, which act as first movers in the regulatory process, and each of which has a distinct geographic jurisdiction. *See* 16 U.S.C. § 1852. The councils prepare fishery management plans, *id.* § 1852(h)(1), which serve as the focal point for policy decisions made in each fishery, and are subject to specific statutory requirements. *Id*. § 1853(a). The councils also recommend implementing regulations for the fishery management plans, *id.* § 1853(c), which are the critical "rubber meets the road" decision points for management. The agency is relegated to being just another participant on the councils, *see id.* § 1852(b)(1)(B), and is fairly restricted in its ability to overturn or reshape council management decisions, *id.* § 1854(a)–(b).

Structurally, the councils are designed as funnels—gathering all the relevant stakeholders and pulling them into a single forum where disagreements can be hammered out and decisions eventually get made. *See id.* § 1852(b) (broad membership); *id.* § 1852(g) (advisory bodies). If you want to be heard and affect federal fishery management decisions, Congress wanted you to show up at a council. There is no provision for substantive decisions to be made outside the councils, nor any real alternate procedure through which management occurs, aside from a few narrow situations. *See, e.g., id.* § 1854(c) (secretarial amendments when council fails to act); *id.* § 1855(c) (emergency/interim actions by secretary); *id.* § 1852(a)(3) (highly migratory species).

The judicial review provision at Section 1855(f) serves to reinforce this funneling effect. Once everyone has showed up at the council, has argued and collaborated and lobbied each other to the point of exhaustion, and a decision finally has been made, Congress intended for that decision to stick. Thus a 30-day statute of repose for all regulations and actions taken under

21

regulations implementing a fishery management plan. *Id.* § 1855(f)(1). And express provision for expediting cases through the courts, if someone does file suit within 30 days. *Id.* § 1855(f)(4). And no injunctions in the meantime: the council's decision is presumed to hold, unless and until a court definitively finds it illegal. *Id.* § 1855(f)(1)(A); *see also Kapa'a v. Trump*, No. 25-cv-209-MWJS-WRP, Slip Op. at 24 n.5 (noting "[Section] 1855(f) and its restrictions apply only to *promulgated* regulations [and implementing actions], given the 'highly detailed and public process leading up' to their adoption." (emphasis in original) (quoting *Turtle Island Restoration Network v. Dep't of Commerce*, 438 F.3d 937, 947–48 (9th Cir. 2006))).

In this lawsuit, Plaintiffs challenge final agency actions[2] styled as "exempted fishing permits." These actions do not match the structural purpose of Section 1855(f). They are not decisions hammered out in the broad forum of a council. They are unilateral actions taken by NMFS outside the normal course of management, with only cursory public comment. Nothing about this type of action suggests a need to curtail judicial review, in order to ensure the integrity of the council process. If anything the opposite is true, insofar as these permits are an end-run around the council process, intentionally taken to avoid scrutiny. Thus the structural rationale for tightened judicial review, embodied in Section 1855(f), simply does not apply here.

Nor does the challenged action in this case fit within the text of Section 1855(f). The Exempted Fishing Permits plainly are not "[r]egulations promulgated by the Secretary under this Act." *Id.* § 1855(f)(1). Nor are they "actions that are taken by the Secretary under regulations which implement a fishery management plan." *Id.* § 1855(f)(2). On their face, the Exempted Fishing Permits are issued under the authority of general nationwide regulations promulgated by

---

[2] *See* 50 C.F.R. 600.745(b)(3)(iv) ("The decision of a Regional Administrator or Director to grant or deny an [exempted fishing permit] is the final action of NMFS.").

NMFS, located at 50 C.F.R. § 600.745(b). *See, e.g.*, Florida Permit, at 1 (Exhibit 1) (stating NMFS "issues this exempted fishing permit" "in accordance with procedures established at 50 CFR 600.745(b)"). They are not actions taken under the authority of Snapper-Grouper Fishery Management Plan regulations—which can be found elsewhere, at 50 C.F.R. Part 622, Subpart I (i.e., sections 622.170 to 622.194).

Thus neither the statutory text nor the structural purpose of Section 1855(f) apply to Plaintiffs' challenge to the Exempted Fishing Permits. That provision does not govern, and the case proceeds under ordinary APA review. *See, e.g.*, *Abbott Labs.*, 387 U.S. at 141 ("The mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others." (internal quotation omitted)); *see also N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 21 (D.C. Cir. 2008) (noting, with respect to an action by NMFS falling outside the scope of Section 1855(f), that "APA review would appear to suffice"); *Kapa'a v. Trump*, No. 25-cv-209-MWJS-WRP, Slip Op. at 24 ("The fact that § 1855(f) is inapplicable here, however, does not mean that no judicial review is available for Plaintiffs' Magnuson Act claim. Even when § 1855(f) does not apply, judicial review of a Magnuson Act claim may be available under the APA, which authorizes judicial review of final agency action for which there is no other adequate remedy in a court." (cleaned up)).

