**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                        )
SOUTHEASTERN FISHERIES                 )
ASSOCIATION, INC., et al.,                      )
                                                        )
   *Plaintiffs*                            )
                                                        )
    v.                                    )  Case No. 26-cv-1533
                                                        )
HOWARD LUTNICK, in his official capacity   )
as Secretary of Commerce, et al.,              )
                                                        )
   *Defendants*                           )
                                                        )
_____)

**DECLARATION OF JEFFREY ODEN IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR STAY**

I, Jeffrey Oden, pursuant to the provisions of 28 U.S.C. § 1746, declare as follows:

1.  This declaration is based on my personal knowledge, information, and belief. I am over 18 years of age, and am competent to testify to all facts contained in this declaration.

2.  I am a commercial fisherman, and I live in Hatteras, North Carolina.

3.  I am the President of Slash Creek Waterworks, Inc. ("Slash Creek"), a North Carolina corporation that was incorporated in 1982. My wife is the Secretary of Slash Creek, and together we are the sole and full owners of the corporation.

4.  Slash Creek holds title to one fishing vessel, the *F/V Second Wind*, which I captain and from which I conduct commercial fishing for species managed under the South Atlantic Snapper-Grouper Fishery Management Plan.

1

5.      Slash Creek holds a federal limited access vessel permit for Snapper-Grouper species. This permit is assigned to the *Second Wind*, and it allows me, on that vessel, to catch and sell specific quantities of red snapper, as well as other Snapper-Grouper species, in the South Atlantic region.

6.      In the geographic area in which the *Second Wind* operates, red snapper are available and catchable with the bandit reel fishing gear and buoy gear that I carry and use on the vessel. I have landed and sold red snapper caught under South Atlantic Snapper-Grouper regulations in the past, and will do so again in the future.

7.      Under the current low trip limits for South Atlantic red snapper, it is barely worth the effort and fuel cost to travel to specific areas of high red snapper concentration in order to target them, because the trip limit is only 75 pounds.

8.      When my access to red snapper constrained in this way, I will merely catch red snapper opportunistically, to the extent I encounter them in other targeted fishing activity.

9.      If trip limits for red snapper were increased, the *Second Wind* would be able to target red snapper profitably.

10.      Fish buyers pay an amount for red snapper that varies depending on a number of factors, but can be over seven dollars per pound.

11.      If trip limits for red snapper were increased, red snapper fishing could provide a substantial source of revenue for Slash Creek.

12.      In addition to my fishing business, I actively participate in the South Atlantic Fishery Management Council process. I was a member of the Snapper-Grouper Advisory Panel for three years, which is an appointed body of participants in the Snapper-Grouper fishery that advises the Council on management of that fishery. I continue to stay apprised of management

2

issues in the Snapper-Grouper fishery. I periodically attend Council meetings and provide public testimony, and I regularly communicate with managers on issues related to both the Snapper-Grouper fishery and the Atlantic Highly Migratory Species fishery.

13.     My understanding is that the current low trip limits and short season for red snapper are a product of the stock's rebuilding plan and the ongoing problem of recreational dead discards. Specifically, the massive amount of dead discards from the recreational sector are taken off the top, before the catch limit is set and allocated out to the sectors. Because of this, we end up "paying the bill" for the recreational sector through our low commercial catch limit.

14.     I understand that when the stock is declared rebuilt, I and other commercial fishermen will have increased access to red snapper. This will be true regardless of whether the recreational sector solves its dead discard problem—which I sincerely hope happens.

15.     My business, Slash Creek, routinely operates on thin economic margins. Diesel fuel, bait, tackle, food, safety equipment, vessel maintenance, and other expenses all have increased in recent years, resulting in smaller net revenues per trip.

16.     The agency action now being challenged—exempted fishing permits that will allow for a massive increase in recreational red snapper fishing—will make my situation worse.

17.     By allowing recreational landings to wildly exceed the Recreational Annual Catch Limit with no payback or accountability, the permits will inflict overfishing on the South Atlantic red snapper stock, reducing its abundance and setting back the rebuilding plan.

18.     Every additional year under the rebuilding plan is another year that commercial fishermen like me will be held to highly restrictive trip limits. So by delaying rebuilding, the exempted fishing permits will delay the point at which commercial trip limits will be raised, and when red snapper fishing becomes economically viable for Slash Creek at any meaningful scale.

19.     Red snapper has a relatively high ex-vessel value, and I already have had to forego substantial revenue during the years of rebuilding. I was doing so on the understanding that the rebuilding plan would proceed as intended and that my business—whether still operated by me or by someone else by that point—would eventually regain meaningful access to the stock. The Exempted Fishing Permits extend that period of low revenue, for no conservation purpose and in direct contravention of the law.

20.     There is no compensation mechanism available to me or to Slash Creek Waterworks for this harm. The Magnuson-Stevens Act does not provide a damages remedy. The financial losses I will suffer as a result of extended red snapper rebuilding are losses that I will simply absorb—just as I have absorbed years of low trip limits already—while the recreational sector continues to operate without accountability.

21.     Continued low trip limits for South Atlantic red snapper is not just bad for me and other commercial fishermen. The commercial sector provides access to fresh, sustainably-managed seafood for all the millions of Americans who do not have the time or ability to go fishing. Thus extending the restrictions on red snapper will also hurt the families, businesses, and individuals who wish to eat local South Atlantic red snapper but find themselves unable to source it, or priced out due to scarcity.

