**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| SOUTHEASTERN FISHERIES ASSOCIATION, INC., et al., )<br><br>*Plaintiffs* )<br><br>v. )<br><br>HOWARD LUTNICK, in his official capacity as Secretary of Commerce, et al., )<br><br>*Defendants* ) | Case No. 26-cv-1533 |

---

**DECLARATION OF JACK COX, JR. IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR STAY**

I, Jack Cox, Jr., pursuant to the provisions of 28 U.S.C. § 1746, declare as follows:

1.      This declaration is based on my personal knowledge, information, and belief. I am over 18 years of age, and am competent to testify to all facts contained in this declaration.

2.      I am a commercial fisherman and businessman, and while I move around frequently, my vessels are home ported in Atlantic Beach, North Carolina.

3.      I am the sole owner and shareholder of Strawberry, Inc. ("Strawberry"), a North Carolina corporation that was established in 1992.

4.      Strawberry holds title to a fishing vessels, the *F/V Sunrise*, which conducts commercial fishing for species managed under the South Atlantic Snapper-Grouper Fishery

1

Management Plan and the Consolidated Atlantic Highly Migratory Species Fishery Management Plan.

5.      Strawberry holds one federal limited access vessel permit for Snapper-Grouper species. This permit is assigned to the *Sunrise*. It allows that vessel to catch and sell specific quantities (i.e., trip limits) of red snapper, as well as other Snapper-Grouper species in the South Atlantic region.

6.      In the geographic area in which the *Sunrise* fishes, red snapper are available and catchable with the rod and reel fishing gear that is carried and used on the vessel.

7.      We routinely fish for most of the species in the Snapper-Grouper fishery, and in the course of that fishing, we sometimes catch red snapper incidentally. When the commercial red snapper season is open, we are able to retain up to the trip limit, which recently has been restricted to 75 pounds.

8.      At times, we will target red snapper directly during the open season—though because the trip limit is so low, this really means integrating some fishing for red snapper into an existing trip, rather than planning an entire trip around red snapper.

9.      Thus through both incidental catch and direct targeting, the *Sunrise* has landed and sold South Atlantic red snapper caught in the past, and will do so again in the future.

10.     If trip limits for red snapper were increased, the *Sunrise* would be able to retain and sell more red snapper during the open season. This would lead me to alter my fishing patterns and target red snapper more frequently.

11.     Fish buyers pay an amount for red snapper that varies depending on a number of factors, but often is seven or more dollars per pound.

12.     Recent trip limits have been so low that they severely restrict the revenue I can earn through catching and selling red snapper. That said, if trip limits were to increase, red snapper fishing could provide a substantial source of revenue for my business.

13.     In addition to my fishing business, I actively participate in the fishery management process. I read management and scientific reports, and participate at meetings of the South Atlantic Fishery Management Council and the North Carolina Marine Fisheries Commission. I provide public testimony as needed regarding fishery management issues that affect me and my business, as well as on the commercial sector more broadly. I have advocated consistently over the years for accountability in fishery management.

14.     Currently I am a member of the Snapper Grouper Advisory Panel, which is an appointed body of participants in the Snapper-Grouper fishery that advises the Council. I also have served on the North Carolina Marine Fisheries Commission. I am a member of several commercial fishing organizations, including Southeastern Fisheries Association.

15.     My understanding is that the current low trip limits and short season for red snapper are a result of the ongoing dead discard problem in the recreational sector, combined with the need to restrict catch for rebuilding purposes. Basically, the recreational sector is eating up most of the available red snapper catch through their dead discards, and only a small amount is left over for landings—which is then split out according to the South Atlantic Council's allocation ratio of 28.07 percent commercial and 71.93 percent recreational. The end result is commercial fishermen get a very small amount of fish.

16.     From this starting point, the exempted fishing permits challenged in this case will massively increase the amount of recreational landings this year. Recreational catch will overshoot the annual catch limit many times over, and no accountability measures will apply.

3

17. This will directly harm me and my business. Allowing overfishing on the red snapper stock will knock down red snapper abundance and set back its rebuilding plan, requiring further management restrictions. Those restrictions could come in the form of further-lowered trip limits, or in the form of more years under the stock's rebuilding plan. The latter is more likely, given that there is little more than can be squeezed out of landings currently. Either way, the consequences will applied to both the recreational sector and the commercial sector—even though the problem will result from fishing by just the recreational sector.

18. Thus the commercial sector will be—yet again—"paying the bills" for unaccountable fishing in the recreational sector.

19. Because of my involvement in the management process, I understand the stakes well. The South Atlantic red snapper stock has been in a slow, hard-fought recovery from decades of overfishing. The commercial sector has endured significant restrictions throughout this recovery—restrictions that I have personally experienced in my fishing operations. The expectation has always been that these sacrifices would eventually yield a rebuilt stock with higher trip limits and more viable commercial fishing. But the exempted fishing permits will jeopardize this by pushing the rebuilding timeline further out into the future.