## II.    Plaintiffs Are Likely to Succeed on the Merits

"A plaintiff's likelihood of success is the 'most important factor' in determining whether preliminary injunctive relief is warranted." *Am. First Legal Found. v. Becerra*, No. 24-cv-1092-RC, at 8 (D.D.C. Aug. 9, 2024) (Contreras, J.) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)). This factor strongly favors Plaintiffs.

### A. The Record Reflects that Recreational Catch of South Atlantic Red Snapper Will Increase Dramatically Under the Exempted Fishing Permits

In recent years, the recreational open season for South Atlantic red snapper has been in the range of 1–3 days. Last year, it was 2 days. *See* 90 Fed. Reg. at 24,530 (Amendment 59 final rule). Under the Exempted Fishing Permits, by contrast, this year it will be 39 days off Florida and 62 days off the other states. *See* Florida Permit (Exhibit 1); Georgia Permit (Exhibit 2); South Carolina Permit (Exhibit 3); North Carolina Permit (Exhibit 4).

More recreational red snapper catch will occur under a 39-day and 62-day open season than under a 2-day open season. This is not a difficult conclusion to reach. Given that this year's season will be nearly twenty times as long off Florida, and over thirty times as long off the other states, a lot more red snapper will be caught than last year.

NMFS has not disputed this conclusion (as discussed further below), so it may be enough to rest on the common-sense observation that a longer open season means more catch. If more detail is needed, however, the record contains ample support.

Last year, in Florida alone around 25,000 red snapper were landed during the 2-day open season. *See* Ellie Corbett & Chloe Ramsay, Florida Fish & Wildlife Conservation Commission, Recreational Effort, Catch, and Biological Sampling in Florida During the 2025 South Atlantic Red Snapper Season, F-5573-23-F2, at 7, 14 (Dec. 3, 2025) (Exhibit 15) (estimating 24,888 fish landed by private angler and charter components in Florida in 2025, with headboat landings yet to be counted).

Applying this rate—roughly 12,500 fish per day—to the 39-day recreational season this year would end up with an estimate of around 487,500 landed red snapper for 2026. *See, e.g.*, Letter from Meredith Moore and Catherine Bruger, Ocean Conservancy, to Mary Vara, NMFS, at 3–4 (Mar. 10, 2026) (Exhibit 11) ("Ocean Conservancy Letter") (making same observation).

24

This equation—number of days times prior year's landing-rate—is NMFS's ordinary method for estimating season length. *See, e.g.*, Amendment 59, at E-10 (Table 9) (Exhibit 18).

The states, in their application materials for the Exempted Fishing Permits, hypothesize that per-day landing rates will decrease if the total red snapper season length is increased. *See, e.g.*, Florida Application, at 8 (Exhibit 6). This kind of effort decompression has been observed in some recreational fisheries, and the states cite two published studies from the Gulf of Mexico in support.[3]

There are reasons to doubt effort decompression will apply to an equal degree in the South Atlantic compared to the Gulf, *see* Ocean Conservancy Letter, at 5 (Exhibit 11), and NMFS has not examined or endorsed the theory. But even if it did apply to an exactly equal degree, South Atlantic recreational red snapper landings in 2026 still would end up being around 170,000 fish.[4]

That number—170,000 landed red snapper—essentially represents the smallest possible amount of landings that the record would support, and it still involves nearly a seven-fold increase in recreational red snapper landings compared to 2025. The prior number—487,500 landed red snapper—is more or less the other end of the range of values that the record would

---

[3] Tara S. Topping et al., A Comparison of Private Recreational Fishing Harvest and Effort for Gulf of Mexico Red Snapper During Derby and Extended Federal Seasons and Implications for Future Management, 39 N. Am. J. Fisheries Mgmt. 1311 (2019) (Exhibit 14); Sean P. Powers & Kevin Anson, Compression and Relaxation of Fishing Effort in Response to Changes in the Length of Fishing Season for Red Snapper (*Lutjanus campechanus*) in the Northern Gulf of Mexico, 117 Fishery Bull. 1 (2018) (Exhibit 13).

[4] The two Gulf studies showed reductions in landing rates to around 35% and 45%, respectively, of the prior compressed-season rates. Applying the best-case value of 35% would yield a 2026 landings rate of around 4,400 red snapper per day in Florida alone. Over the 39-day Florida season (ignoring wholly the other states) this results in around 170,000 landed fish. *See also* Ocean Conservancy Letter, at 5–6, (Exhibit 11) (same analysis).

support, and it involves a nearly twenty-fold increase in recreational red snapper landings compared to 2025.

Turning to total catch, which is the combination of landings and dead discards, the record reflects a substantial increase under the Exempted Fishing Permits. Given the very large increase in landings just noted, the only way total catch could avoid going up under the Exempted Fishing Permits would be if there were a very large offsetting decrease in dead discards of red snapper. There is little evidence in the record on this subject, but what evidence does exist refutes that notion.