22.     I have spent 48 years as a commercial fisherman, almost all of which has been in the South Atlantic region. I have fished in all seasons, and in all manner of conditions—during dawn runs on glassy seas, and in early-season storms when conditions are rough.

23.     Over those decades, I have developed a knowledge of the waters and the fish that live below.

24.     Red snapper is a species I know well. The first snapper-grouper fish I ever caught, 48 years ago, was a red snapper. I know where to find them at different times of year and in different conditions, which is important because off North Carolina they are not as common as they are further south. I know what it takes to catch them efficiently.

25.     I understand the species that inhabit the ocean ecosystem off my coast. I know which species are where, who co-occurs with whom, how and when they migrate, and how to track them down. This is not textbook knowledge; it is experience from decades on the water.

26.     For me, fishing is not just a business. It is what I do with my life, and what has made me into the person I am. My time on the water shapes how I experience every day—from reading the weather patterns to thinking about the season and currents, and how I understand my place in the natural world.

27.     My well-being is tied to the health of fish populations that I catch. For that reason, I do not experience the damage inflicted on the red snapper stock by these exempted fishing permits merely as a business problem. I experience it as harm to my way of life, and I feel it personally. It is hard to convey this to someone who has not spent years or decades on the water.

28.     I have waited a long time for South Atlantic red snapper to recover and rebuild, and we have made significant progress. That recovery has come at a cost to me and to my colleagues in the commercial sector, though, who have accepted low limits and forgone income throughout the rebuilding process. It is very difficult to stomach that the stock now will get beaten down by an arbitrary and politically-driven recreational fishing binge.

29.     Commercial fishermen are among the last people (other than farmers) in this country whose way of life depends on nature. Our relationship to the ocean and fish is not casual or a matter of fun; it is a relationship of sustenance and dependence. The health of fish stocks

like red snapper is not an abstraction to us. We feel it when the fish are abundant, and we feel it when they are not. The damage to the red snapper stock inflicted by these exempted fishing permits is, for me, a real and meaningful injury.

30.    I am part of a community of commercial fishermen on the Outer Banks and adjoining areas, in North Carolina. This is a community that has supported itself through commercial fishing for generations, and it is a community built on bonds among the fishermen themselves—friendship, shared experience, mutual assistance, and common purpose.

31.    The commercial fishermen I know and work alongside share information constantly: about fish locations and behavior, about weather and sea conditions, about markets and buyers, about gear and vessel maintenance. We help each other when a vessel breaks down or when crew is needed on short notice. Many of us have known each other for decades. The community has a coherence and identity that goes well beyond the specific individuals who make it up.

32.    The community also includes a broader network of businesses and institutions. Fish houses and dealers buy and distribute the catch. Fuel docks, marine suppliers, and boat yards provide the goods and services that keep vessels running. When commercial fishermen suffer, these other businesses and individuals feel it as well. So in this way, the economic impact of shortsighted management decisions like the exempted fishing permits ripples outward far beyond my own business.

33.    The challenged exempted fishing permits harm this community. Commercial fishermen in the South Atlantic have participated in the Magnuson-Stevens Act management process in good faith for years—attending council meetings, providing testimony, accepting strict limits, and trusting that the system would deliver a rebuilt stock and a healthier fishery.

34.    In particular, we have labored under a 2-for-1 permit transfer provision for decades. We accepted that this was appropriate when it was enacted in 1998, but it has far outlived its purpose. By now it has winnowed the fleet down into a shadow of its former self. We have worked for years to try to lift the 2-for-1 provision, and only recently has gained some traction in this effort. This has been extremely difficult—both watching the industry struggle under the rule, and seeing how little attention the commercial industry receives from management.

35.    The Exempted Fishing Permits show us that all the regular rules can be thrown aside, if you have enough political power. It also shows us that the commercial industry is essentially roadkill.

36.    We have endured decades of sacrifice as we watched our industry drop from over 2000 participants in the 1990s, to somewhere in the 200-300 range of active participants today. We have worked under tight rebuilding plan trip limits, hosted observers, submitted logbooks (and even discard logbooks) and all manner of paperwork, in order to ensure our catch is accountable.

37.    This was not matched by anything on the recreational side. Instead, that sector remains open-access, and it has grown and grown to the point where it now dwarfs the commercial sector. The for-hire component, for example, has increased from around 700 vessels two decades ago to over 2800 today—all while the commercial sector was being squeezed down by the 2-for-1 policy.

38.    It is deeply demoralizing to me and to the commercial fishermen I know, to watch the recreational sector continue to fish without accountability, and to get its way over and over. It undermines confidence in the management system that we have invested in and relied upon. It

drains the sense of community purpose that sustains commercial fishermen through difficult seasons and tight margins. And it puts us in a position that is fundamentally unfair: bearing the burdens of conservation, while others fish outside of it with the full support of the agency.

39.    If the exempted fishing permits were vacated and management allowed to proceed in the ordinary way under the Magnuson-Stevens Act, I anticipate that red snapper would rebuild by its deadline, if not before. The resource finally would reach a healthy state, and the commercial fishing industry, in which I have invested so much—and which produces seafood on behalf of all the Americans who do not have time to go fishing themselves—would receive a meaningful benefit in terms of increased access and stronger revenues.

I declare under penalty of perjury under the laws of the United States that the foregoing is true to the best of my knowledge and belief.

Executed on May 9, 2026 in Hatteras, North Carolina.

_____
JEFFREY ODEN