20. My business routinely operates on thin economic margins. Fuel, bait, tackle, food, safety equipment (and its maintenance), insurance, vessel maintenance, and other expenses all have increased in recent years, resulting in smaller net revenues per trip.

21. If the challenged exempted fishing permits are vacated and management of red snapper can proceed in the ordinary course, I anticipate my business benefiting as the stock rebuilds—through higher commercial trip limits and increased availability of red snapper to catch and sell. Upon rebuilding, we would be able to target red snapper more directly, and the

species would provide a lifeline to my business. Strawberry and I would benefit through increased revenues, improved economic stability, more regular investments in maintenance and repairs, reduced crew turnover, and an increase in the overall economic sustainability of the business.

22.    The challenged action forecloses this opportunity—not because the fish are unavailable, but because an arbitrary regulatory action will deplete the stock and delay the conditions under which such improvements would be possible.

23.    There is no administrative or legal mechanism by which I can recover the revenue I will lose as a result of the delay in rebuilding caused by the exempted fishing permits. The harm will simply accumulate, year after year, as the rebuilding plan extends into the future.

24.    I have fished for snappers and groupers since 1978. My fishing experience includes many years off the coast of the South Atlantic states, as well as some time in the broader Caribbean region. I also have worked as a seafood wholesaler, brokering the sale of fish from my own as well as other Snapper-Grouper vessels for a number of years.

25.    From my years of fishing, I have developed a deep knowledge of the waters of the South Atlantic, and the species that live in them. This is knowledge that comes not from reading about fish but from spending thousands of days on the water, locating them, catching them, handling them, and learning their behavior firsthand.

26.    While I do spend time reading scientific and management reports, my relationship with the snapper and grouper species in the South Atlantic is not primarily through words. It is a personal relationship, built on years fishing for and around these fish. I know their habits and their habitats in a direct, practical way that can only come from being there.

27. Because of this relationship with the ocean and its fish, commercial fishing is not simply a business for me. It is a way of life and an identity. The ocean is central to my daily existence, and my well-being is tied to the health of our fish populations in a way that goes far beyond my income and balance sheet. When a fish stock I depend on and care about is damaged—particularly when it is damaged arbitrarily and illegally—I experience it as a personal harm.

28. I have watched South Atlantic red snapper slowly rebuild over the years. I have accepted the restrictive trip limits that came with that rebuilding process, in the hope that the stock would eventually recover and our industry could see some sustainable revenue from it. Yet now, for political reasons, the agency has approved exempted fishing permits that will allow a recreational red snapper fishing binge—meaning a year of far higher exploitation than is sustainable.

29. As a fisherman who knows and cares about red snapper, it is painful and disturbing to watch this play out, as I know it will harm the stock and undo years of progress.

30. Another consideration that is important for me is supporting new entrants in the commercial fishery. In today's fishery, costs are high and margins are tight, and for many people it does not make sense to try to climb over the capital and regulatory barriers just to enter a barely-viable fishery.

31. What this means is that as my generation ages out of the fishery over the next twenty or so years, fewer young people will enter to replace us. This is visible even today, as the commercial Snapper-Grouper fishery has shrunk to only a fraction of its size and new entrants are few and far between.

32.    And as the commercial industry declines, the community of friendship, support, and shared purpose among commercial fishermen also is declining.

33.    I know most all of the remaining fishermen in my area of the coast personally, from our decades of being on the water together, and from sharing the same docks, ice houses, buyers, and often crew members. I am connected to other commercial fishermen in practical ways, like sharing information about fishing conditions, prices, and management. We help each other when problems arise, and we try to work together to make ourselves heard in the management forums. It is not just a professional network; these friendships and relationships create out a community in the fuller sense of the word. For me, this network has been very important over the years.

34.    As the industry shrinks, there are fewer commercial fishermen and greater distances between us. I work hard to maintain connections with other commercial fishermen, because I do not want folks to become isolated and alone in this trade. And that is also part of why I work to help new entrants—to try and make sure people are joining, so they can fill some of the holes created as other people age out.

35.    The red snapper exempted fishing permits harm this community in a way that I want to be clear about. Commercial fishermen in this region have, for years, operated within the Magnuson-Stevens Act management framework—not because it has always been favorable to us, but because we understand that sound resource management is in our long-term interest and is required by law. We have accepted the costs of that framework. The challenged action now uses an administrative device to allow the recreational sector to fish outside that framework, while the commercial sector remains bound by it. This is not just economically unfair; it corrodes the integrity of the entire management system.

36.     As a member of the Advisory Panel, I have spent years serving as a conduit for my fellow fishermen into the management process, and working to keep my colleagues engaged and connected. The challenged action undermines that work, as it signals to the commercial fishing community—and to the public—that legal accountability in fishery management is optional when the right political pressure is applied. This is harmful to the long-term health of the stock, harmful to the commercial fishing community, and harmful to me personally as a result.

I declare under penalty of perjury under the laws of the United States that the foregoing is true to the best of my knowledge and belief.

Executed on May 9, 2026 in Bastimentos Island, Panama.

_____
JACK COX

8