Florida's wildlife agency in recent years has conducted a few small-scale experiments to examine how recreational landings and discards of red snapper change, in the transition between closed season and open season. The agency presented their results to NMFS and the South Atlantic Council a few months back, and the relevant slide is below:



Florida Fish and Wildlife Conservation Commission, FWC Atlantic Red Snapper EFP Project: Year 1, at 14 (Dec. 2025) (slides) (Exhibit 16). On each side, the control represents closed season and experimental represents open season. Light blue "harvest" bars are landings.

Without getting too far into the details,[5] the significance of these data is that not nearly enough dead discards will be reduced, to offset the increase in landings. *See, e.g.*, Ocean Conservancy Letter, at 7–8 (Exhibit 11) (discussing charts); *see also* Letter from Seth Atkinson, o/b/o Slash Creek Waterworks, to Mary Vara, NMFS, at 2–3 (Mar. 10, 2026) ("Slash Creek Letter") (Exhibit 12) (briefly doing the same).

Thus the only evidence in the record suggests that any reduction in dead discards will be very modest, and will not come anywhere close to offsetting the large increase in landings under the Exempted Fishing Permits. Total catch, accordingly, can be expected to increase significantly.

One further point bears mentioning. During the public comment period, NMFS was presented with credible analysis on this precise topic: that red snapper landings and total catch would increase substantially under the Exempted Fishing Permits. *See, e.g.*, Ocean Conservancy Letter, at 3–8 (Exhibit 11); Slash Creek Letter, at 1–3 (Exhibit 12). In response, the agency declined to provide *any contrary analysis or refutation*. To the extent NMFS even got close to the issue, it was simply to note—without endorsing—some bald assertions that the states had made in their application packets:

> The proposed [Exempted Fishing Permit] applications state that the projects will not increase fishing mortality because recreational effort for snapper-grouper species already occurs year-round regardless of season length. The applicants cite

---

[5] The main detail is that discards in the charts above are both live and dead. All of the dark blue bars must be reduced to around a quarter (23%) of the sizes shown above, in order to reflect dead discards. When this is done, the change from closed season to open season is accompanied by a much more dramatic increase in total catch.

> past research, as well as state management of red snapper in the Gulf of America, which indicate that extended fishing seasons reduce overall fishing effort by preventing the "derby-style" effort compression seen in shorter fishing seasons. Therefore, *the applicants determined* that the projects are not expected to result in increased effort or fishing mortality to harvest red snapper in the South Atlantic, and that, if there were impacts, they would be minimal and not result in significant effects to the red snapper stock or to the snapper-grouper fishery as a whole.

Noah Silverman, Categorical Exclusion (CE) Memorandum for Four Exempted Fishing Permit (EFP) Applications for the Recreational Harvest of South Atlantic Red Snapper in 2026 (RIN 0648-XF539), at 2–3 (Apr. 30, 2026) (Exhibit 5) ("Categorical Exclusion Memo") (emphasis added). This is a startling abdication, which is made even worse by the fact that the states themselves refused to provide any estimate of how many red snapper would be caught under their proposed open seasons.[6]

So the record is clear that a very large increase in recreational red snapper landings will occur under the Exempted Fishing Permits, along with a similarly large increase in total catch, and the agency has not attempted to establish any contrary factual position.

**B.      This Massive Increase in Recreational Catch Would Not Be Legal as an Ordinary Management Action Under the Magnuson-Stevens Act**

**1.      The Exempted Fishing Permits Will Cause Overfishing**

On both overfishing (this section) and annual catch limits (the following section), the dynamic is the same. NMFS already is pressed up against the relevant limit, under status quo management, and the Exempted Fishing Permits will substantially increase both fishing mortality and catch—pushing the stock over its overfishing threshold and annual catch limit, respectively.

---

[6] *See, e.g.*, Florida Application, at 3 (Exhibit 6) (agency staff noting no numerical estimate would be provided); *id.* at PDF 2 (political appointee railing against the very idea of estimating how many fish would be landed under the requested permit).

The overfishing threshold for South Atlantic red snapper was revised most recently in Amendment 59. There, NMFS defined the proxy for fishing mortality at maximum sustainable yield (i.e., the $F_{MSY}$ proxy), which functions as the overfishing threshold, as being the fishing mortality rate experienced by the stock during the 2021–2023 period (i.e., $F_{2021-2023}$). *See* 90 Fed. Reg. at 24,529 (Amendment 59 final rule). The threshold was quantified in the SEDAR 73 Update assessment as a fishing mortality rate of 0.34. *See* SEDAR 73 Update, at 17 (Exhibit 17).

While this sounds technical, the consequence is simple: overfishing will occur if the fishing mortality rate increases at all, relative to the 2021–2023 period. That period represents the status quo; it is the most recent three-year period for which information is available in the latest stock assessment. *See* SEDAR 73 Update, at 29 (Exhibit 17). In short, the stock currently is taking as much fishing mortality as it can handle, and any further increase will push it into overfishing territory.

The Exempted Fishing Permits will cause fishing mortality to increase. Fishing mortality is comprised of mortality from both landings and dead discards, and each of those can be broken down further into commercial and recreational components. Commercial landings and dead discards are not expected to change in 2026, as the commercial sector will operate under status quo management. Recreational landings will skyrocket under the Exempted Fishing Permits, as discussed above, and dead discards will not decrease anywhere near enough to offset the increased landings. *See supra* pages 24–28. Thus fishing mortality on the stock will go up.

Because fishing mortality will increase, and the stock already is at its overfishing threshold, the result will be overfishing. Public comments clearly articulated this conclusion to NMFS—overfishing will occur—but the agency has no substantive rebuttal. *Compare, e.g.*,

29

Ocean Conservancy Letter, at 8–10 (Exhibit 11), *and* Slash Creek Letter, at 2–3 (Exhibit 12), *with* Categorical Exclusion Memo, at 2–3 (Exhibit 5).

Overfishing is prohibited under National Standard 1 of the Act. *See* 16 U.S.C. § 1851(a)(1). Other provisions tie in and reinforce the prohibition. *See, e.g.*, *id.* §§ 1853(a)(1)(A), (a)(10), 1854(e), 1855(c). Overfishing is not negotiable; the central purpose of the Act is to ensure sustainable management of our nation's fish stocks. *See, e.g.*, *Natural Res. Def. Council v. Daley*, 207 F.3d 747, 753 (D.C. Cir. 2000). The Exempted Fishing Permits therefore violate the single most fundamental requirement of the Magnuson-Stevens Act.

### 2. The Exempted Fishing Permits Will Wildly Overshoot the Stock's Annual Catch Limit

The Recreational Annual Catch Limit for South Atlantic red snapper is 22,727 landed fish. *See* 90 Fed. Reg. at 24,529 (Amendment 59 final rule); 50 C.F.R. § 622.193(y)(2). NMFS also has established a so-called Total Annual Catch Limit for the stock of 509,000 fish, which includes both landings and dead discards, but that number has no accountability measures attached to it. *Compare* 90 Fed. Reg. at 24,529–30 (explicitly stating accountability measures will not attach to Total Annual Catch Limit), *with* 16 U.S.C. § 1853(a)(15) (requiring annual catch limit mechanism to "include[e] measures to ensure accountability").

Regardless of which of those is the "true" annual catch limit from a statutory perspective, it will be exceeded by the Exempted Fishing Permits. As explained above, landings will increase from around 25,000 fish currently to several hundred thousand, even under the most optimistic assumptions. *See supra* pages 24–26. Total catch will increase as well, as any dead discard reduction will not offset the large increase in landings.[7] *See supra* pages 26–28.

---

[7] The agency's Total Annual Catch Limit has the same dynamic as the overfishing threshold: the current amount is fully subscribed, and any increase will lead to an exceedance. So for the same

There is no credible argument that with the extended 39-day / 62-day recreational season, red snapper will stay under its annual catch limit in 2026.[8]

Annual catch limits are required pursuant to 16 U.S.C. § 1853(a)(15). They were added by Congress in 2006, to reinforce and operationalize the Act's prohibition on overfishing. *See, e.g.*, *Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d at 266. Directly planning to exceed the relevant catch limit—by a large amount—is prohibited by the statute. *Cf. id.* ("Common sense would indicate that this procedure—which resulted in catch limits above the statutorily permissible levels—contravenes the plain language of the Act").

### 3.    The Exempted Fishing Permits Will Create a De Facto Reallocation

Red snapper allocation is governed by a hard-fought compromise, in which 71.93% of the catch goes to the recreational sector and 28.07% goes to the commercial sector. *See* 77 Fed. Reg. 15,916 (Mar. 16, 2012). Under the current annual catch limit of 34,000 landed fish, this comes out to 22,797 landed fish for the recreational sector, and 102,951 landed pounds for the commercial sector (which is equivalent to about 11,203 fish). *See* 90 Fed. Reg. at 24,529; 50 C.F.R. § 622.193(y).

The Exempted Fishing Permits will allow a large increase in recreational landings in 2026. As discussed above, NMFS has not attempted to estimate the amount of recreational landings that will occur, but the record reflects a range of 170,000 to 487,500 fish. *See supra*

---

reasons, the Total Annual Catch Limit (if that number mattered at all) will be exceeded by the Exempted Fishing Permits.

[8] NMFS appears to agree, as it felt the need to "exempt[]" the states from the section of the Code of Federal Regulations that implements the 22,727 fish red snapper Recreational Annual Catch Limit. *See, e.g.*, Florida Permit, at 2 (Exhibit 2) (purporting to exempt catch under the permit from 50 C.F.R. § 622.193(y)(2)).

31

pages 24–26. The commercial sector will be under status quo management in 2026, and can be expected to land approximately the Commercial Annual Catch Limit of 11,203 fish.

Using these estimates means the actual allocation ratio in 2026 will be *at least* 93.8% recreational and 6.2% commercial (using the low end recreational value). In reality, it will favor the recreational sector even more than that.

National Standard 4 of the Magnuson-Stevens Act states that all allocations "shall be (A) fair and equitable to all such fishermen; [and] (B) reasonably calculated to promote conservation." 16 U.S.C. § 1851(a)(4). A few related provisions reinforce the concept. *See, e.g.*, 16 U.S.C. § 1853(a)(14) (fair an equitable allocations for rebuilding stocks, which includes South Atlantic red snapper); *id.* § 1854(e)(4)(B) (same).

When a management action has the effect of altering significantly the existing allocation ratio, with no acknowledgment or analysis, it can violate the Act. *See Guindon v. Pritzker*, 31 F. Supp. 3d 169, 200–01 (D.D.C. 2014) (Rothstein, J.) (holding this); *see also United Cook Inlet Drift Ass'n v. NMFS*, No. 21-cv-00247-JMK, Slip Op. at 35–39 (D. Ak. June 21, 2022) (same).

The Exempted Fishing Permits have the effect of dramatically changing the South Atlantic red snapper allocation ratio for 2026. NMFS has not acknowledged or analyzed this, and as such cannot have concluded that it is "fair and equitable" and "reasonably calculated to promote conservation" under National Standard 4. Thus the de facto reallocation violates the Act. *See Guindon*, 31 F. Supp. 3d at 200–01 (finding a de facto reallocation violated National Standard 4, under almost identical circumstances).

### C.  NMFS Has No Authority to Exempt Itself From the Substantive Requirements of the Magnuson-Stevens Act

The analysis above should not be particularly controversial. That is, for a tightly managed stock hovering at the edge of overfishing, if NMFS adopted a fishery management plan

amendment and implementing regulations that arbitrarily kicked the doors wide open to recreational fishing, it would be an easy conclusion that the action violated the Act.

The main question in this case, then, is whether NMFS has the power to take that same action through the use of an "exempted fishing permit." And the answer is no.

The agency's stated authority for the Exempted Fishing Permits was its own general nationwide regulations at 50 C.F.R. § 600.745(b). *See, e.g.*, Florida Permit, at 1 (Exhibit 1) (stating NMFS "issues this exempted fishing permit" "in accordance with procedures established at 50 CFR 600.745(b)").

And to the extent the nationwide regulations at 50 C.F.R. § 600.745(b) have any statutory grounding at all, it appears to be in 16 U.S.C. § 1867(d). *Accord* 74 Fed. Reg. at 42,786 (identifying this statutory provision under heading "Need for Action").

Section 1867(d), however, is not a grant of authority to Defendants. It merely instructs NMFS to "promulgate regulations that create an expedited, uniform, and regionally-based process to promote issuance, where practicable, of experimental fishing permits." 16 U.S.C. § 1867(d). It exists as a subsection within a statutory section establishing a "Cooperative Research and Management Program," which essentially is a funding mechanism for collaborative projects to improve fishing gear, protect habitat, and reduce bycatch, among other things. *Id.* § 1867(a)–(c), (e)–(f). In context, Section 1867(d) is a process requirement—telling the agency to get things moving more quickly and efficiently, with respect to experimental fishing.

"Experimental fishing" is nowhere defined in the Act, but basic principles of statutory interpretation show that it is not a secret escape hatch from the substantive requirements for fishery management. The text itself refers to "experimental," fishing; there is no mention of any

33

"exemption" for such fishing. Nor is there any reason why "experimental" requires waiving core statutory requirements to a fishery. Experiments routinely are conducted in federal fisheries, within the ordinary course of management, and within the Act's substantive requirements. Experimental fishing uses research set-asides or other accounting methods to stay consistent with annual catch limits and prevent overfishing, and bycatch and habitat impacts are analyzed to ensure the experiment will not jeopardize the overall compliance of the fishery with these statutory requirements. This is all quite clear from the agency's own rulemaking implementing Section 1867(d). *See, e.g.*, 74 Fed. Reg. at 42,788 ("It is very important that . . . any mortality is accounted for consistent with [National Standard 1], the [National Standard 1] Guidelines, and [Magnuson-Stevens Act] section 303(a)(15), as well as other [Magnuson-Stevens Act] provisions and other applicable laws, including the [Endangered Species Act]."); *id.* ("The mortality associated with conservation engineering work needs to be properly accounted for and analyzed, consistent with [National Standard 1], the [National Standard 1] Guidelines, and [Magnuson-Stevens Act] section 303(a)(15).").

Statutory structure further makes clear that Section 1867(d) is not a grant of authority to NMFS to permit fishing activity that otherwise would violate the Act. The Act's management framework is comprehensive. As discussed above, it establishes councils, assigns jurisdictions, and creates fishery management plans—placing those plans at the center of the regulatory system. *See supra* pages 2–4; 16 U.S.C. §§ 1852–53. It designates councils as the first movers in management, funnels stakeholder participation through the councils, and provides specialized provisions for judicial review of council decisions. *See id.* § 1855(f); *supra* pages 18–23. It assigns the agency a relatively limited role, serving largely as umpire and backstop. It ensures council decisions comply with the law, and it steps in when necessary through secretarial

34

amendments and emergency actions. *See* 16 U.S.C. §§ 1854(a)–(b), 1855(c). In this context, Congress would have been hiding an elephant in a mousehole, if it had intended Section 1867(d) to be a substantive grant of authority for NMFS to conduct fishery management unilaterally and outside the ordinary process. This simply is not plausible.

Section 1867(d) is a minor procedural instruction from Congress to the agency; it does not provide a statutory basis for Defendants to take management actions that otherwise would violate the statutory requirements of the Act. For this reason, and because the challenged Exempted Fishing Permits violate the Act's substantive requirements, *see supra* pages 28–32, the permits are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Alternatively, they are "arbitrary, capricious . . . or otherwise not in accordance with law" *id.* § 706(2)(A).

## III.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief

The standard for irreparable harm is high but not insurmountable.  There are a few different aspects to the inquiry:

> First, "the injury must be both certain and great; it must be actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). The party seeking relief must show that the complained-of injury is so imminent that there is a clear and present need for equitable relief. *Id.* Second, the movant must "substantiate the claim that irreparable injury is 'likely' to occur." *Id.* (citation omitted). . . . Third, the moving party must establish causation. That is, it "must show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Id.*

*Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 398-99 (D.D.C. 2020) (Mehta, J.); *see also Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015).

Plaintiffs will be injured by the Exempted Fishing Permits in several different ways, as described below.[9] Each is imminent, likely to occur, not remediable after it occurs, and caused directly by Defendants' action. *See Mexichem Specialty Resins*, 787 F.3d at 555.

**A.      Defendants' Action Will Inflict Unrecoverable Economic Losses on Plaintiffs**

Current commercial trip limits for red snapper are extremely low, and these low trip limits are necessitated by the stock's rebuilding plan. Because the challenged agency action will wildly exceed the Recreational Annual Catch Limit and inflict overfishing on South Atlantic red snapper, it will reduce stock abundance and biomass, and accordingly will set back the stock's rebuilding plan. *See* 82 Fed. Reg. at 27,779; *see also* Oden Decl. ¶¶16–18; Cox Decl. ¶¶16–17; Giambanco Decl. ¶¶19–21.

This means Plaintiffs will be regulated under more years of low red snapper trip limits than otherwise would be the case. Red snapper has a relatively high ex-vessel value, so enduring more years of restrictive trip limits will directly harm Plaintiffs through lower revenues and reduced economic viability of their businesses. *See, e.g.*, Giambanco Decl. ¶¶9–12, 20–22; Oden Decl. ¶¶7–11, 14–19; Cox Decl. ¶¶7–12, 16–22.

"Financial injury is only irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Mexichem Specialty Resins*, 787 F.3d at 555 (internal quotation omitted). Here, no compensatory or corrective relief will be available to Plaintiffs because the financial injury will be caused by Federal government action, and no procedure exists within the Magnuson-Stevens Act or elsewhere for compensation in this situation. *See also* Oden Decl. ¶20; Giambanco Decl. ¶23; Cox Decl. ¶23.

---

[9] Plaintiffs' position is that the facts set forth below also serve to establish standing. *See, e.g.*, *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) (Moss, J.) (noting irreparable harm is a "more demanding burden" than standing).

Plaintiffs acknowledge that standing alone, their economic injuries may not be enough to establish irreparable harm. *See, e.g.*, *Mexichem Specialty Resins*, 787 F.3d at 555 ("Where the injuries alleged are *purely* financial or economic, the barrier to proving irreparable injury is higher still, for it is well settled that economic loss does not, in and of itself, constitute irreparable harm." (emphasis added) (internal quotation omitted)). But taken together with the other harms described below, Plaintiffs' economic injuries may add to the overall showing. *Cf. Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 192 (D.D.C. 2021) (Contreras, J.) (finding irreparable harm from combination of financial harm and other harms).

### B.    Defendants' Action Will Harm the Red Snapper Stock, to Which Plaintiffs Are Connected Through Livelihood and Way of Life

Defendants' action will damage a natural resource that Plaintiffs depend on. This destruction affects Plaintiffs beyond its simple economic repercussions, because Plaintiffs' entire way of life is tied to the ocean and its fish stocks. They feel it keenly when arbitrary damage is inflicted on one of our nation's marine natural resources.

South Atlantic red snapper is in a delicate position right now. After decades of overfishing, the population had several years of high recruitment, leading to increased abundance. Fishing mortality remains high, however, and NMFS's decision in Amendment 59 to raise the overfishing threshold means there is no room for error: everything has to go exactly as planned in the upcoming years, in order for the stock to rebuild by its deadline of 2044.

In this context, the Exempted Fishing Permits are a terrible idea. At a minimum seven years' worth of recreational landings will accrue, and likely much more. *See supra* pages 24–26. Overfishing will result, and the population will be knocked down. The stock's rebuilding plan will be set back as a consequence. Plaintiffs along with everybody else know that the recreational fishing binge from the Exempted Fishing Permits will harm the stock and set back its rebuilding

37

progress. *See, e.g.*, Oden Decl. ¶¶17; Cox Decl. ¶¶16–19; Giambanco Decl. ¶¶19–20. Defendants themselves have acknowledged as much, in a similar context. *See* 82 Fed. Reg. 27,777, 27,779 (June 19, 2017) (unilaterally extending Gulf of Mexico red snapper recreational season by 39 days, in similar circumstances, and noting that doing so "will necessarily mean that the private recreational sector will substantially exceed its annual catch limit, which was designed to prevent overfishing the stock," and that "this approach may delay the ultimate rebuilding of the stock by as many as 6 years").

As commercial fishermen, Plaintiffs' careers and livelihoods—as well as their identities and values—are intimately tied to fish and fishing. Their fates are connected with the fish stocks in the South Atlantic, such that when fish populations thrive, they thrive, and when the fish struggle, they struggle.

This interdependence comes from lifetimes spent on the water. Commercial fishing is the last major wild-capture food source remaining for humans, and while many of the dangers portrayed in Hemmingway's *The Old Man and the Sea* have been eased by modern technology, the relationship between fishermen and the ocean remains complex and deep. It is a relationship that goes beyond business revenues, and encompasses much of Plaintiffs' and their colleagues' lives. They catch fish, they think about fish, they eat fish, they buy and sell fish, they talk about fish, they know where to find fish in the ocean, and they can tell you innumerable details about a fish just from looking at it. Their lives, in short, are intertwined with fish and the oceans those fish live in. *See, e.g.*, Oden Decl. ¶¶21–29; Cox Decl. ¶¶24–29; Giambanco Decl. ¶¶24–26.

Because of this relationship, Plaintiffs are profoundly affected by the arbitrary destruction of the resource caused by Defendants' action. Kicking open the doors to recreational fishing and hammering the stock will cause population impacts that ripple out for decades. This hits

Plaintiffs like a punch in the gut. *See, e.g.*, Oden Decl. ¶¶27–29; Cox Decl. ¶¶27–29; Giambanco Decl. ¶¶25–26.

It may be hard to understand from the outside, but Plaintiffs' relationship with the ocean and its fish populations assuredly is no less real or meaningful than, for example, the care held by an individual for a special place or species of wild animal, the interest of a conservation organization in protecting nature, or a group's aesthetic interest in historical architecture. *See, e.g.*, *Nat'l Trust for Hist. Preserv. in the U.S. v. Nat'l Park Serv.*, No. 25-cv-4316-RJL, Slip Op. at 28–32 (D.D.C. Mar. 31, 2026) (Leon, J.) (finding irreparable injury to organization's aesthetic, cultural, and historical interests); Conserve Sw. Utah v. Dep't of Interior, No. 26-cv-317-RDM, Slip Op. at 43–47 (D.D.C. Mar. 1, 2026) (Moss, J.) (holding harm to species irreparable); *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 220–22 (D.D.C. 2003) (Sullivan, J.) (holding harm to plaintiff's relationship with certain birds to be irreparable); *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (Urbina, J.) (finding irreparable harm where "plaintiffs enjoy observing, photographing and generally commiserating with the animals"); *Fund for Animals v. Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993) (Oberdorfer, J.) (finding aesthetic injury "palpable and concrete" and in turn irreparable).

This form of harm, finally, should receive extra weight in the Court's analysis. Courts have noted that irreparable harm analysis can be informed by the purpose of the underlying statute alleged to have been violated. *See, e.g.*, *Nat'l Wildlife Fed. v. Burford*, 835 F.2d 305, 337 (D.C. Cir. 1987) (Williams, J., dissenting) (noting that irreparable harm "is of course defined in terms of the evil that the particular statute was designed to prevent"); *Am. Rivers v. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 258–59 (D.D.C. 2003) (Kessler, J.) (noting strong Congressional mandate in Endangered Species Act favors finding harm to species to be irreparable).

39

The core purpose of the Magnuson-Stevens Act is to protect and ensure sustainable management of our nation's fishery resources, because everything flows from the resource—vibrant commercial and recreational fisheries, fishing communities, and so forth. *See, e.g., Daley*, 209 F.3d at 753 (rejecting the "suggestion that there is a conflict between the Fishery Act's expressed commitments to conservation and to mitigating adverse economic impacts," and noting NMFS "must give priority to conservation measures"). Thus when considering the damage inflicted on the South Atlantic red snapper resource by Defendants' action (and its corresponding impact on Plaintiffs), the Court can and should observe that the agency action runs directly counter to the statute's central purpose, making it more likely to constitute irreparable harm. *See Burford*, 835 F.2d at 337.

## C.      Defendants' Action Will Damage the Commercial Fishing Community, Which Plaintiffs Actively Work to Maintain

The final way Plaintiffs will be harmed is through damage to the commercial fishing community. Commercial fishermen tend to be solitary individuals, spending long stretches alone, or with one or two crew members at most. They endure work conditions at sea that most of us will not see in our entire lives, and when they return to shore, they re-enter a society that largely does not understand them. For Plaintiffs and their colleagues, it is critical to know that a few others like them are out there. They may be within range on the radio when someone needs help, or just to compare notes on conditions or catch. They may see each other on shore, unloading catch or preparing to head out. Or they may cross paths at a fishery council meeting, trying to get managers to see things from their point of view. But in ways large and small, commercial fishermen like Plaintiffs depend on each other—for information, safety, and as much as anything morale and friendship. *See, e.g.*, Oden Decl. ¶29 ("it is a community that functions in large part

40

through the bonds among the fishermen themselves—friendship, shared experience, mutual assistance, and common purpose").

This dispersed but critical community is falling apart as individuals become demoralized and leave the industry. For decades now, Plaintiffs have watched their own sector erode under the weight of increasing costs and decreasing available landings. Oden Decl. ¶34, 36 (reduction from thousands to a few hundred active participants). Plaintiffs and their colleagues host observers, maintain Vessel Monitoring Systems, submit multiple types of logbooks, and operate under tighter and tighter trip limits—all for the purpose of ensuring their catch is accountable and sustainable. *See* Oden Decl. ¶36; Cox Decl. ¶35; Giambanco Decl. ¶28.

At the same time, they have watched the open-access recreational sector grow and grow, with managers continually failing to provide accountability for that sector. And as recreational catch eats up more and more of the available harvest, the commercial sector ends up "paying the bill" with lower trip limits. *See, e.g.*, Cox Decl. ¶15; Oden Decl. ¶13, 37; Giambanco Decl. ¶17.

It is a common occurrence to hear that a long-time fisherman has decided to hang up his hat and leave the fishery, in the face of declining margins and the overall impossibility of making it work. Many operations are viable in the narrowest of terms: they barely break even, and must defer long-term costs like repairs and maintenance. *E.g.*, Oden Decl. ¶¶15; Cox Decl. ¶¶20–21, 30; Giambanco Decl. ¶14. NMFS's own data, for example, shows that average net revenue—i.e., profit—for a vessel from snapper-grouper fishing is between $5,000 and $6,000 per year. *See* Scott Crosson, A Description of the Economics of the South Atlantic Red Snapper Fishery, SEDAR90-DW-25, at PDF 6 (Apr. 2025) (Exhibit 19). There is not a zero missing from those numbers. And as grey-haired fishermen give up and leave, few young fishermen are taking their

41

places. Slowly waterfronts are changing from fish houses, boatyards and icehouses, into oceanside condos and luxury yacht-builders.

In the face of this steady erosion, Plaintiffs actively work to keep the community of commercial fishing alive and repair the tattered social fabric within industry. *See, e.g.*, Oden Decl. ¶¶30–32; Cox Decl. ¶¶30–34. They do this so they can depend on that community when they need to, and because of the connection it provides. *See, e.g.*, Oden Decl. ¶¶30–31; Cox Decl. ¶¶33–34. A large part of the reason Plaintiffs get involved in management—and bring lawsuits such as this one—is because they want to protect what is left of the commercial fishing industry, and keep the community alive for a new generation of entrants. *See, e.g.*, Cox Decl. ¶¶30–31, 34.

The demoralization cost to commercial fishermen is real, when Defendants arbitrarily break the law and harm the resource. Essentially, Plaintiffs are fighting against a slow loss of community and way of life, and Defendants have come along and given it all a shove, hastening it along. *See* Oden Decl. ¶¶33–38; Cox Decl. ¶¶35–36; Giambanco Decl. ¶¶27–29.

## IV.    The Balance of Equities and Public Interest Favor Injunctive Relief

Under the third prong of the preliminary injunction standard, the court "weighs the harm to [the plaintiff] if there is no injunction against the harm to the [defendant] if there is." *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). Under the fourth prong, courts consider whether "an injunction is in the public interest." *Winter*, 555 U.S. at 20. These two inquiries "merge when the Government is the opposing party," because the government's interests are—in theory—the same as the public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

These factors are simple to apply here. Denying an injunction to Plaintiffs will lead to economic, environmental, and social harms, as set forth in the previous section. That weighs heavily. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.").

Defendants, by contrast, will not be harmed by issuance of an injunction or stay. The only effect would be to compel them to follow the law, which is not cognizable as a harm. As this Court has previously noted: "[t]here is generally no public interest in the perpetuation of unlawful agency action. On the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their . . . operations." *Am. First Legal Found.*, No. 1:24-cv-1092-RC, at 34 (cleaned up); *see also N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) (Friedman, J.) ("The public interest is served when administrative agencies comply with their obligations under the APA." (citation omitted)).

Thus the third and fourth injunction factors tilt in favor of Plaintiffs. And when combined with their likelihood of success on the merits and their showing of irreparable harm, preliminary relief is warranted. *Winter*, 555 U.S. at 20.

## CONCLUSION

For the reasons above, Plaintiffs respectfully request the Court grant their motion for a preliminary injunction or stay.

43

Dated:  May 10, 2026                                Respectfully submitted,

                                                    /s/ Seth Atkinson
                                                    Seth L. Atkinson (Bar ID CA00190)
                                                    Quillback Consulting
                                                    540 Meder Street
                                                    Santa Cruz, CA 95060
                                                    (203) 331-2792
                                                    seth@quillbackconsulting.com

                                                    *Attorney for Plaintiffs*

44