

1300 19th Street NW
8th Floor
Washington DC 20036

202.429.5609 Telephone
202.872.0619 Facsimilie
www.oceanconservancy.org

March 10, 2026

Ms. Mary Vara
Southeast Regional Office
National Marine Fisheries Service
263 13th Avenue South
Saint Petersburg, FL 33701

Electronic delivery via Regulations.gov

**Re:  NOAA–NMFS–2026–0496: State applications for exempted fishing permits allowing increased recreational catch of red snapper in South Atlantic waters.**

Dear Ms. Vara:

Ocean Conservancy[1] offers the following comments to NOAA Fisheries regarding the above-referenced applications for exempted fishing permits (EFPs) by the states of Florida, Georgia, South Carolina and North Carolina (collectively, "the States").

**We urge you to deny the EFP proposals.**

In brief, the States' EFPs would dramatically increase the open season for recreational red snapper fishing, resulting in large increases for landings and fishing mortality. The fishing activity allowed under the EFPs will result in red snapper's annual catch limit (ACL) being exceeded in 2026 as well as the stock being subjected to overfishing.

Because the States' EFPs would undercut the stock's ACL mechanism and allow overfishing, the National Marine Fisheries Service (NMFS) in approving them would be violating its statutory duties to manage red snapper with an ACL and accountability measures and to prevent overfishing. To the extent EFPs are authorized under the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act), it is only as a tool to foster cooperative research that promotes conservation; EFPs do not provide a route to exempt entire fisheries from the Act's core conservation requirements.

The EFPs also propose changes in recreational data collection, including adding app-based angler reporting while ending other sampling programs. While Ocean Conservancy supports improvements to data collection, changes must be scientifically rigorous and thoughtfully designed. The changes proposed in the States' EFPs are neither.

*          *          *

---

[1] Ocean Conservancy unites science, people and policy to protect our ocean, today and for generations to come.

**I.    The Increase in Recreational Fishing Under the Proposed EFPs Will Result in Exceeding the ACL for South Atlantic Red Snapper and Overfishing of the Stock.**

If the States' EFPs are granted, recreational fishing effort for South Atlantic red snapper will increase significantly. Recently the recreational red snapper season has been in the range of 1-3 days; the EFPs propose 62-day seasons for North Carolina, South Carolina, and Georgia and a 39-day season for Florida. As described below, all the evidence currently available indicates this change will result in substantially higher landings of South Atlantic red snapper, such that landings will exceed the stock's ACL. At the same time, and as described below, no evidence supports the idea that there will be a sufficiently large decrease in dead discards to offset the increased landings. The stock's fishing mortality rate will increase above the maximum fishing mortality threshold, and overfishing will result—in violation of the Magnuson-Stevens Act, 16 U.S.C. § 1800 et seq.

**A.    The Current ACL for South Atlantic Red Snapper is 34,000 Landed Fish.**

Annual catch limits and accountability measures have been required for all federal fisheries since the 2006 amendments to the Magnuson-Stevens Act.[2]

The current ACL mechanism for South Atlantic red snapper was established in 2018 in Amendment 43 to the Snapper-Grouper Fishery Management Plan.[3] The mechanism consists of a recurring landings-only limit, which is allocated to the two sectors via the governing allocation ratio of 71.93% recreational and 28.07% commercial. The numerical value of the ACL as established in Amendment 43 was 42,150 landed fish.[4] In 2024, it was temporarily adjusted to 31,000 landed fish, based on the SEDAR 73 stock assessment.[5] In 2025, it was changed on a permanent basis to 34,000 landed fish, relying on the SEDAR 73 Update assessment.[6]

The only management measures serving to constrain landings to the ACL (i.e., accountability measures) are season, bag and trip limits.[7] Season length is calculated ahead of time for the recreational sector based on projected landings per day, and the season is closed when the pre-set number of days of fishing has been completed. For the commercial sector, season length is projected ahead of time, but closure generally depends on in-season landings data, such that the commercial season is closed when the sector is estimated to have met its ACL.

In Amendment 59, NMFS purported to establish a "total ACL" for red snapper of 509,000 fish, which includes both landings and dead discards.[8] This is not a binding ACL but rather merely a tool to "allow NMFS and stakeholders an opportunity to better understand the tradeoffs between reducing dead discards and increases in the ACL."[9] Because there are no corresponding measures to ensure accountability to the specified limit, the "total ACL" does not constitute an annual catch limit from a

---

[2] See Pub. L. No. 109–479, § 104(a)(10), 120 Stat. 3575, 3584 (Jan. 12, 2007), codified at 16 U.S.C. § 1853(a)(15).
[3] See Amendment 43 Final Rule, 83 Fed. Reg. 35,428 (July 26, 2018), codified at 50 C.F.R. § 622.193(y).
[4] 83 Fed. Reg. at 35,429.
[5] Temporary Rule, 89 Fed. Reg. 50,530, 50,531 (June 14, 2024).
[6] Amendment 59 Final Rule, 90 Fed. Reg. 24,527, 24,529 (June 11, 2025).
[7] See generally 50 C.F.R. § 622.193(y).
[8] See 90 Fed. Reg. at 24,529 (noting total value is comprised of 34,000 landed fish and 475,000 dead discards).
[9] Id. at 24,535.

statutory perspective.[10, 11] Thus, the relevant ACL for South Atlantic red snapper remains the landings-based limit of 34,000 fish.

     **B.**     **Red Snapper Landings Will Exceed the Annual Catch Limit if the States' EFPs Are Approved.**

The landings-based ACL of 34,000 red snapper is divided into a Recreational ACL of 22,797 landed fish and a Commercial ACL of 102,951 landed pounds (equivalent to 11,203 fish).[12] Throughout this section, "catch" refers to both landings and discards, while "landings" refers specifically to fish that are retained.

Commercial landings are not expected to change under the States' EFPs. The EFPs themselves expressly disclaim any changes to commercial management,[13] and NMFS has not indicated that any changes will be made to commercial regulations if the States' EFPs are approved.[14] So for analytical purposes, the agency must assume that the full Commercial ACL will continue to be landed going forward.[15] As such, if recreational landings exceed the Recreational ACL, the full ACL for the stock will be exceeded.

The current Recreational ACL of 22,797 landed fish has been in effect for one year so far — 2025 — in which the recreational red snapper season was set at two days. The season length in 2025 was set in the ordinary manner: The Recreational ACL was divided by a projected landings rate (fish landed per day) to determine the number of open days, and the projected catch rate was estimated based on actual catch data from previous years.[16] Specifically, the agency analyzed several possible catch rate estimates for

---

[10] The statutory mandate at 16 U.S.C. § 1853(a)(15) consists of a twinned requirement: an "annual catch limit[]" and "measures to ensure accountability." This pairing is intentional, because each element helps to define and give meaning to the other. Specifically, a number only functions as a limit if there are associated measures that constrain catch to that number (i.e., accountability measures). Without any corresponding measures to constrain catch, the number is not a limit—it is informational or aspirational at best. And management measures only become "measures to ensure accountability" when they function to constrain catch to the specified limit. This is because the concept of accountability exists only in reference to a specified threshold or limit; there is no such thing as free-floating or generalized accountability without a referent. Thus, measures that regulate in some way, but do not serve to constrain catch to a specific numerical limit, are merely ordinary management measures. The agency's "total ACL," lacking any measures to ensure accountability, simply is not an "annual catch limit[]" from a statutory perspective.

[11] Even if the "total ACL" number were viewed as a catch limit, the same result would hold: the States' EFPs will cause an exceedance of the catch limit. This is because, as described in Section I.C below, there is no evidence that dead discards will be reduced sufficiently to offset the increased amount of landings from the EFPs. So whether viewed in terms of landings alone (the enforceable ACL in regulations) or total catch (the agency's non-regulatory "total ACL"), the States' EFPs will breach the annual catch limit mechanism for South Atlantic red snapper.

[12] See 90 Fed. Reg. at 24,529; 50 C.F.R. 622.193(y).

[13] See Florida Fish & Wildlife Commission, Request for an Exempted Fishing Permit for Management of the Private Recreational and For-Hire Components of the Red Snapper Recreational Fishery Off Florida's Atlantic Coast for 2026-2028, at 9 (Jan. 23, 2026) (herein "Florida EFP Application"); Georgia DNR Coastal Resources Division, Exempted Fishing Permit Application - Updated, at 9 (Jan. 23, 2026 (herein "Georgia EFP Application"); South Carolina Department of Natural Resources, Application for Exempted Fishing Permit, at PDF 5 (Jan. 23, 2026) (herein "South Carolina EFP Application"); North Carolina Division of Marine Fisheries, Application for Exempted Fishing Permit, at PDF 3 (Jan. 23, 2026) (herein "North Carolina EFP Application").

[14] See 91 Fed. Reg. at 6828.

[15] This has been the case in recent years. See, e.g., South Atlantic Commercial Landings for 2024 and 2025, available at https://safmc.net/documents/south-atlantic-commercial-landings_dec2025-pdf.

[16] 90 Fed. Reg. at 24,530.

2025, chose to use the lowest rate (9,526 fish/day), applied that to the Recreational ACL to yield a recreational season of 2.4 days, and then rounded that down to two days (as partial days are not possible from a management standpoint).[17]

Preliminary data from the State of Florida Specialized Mini Season Survey indicates that in the State of Florida alone, over 24,885 red snapper were landed by private and charter anglers in the two-day season in 2025.[18]

The States' EFPs propose to increase the open season for South Atlantic red snapper from two days to 39 days (for Florida) and 62 days (for the remaining states). A simple expansion using the State of Florida 2025 landings rate, and ignoring the contribution from other states, would suggest that over 485,000 fish will be landed in a 39-day season.

This result—over 485,000 fish, a number that is 20x the ACL—embodies the agency's current methodology for estimating recreational landings (i.e., basing estimated landings on recent per-day landings rates). As such, it represents the starting point for analysis, and to the extent NMFS chooses to apply a different methodology for estimating recreational landings in 2026, the agency must provide a rational[19] and scientifically sound[20] explanation for that decision.

The States' EFPs suggest that recreational landings in 2026 should be estimated using a different method, namely by reducing the daily catch-rate estimates based on assumed effort decompression.[21] Effort decompression is the idea that per-day effort and landings will decline as the recreational fishing season is extended because anglers perceive less scarcity around opportunities to go fishing. The States specifically point to two studies from the Gulf in support of the effort-decompression hypothesis.[22]

The first thing to note regarding effort decompression is the degree of reduction in per-day red snapper landings that would be necessary in the South Atlantic to go from the current two-day season to the proposed 39-day season without breaching the 22,797 fish Recreational ACL. For this to happen, the South Atlantic recreational landings rate would have to drop from over 12,500 landed fish per day to

---

[17] National Marine Fisheries Service, Amendment 59 to the Fishery Management Plan for the Snapper-Grouper Fishery of the South Atlantic Region, at E-10 (May 15, 2025) (Table 9), available at https://repository.library.noaa.gov/view/noaa/71119.

[18] Ellie Corbett & Chloe Ramsay, Florida Fish & Wildlife Conservation Commission Report F-5573-23-F2, Recreational Effort, Catch, and Biological Sampling in Florida During the 2025 South Atlantic Red Snapper Season, at 3 (Dec. 3, 2025), available at https://myfwc.com/media/ez0i1lof/atlantic-red-snapper-2025.pdf.

[19] See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 514 (2009) (requiring "a reasoned analysis for the change beyond that which may be required when an agency *does not* act in the first instance" (cleaned up) (emphasis in original)).

[20] See 16 U.S.C. § 1851(a)(2) (National Standard 2, requiring all management actions under the Magnuson-Stevens Act to be based on the best scientific information available).

[21] See Florida EFP Application at 8; Georgia EFP Application at 7; South Carolina EFP Application at PDF 4–5, 12–13; North Carolina EFP Application at PDF 11.

[22] See Tara S. Topping et al., A Comparison of Private Recreational Fishing Harvest and Effort for Gulf of Mexico Red Snapper During Derby and Extended Federal Seasons and Implications for Future Management, 39 N. Am. J. Fisheries Mgmt. 1311 (2019); Sean P. Powers & Kevin Anson, Compression and Relaxation of Fishing Effort in Response to Changes in the Length of Fishing Season for Red Snapper (*Lutjanus campechanus*) in the Northern Gulf of Mexico, 117 Fishery Bull. 1 (2018).

4

below 585 landed fish per day[23]—meaning the landings rate in 2026 would have to be roughly 5% of the landings rate observed in 2025 and significantly less than the landings rates observed from any season from 2012 onward.[24]

The States stop short of claiming this will actually occur, and for good reason, because this degree of reduction in per-day landings is not supported by any evidence. The studies proffered by the States show a drop in per-day landings, upon an expansion of the recreational red snapper season in the Gulf to a new rate that was around 35% (in Texas) and 45% (in Alabama) of the rate seen previously under a mini-season.[25] Even if the most optimistic of those results applied in the South Atlantic, it still would leave the 2026 recreational catch rate around seven times higher than what is necessary for a 39-day season to stay under the Recreational ACL.[26]

Second, there are reasons to doubt whether recreational red snapper catch rates in the South Atlantic would respond to the degree shown in the cited studies. With respect to the Texas study, the authors acknowledge that state waters off Texas are a viable destination for red snapper fishing, and state waters remain open to red snapper fishing year-round.[27] This is a major structural difference from the South Atlantic, where red snapper fishing either is not permitted or is less accessible in state waters, depending on sector and geography. Because of this difference, inferences from the Texas study are limited at best when applied to the South Atlantic. And in the Alabama study, the only metric showing a reduction to 45% of the mini-season rate was landings-by-weight. Both landings-in-numbers and effort remained higher, at 65% and 62% of the mini-season rate respectively.[28] As such, that study is better read as supporting a more modest decrease in per-day catch rates.

Regardless, even if effort decompression did occur in the South Atlantic at rates similar to those in the Gulf studies, recreational red snapper landings in the South Atlantic under the States' EFPs still would end up being in the hundreds of thousands of fish.[29] Relative to recreational landings in recent years,

---

[23] A daily catch rate of 585 fish per day is calculated by taking the recreational ACL of 22,797 fish and dividing it by the anticipated season length proposed by Florida of 39 days. Not only does the 585 fish per day value exclude any landings from the three northern states in their excess days (as they propose 62-day seasons), but it also excludes any landings from the headboat component of the recreational sector. See Florida Fish & Wildlife Commission, Red Snapper Research on the Atlantic Coast, https://myfwc.com/research/saltwater/fishstats/srfs/atlanticredsnapper (noting headboats are counted separately).

[24] See Corbett & Ramsay, supra Note 18, at 3 (Table 1.4) (demonstrating total catch estimates varying from 5,390 to 37,750 red snapper per day, from 2012 to 2025—with season lengths varying between 1 and 9 days).

[25] See Topping et al., supra Note 22, at 1315 (observing during 39-day extended red snapper season in Texas around 35% of the per-day fishing effort and landings-in-numbers observed during short 3-day season); Powers & Anson, supra Note 22, at 5 (observing during 39-day extended red snapper season in Alabama around 46% of the per-day landings-by-weight observed during short 3-day season).

[26] Thirty-five percent of the 2025 catch rate of (over) 12,500 fish per day is (over) 4,375 fish per day, which is still over seven times the necessary catch rate of 585 fish per day in order to stay under the ACL.

[27] See Topping et al., supra Note 22, at 1312.

[28] See Powers & Anson, supra Note 22, a 5.

[29] Applying the most optimistic estimate of 35% from the Topping et al. study to the 2025 landings rate of 12,500 fish per day results in a landings rate of 4,375 fish per day for the 2026 season. Multiplied by the proposed 39-day season yields a total season catch in 2026 of 170,625 fish. The slightly less-optimistic estimate of 45% from the Powers & Anson study yields a total season catch in 2026 of 219,375 fish. And if actual decompression is more like what Powers & Anson document for effort and landings-by-number, the total season catch in 2026 would be over 300,000 fish.

which have been in the range of tens of thousands of fish,[30] this represents a massive increase. And relative to the Recreational ACL of 22,797 fish, this represents a massive overage.

At the end of the day, a region-wide catch rate of 585 landed red snapper per day in the South Atlantic remains implausible based on all available evidence.

Perhaps realizing as much, the States expressly refused to provide any estimates of the landings that would be expected to result under their EFPs.[31] While the States may choose to avoid the issue, NMFS may not.

Granting the EFPs would increase dramatically the amount of recreational red snapper landings in the South Atlantic, and the factual record cannot support the conclusion that recreational landings under the EFPs will stay below the Recreational ACL.[32]

### C.    Dead Discards Will Not Be Reduced Sufficiently to Offset the Increase in Landings Under the States' EFPs.

Landings are only one component of total catch. The other is dead discards—which in the case of South Atlantic red snapper represents the lion's share of total catch and fishing mortality and is primarily driven by the recreational sector.[33]

If the States' EFPs were expected to reduce dead discards by the same amount that they propose to increase landings, then granting the EFPs might not have a significant net impact on the stock's fishing mortality rate.[34] Unfortunately, the facts do not support such a conclusion.

It is important to observe at the outset that dead discards occur year-round for South Atlantic red snapper, and even if the EFPs were granted, 300+ days of the year will remain closed for red snapper

---

[30] See Southeast Data, Assessment, and Review, SEDAR 90: South Atlantic Red Snapper, Section II: Data Workshop Report, at 142 (Dec. 2025 pre-peer review draft) (Table 4.10.15) (recreational landings data).

[31] The States indicate their reason for declining to provide numerical estimates of landings is because MRIP landings data are insufficiently precise.  See, e.g., Florida EFP Application at 3; Georgia EFP Application at 8; South Carolina EFP Application at PDF 8; North Carolina EFP Application at PDF 10–11. But the landings rates used to calculate season lengths generally rely far less on MRIP than on the enhanced sampling conducted by the States themselves during red snapper open seasons. See, e.g., National Marine Fisheries Service, Red Snapper Interim Measures to Temporarily Reduce Overfishing of Red Snapper in the South Atlantic Region for 2024: Environmental Assessment and Regulatory Impact Review, at C-5 (May 17, 2024) (showing data sources for all modes and states, wherein MRIP is used for only two out of twelve data sources).

[32] See Natural Res. Def. Council v. Daley, 209 F.3d 747, 756 (D.C. Cir. 2000) (requiring a minimum likelihood of success of 50% for fishery management measures).

[33] See National Marine Fisheries Service, Southeast Fisheries Science Center, Stock Assessment of Red Snapper off the Southeastern United States: Update of SEDAR 73 Assessment, at 29 (Dec. 2024) (Table 9) (time series of fishing mortality rates with landings and dead discards partitioned out); id. at 31, 33 (Tables 11 and 13) (time series of landings and dead discards by numbers of fish).

[34] The States give a nod in this direction, in their EFP proposals. See, e.g., South Carolina EFP Application at PDF 13 (stating an intent to "allow for a portion of previously discarded fish to be retained, thereby converting some discarded fish to landed fish"); North Carolina EFP Application at PDF 12 ("By allowing retention of red snapper that would otherwise be discarded, the requested EFP converts discards into harvest, [and] makes use of the fishery resource instead of wasting the resource . . . ."); Georgia EFP Application at 7 (similar).

fishing. The States agree that discard rates during that time are not expected to change.[35] As such, the only question is whether, during the additional 37 days (in Florida) or 60 days (in the other states) that are being newly opened to fishing, there will be a decrease in dead discards commensurate with the increased landings occurring during that same time.

The only quantitative evidence in this regard comes from Year 1 (2024–2025) of the State of Florida's ongoing EFPs, distinct from the proposed States' EFPs.[36] These are smaller-scale experiments, working within a fixed cap on landings, in which a limited number of participants were allowed to fish for red snapper out of season with various reporting conditions attached. Florida recently presented results from its ongoing work to the South Atlantic Fishery Management Council,[37] and the tradeoff data between discards and landings was illustrated as follows:



Figure 1: Red Snapper discards demonstrated by Florida Fish and Wildlife presentation at the December 2025 Council meeting. Discards are displayed in dark blue, while harvest (landings) is displayed in light blue. On the left, catch from the "Hot Spot Fleet" (based off NE Florida) is depicted, while on the right the "Southeast Snapper Grouper Fleet" (based off SE Florida) catch is summarized. Both groups had a limited number of participants and tested an aggregate bag limit.

While Florida did not provide the underlying numerical values, nor errors associated with these estimates, it is apparent from these bar charts that when anglers are allowed a one-fish bag limit for red

---

[35] See, e.g., Florida EFP Application at 10; Georgia EFP Application at 6–7, 8–9; 12; South Carolina EFP Application at PDF 9, 12–13; North Carolina EFP Application at PDF 12.

[36] See NOAA Fisheries, South Atlantic Red Snapper Exempted Fishing Permits - Aug 2024 - July 2025, https://www.fisheries.noaa.gov/southeast/recreational-fishing/south-atlantic-red-snapper-exempted-fishing-permits-aug-2024-july.

[37] Florida Fish and Wildlife Conservation Commission, FWC Atlantic Red Snapper EFP Project: Year 1, at 14 (Dec. 2025) (slides), available at https://safmc.net/wp-content/uploads/document-blocks/2025/12/16f50cc6-4af8-4263-8642-54c1d1ce307a-SG_A3a_EFP-Year-1-Update_SAFMC-December-2025.pdf.

snapper, the number of discarded red snapper does indeed go down (i.e., the size of the dark blue bars decreases on each side in the "Experimental Group" compared with the "Control Group").

The issue is that the decrease is modest at best. Even in the group with the most pronounced results (the "Southeast Snapper Grouper Fleet"), discards are reduced at most by half. And these are discards—not dead discards. The agency's most recent estimate is that 23% of discarded red snapper die.[38] This is important when considering how much reduction in discards would be needed to offset increases in landings. Given only 23% of any reduction in discards actually represents a saved fish, any increase in landings (the light blue bars above) would have to be offset by a decrease in discards (the dark blue bars above) that is roughly four times larger than the increase for total catch to remain the same.[39] It was clear that such an offset did not occur in the Florida EFP.

In fact, Florida's data shows that landings *increased* by more than discards were *reduced*—even before considering dead discards. The result from the Florida EFP is that total catch increased substantially in the switch from a prohibition (i.e., a day of closed season) to a one-fish bag limit (i.e., a day of open season).

Thus, not only does the available evidence support the conclusion that landings will increase significantly upon increasing the open season for South Atlantic red snapper (as discussed in Section I.B above), but it also refutes the notion that the increase in landings will be offset by a corresponding decrease in dead discards.

### D. The Increased Fishing Mortality from the States' EFPs Will Cause Overfishing for South Atlantic Red Snapper.

The current proxy for fishing mortality at maximum sustainable yield ($F_{MSY}$) for South Atlantic red snapper is defined as the fishing mortality rate the stock experienced across the years of 2021–2023.[40] This $F_{MSY}$ proxy, as it is defined at any given moment, is the overfishing status determination criterion for the stock.[41]

What this means is that overfishing will occur for South Atlantic red snapper if the fishing mortality rate increases at all, relative to the 2021–2023 period.

Because the States' EFPs *will* increase recreational landings of South Atlantic red snapper dramatically (as discussed in Section I.B above), and recreational dead discards will not be reduced to the amount necessary to offset the increased landings (as discussed in Section I.C above), while at the same time the remaining contributors to fishing mortality will remain roughly constant, the necessary conclusion is that granting the EFPs will result in overfishing in 2026.

---

[38] See SEDAR 73 Update, supra Note 33, at 21 (Table 1).

[39] This is enough of a visual to see that the reduction in discards is smaller than the increase in landings – and that is before translating discards into dead discards (by multiplying by 0.23).

[40] See 90 Fed. Reg. at 24,529; see also SEDAR 73 Update, supra Note 33, at 17 (numerical estimate of 0.34 for $F_{2021-2023}$).

[41] 90 Fed. Reg. at 24,529.

8

Each of the components of fishing mortality has been discussed at different points above, but for clarity they are consolidated here:

- Commercial landings in the South Atlantic are tracked via logbooks and human observers, and they have remained within a fairly steady range in recent years.[42] They will not be affected by the States' EFPs, and as such they are not expected to change in a substantial way in 2026.[43]

- Commercial dead discards are estimated through extrapolation based on observer records, and are subject to a fair amount of uncertainty.[44] It is well understood, however, that virtually all commercial discards are regulatory discards, and the regulatory constraints for the commercial sector (season length, trip/bag limits, etc.) have been consistent across recent history. Commercial dead discards in 2026 accordingly can be expected to be similar to what they were in 2021–2023.[45]

- Out-of-season recreational dead discards are estimated via the Marine Recreational Information Program (MRIP), Florida's State Reef Fish Survey (SRFS) program and the for-hire surveys.[46] Out-of-season discards comprise the vast majority of recreational discards,[47] and under the EFPs, the amount of discarding on a given out-of-season day in 2026 can be expected to be basically the same as the amount of discarding on an out-of-season day in 2021–2023 as the prevailing fishing practices and governing regulations will be similar.[48]

- In-season recreational landings[49] are estimated via the same data sources, as well as state-enhanced sampling during the mini-seasons. As discussed in Section I.B above, the per-day rate of landings during the open season in 2026 may be somewhat lower than what occurred in 2021–2023, but the total season-wide landings will be much higher because the number of open-season days will increase from two or three to 39 (in Florida) and 62 (in the other states).

- In-season recreational dead discards are estimated by the same data collection programs. Per-day discarding rates may end up being lower during the open season, compared to closed-season discard rates. If so, extending the length of the open season in 2026 would result in

---

[42] See, e.g., SEDAR 73 Update, supra Note 33, at 32 (Table 12) (showing commercial landings for 2021–2023 around 125,000 lbs./year); South Atlantic Fishery Management Council, South Atlantic Commercial Landings for 2024 and 2025 (Dec. 2025), available at https://safmc.net/documents/south-atlantic-commercial-landings_dec2025-pdf (showing commercial landings averaging around 120,000 lbs./year for 2024 and 2025).

[43] 91 Fed. Reg. at 6828 (noting commercial season "would occur as usual in a manner consistent with the current regulations"). Note that the Commercial ACL has dropped slightly (from 124,815 to 102,951 pounds) due to Amendment 59, but the variance of actual landings around the nominal ACL is significant enough as to obscure any immediate trend. See, e.g., South Atlantic Commercial Landings for 2024 and 2025, supra Note 42 (showing around 144,000 pounds of red snapper landed commercially in 2025, with a nominal Commercial ACL for that year of around 103,000 pounds).

[44] See SEDAR 90 Data Process Report, supra Note 30, at 39–40 (discussing the uncertainty and spatial variation in commercial discard estimates); id. at 49–50 (Table 3.5) (providing numerical estimates for commercial discards).

[45] 91 Fed. Reg. at 6828.

[46] See SEDAR 90 Data Process Report, supra Note 30, at 149 (Table 4.10.18).

[47] Compare id. at 137–140 (Tables 4.10.14a–d) (in-season discards) with id. at 143–144 (Table 4.10.16) (total discards).

[48] See generally supra Note 35.

[49] To the extent there is out-of-season landing of red snapper, it is not likely to be affected by the States' EFPs.

modestly reduced total recreational dead discards for the year, relative to 2021–2023. But as explained in Section I.C above, this reduction would be swamped by the corresponding increase in landings.

This breakdown of total fishing mortality on the South Atlantic red snapper stock is important because having defined the overfishing threshold as $F_{2021-2023}$, NMFS cannot authorize substantial new amounts of fishing mortality on the stock without providing corresponding reductions elsewhere in the fishing mortality "budget."

All available information demonstrates that the States' EFPs will allow a massive increase in recreational landings without reducing recreational dead discards by enough to even come close to offsetting the increased landings-based mortality. <u>There is no way for NMFS to conclude that overfishing will not occur in this situation.</u>

>   **E.      Nothing in the South Atlantic Red Snapper Research Program Changes These Conclusions.**

Florida's EFP proposal references a recent research project called the South Atlantic Red Snapper Research Program[50] (also called the "South Atlantic Great Red Snapper Count") in arguing that the red snapper stock is healthy and can withstand increased fishing pressure.[51]

But the South Atlantic Red Snapper Research Program does not provide any scientific basis for increasing South Atlantic red snapper season lengths.

As NMFS is well aware, status determination for South Atlantic red snapper occurs through the stock assessment process, with the latest assessment being the SEDAR 73 Update. The safe level of fishing mortality for a stock is determined within the assessment, and projections are used to translate that rate into forward-looking catch limits.

Stock assessments are used for this purpose because their statistical models are dynamic—meaning they are designed to simulate the changing population over time. Population dynamics like recruitment, growth, and natural and fishing mortality are modeled explicitly, which enables stock assessments to produce equilibrium and current estimates of fishing mortality, biomass, yield and the like.

The South Atlantic Red Snapper Research Program, by contrast, is an abundance study, which produces a snapshot of the red snapper stock at one moment in time. Abundance studies are not capable of estimating $F_{CURRENT}$, $F_{MSY}$, or $B_{MSY}$ by themselves. They must be integrated into a stock assessment,[52] and only from the stock assessment can such values be derived.

---

[50] See South Atlantic Red Snapper Research Program, https://sarsrp.scseagrant.org.

[51] See Florida EFP Application at 7 (claiming "results from the South Atlantic Red Snapper Research Project indicating that the population may be 2.7 times higher than previously estimated"); id. at 8 (similar).

[52] See, e.g., W.F. Patterson III, et al. (eds.), Population Estimation of U.S. Atlantic Red Snapper: Final Report to the South Atlantic Red Snapper Research Program (Dec. 19, 2025), at vi (" Data and analytical products produced during this work have already been incorporated into the SEDAR 90 assessment process, and the parallel process of incorporating CKMR into the assessment model should enable an even greater application of the data and methods developed during this study to be brought to bear for red snapper assessment, management, and conservation.").

Because it is simply a snapshot of current abundance, the South Atlantic Red Snapper Research Program cannot support the proposition that South Atlantic red snapper can withstand increased fishing pressure over time. The implications of the South Atlantic Red Snapper Research Program—if any—on MSY or $F_{MSY}$ for red snapper will be evaluated through the SEDAR 90 stock assessment process,[53] which is underway and scheduled to complete later this year or early 2027.

Florida's reliance on the South Atlantic Red Snapper Research Program is spurious for a narrower reason as well.  The authors of that study used two different methodologies to estimate abundance: close kin mark-recapture genetic analysis and habitat-based extrapolation. The close kin mark-recapture method yielded an abundance estimate for the stock that was similar to SEDAR 73 Update.[54] Study authors and peer reviewers concluded there was a reasonable degree of certainty around this result.[55] The habitat-based extrapolation method yielded an extremely wide range of possible results, within which the expert opinion-selected point estimate was significantly higher than SEDAR 73 Update.[56] But the uncertainty around this result was so high that study authors recommended against relying on it,[57] and the peer review report agreed, saying the method was "too uncertain to provide a sufficiently reliable…population abundance estimate of red snapper.[58]

Despite this, the habitat-based extrapolation result is what Florida relies on in its EFP to claim that the South Atlantic red snapper population is more abundant than previously believed.[59] Florida fails to mention the fact that study authors recommended against this result—and the peer review panel deemed it too uncertain for use—and also declines to mention the existence of the more reliable genetics-based result. This kind of cherry-picking of results is entirely inappropriate.

In sum, the South Atlantic Great Red Snapper Count does not provide any scientific support for the massive increase in recreational landings proposed by the States' EFPs.

## II.    Approving the Proposed EFPs Constitutes an Explicit Plan by NMFS To Not Comply with the Statutory Requirements for ACLs and Preventing Overfishing.

Approving the States' EFPs would, for the reasons noted above, result in landings vastly overshooting the red snapper ACL of 34,000 fish and a fishing mortality rate well above the current overfishing threshold of $F_{2021–2023}$. The Magnuson-Stevens Act does not allow this.

---

[53] See SEDAR 90 Data Workshop Report, supra Note 30, at 7–8 (Terms of Reference for SEDAR 90 tasking team with incorporating Great Red Snapper Count results into stock assessment); Patterson III et al., supra Note 52, at 92 (noting "the intention has always been to incorporate at least CKMR population estimation directly into the Beaufort Assessment Model (BAM) for Atlantic red snapper").

[54] See Patterson III et al., supra Note 52, at vi.

[55] See id. at 91 (study authors); Southeast Data, Assessment, and Review, South Atlantic Red Snapper Research Program (SARSRP): Review Workshop Report, at 7 (Feb. 13, 2026) (peer reviewers).

[56] See Patterson III et al., supra Note 52, at v–vi.

[57] See South Carolina Sea Grant Consortium, South Atlantic Red Snapper Research Program (SARSRP) Core Messaging Document, Version 1, at 3 (Oct. 16, 2025) (noting "very high degree of uncertainty"); id. at 4 (observing uncertainty was "too great to confidently say where the population is").

[58] SARSRP Review Workshop Report, supra Note 55, at 16.

[59] See Florida EFP Application at 7 (claiming population is 2.7 times larger than previously estimated, which relies on habitat-based extrapolation method from Great Red Snapper Count); id. at 8 (same).

11

*Annual Catch Limits*

To the extent NMFS is in compliance with the statutory requirement for ACLs and accountability measures for South Atlantic red snapper, it is through the ACL mechanism established in Amendment 43 and adjusted in Amendment 59 (as explained in Section I.A above). That mechanism is principally located at 50 C.F.R. § 622.193(y), and includes a numerical landings-based ACL as well as accountability measures that constrain recreational season length and commercial landings.

If NMFS were to approve the States' EFPs, the agency would render meaningless the numerical limit and accountability measures at 50 C.F.R. § 622.193(y). The ACL no longer would function as a limit in any reasonable sense of the word because catch explicitly would be allowed to exceed the stated numerical value. And the corresponding measures regarding recreational season length no longer would serve to constrain recreational landings in any way, as they simply would not be applied during 2026; this would remove their status as accountability measures.[60]

In the place of the ACL and accountability measures at 50 C.F.R. § 622.193(y), the States' EFPs would provide an open-ended amount of landings for the recreational sector    and, accordingly, an open-ended amount of catch for the fishery as a whole. The EFP proposals expressly disclaim any numerical limit on recreational landings (much less total catch) for 2026, and without any limit, there are no corresponding measures to ensure accountability.[61]

Thus under the States' EFPs, South Atlantic red snapper would lack an operational ACL and accountability measures in violation of 16 U.S.C. § 1853(a)(15).

*Overfishing*

Similarly, the agency would violate the statutory prohibitions on overfishing if it granted the States' EFPs because (as explained in Section I.D above) fishing mortality in 2026 would exceed the specified threshold of $F_{2021-2023}$.

The Act addresses overfishing on a prospective basis in National Standard 1 and the core management requirement at 16 U.S.C. § 1853(a)(1). In essence, NMFS must ensure that management measures are in place for all stocks that prevent overfishing.

To the extent the agency is in compliance with the statutory prohibitions on overfishing for South Atlantic red snapper, it is through the regulatory measures at 50 C.F.R. Part 622 Subpart I (i.e., the measures implementing the Snapper-Grouper Fishery Management Plan). The regulatory framework in that Subpart provides limited entry for the commercial sector, various closed and gear-restricted areas,

---

[60] Note that while the States' EFPs formally would displace only the recreational side of the ACL mechanism, at that point nothing would be served by limitation of the commercial sector; a mechanism cannot operate when constraints are removed on the vast majority of catch.

[61] Some of the States' EFPs attempt to characterize aspects of the proposals as accountability measures.  See, e.g., Florida EFP Application at 12 (asserting "annual meetings" are an accountability measure); Georgia EFP Application at 13 (same); North Carolina EFP Application at PDF 6 (same); South Carolina EFP Application at PDF 8 (asserting a two-month season combined with a bag limit of one fish constitutes an accountability measure); North Carolina EFP Application at PDF 1 (cover letter) (same). These attempts are absurd on their face but, more importantly, fail as a logical matter because there is no corresponding limit to which the cited measures would be creating accountability.

12

prohibitions on certain gear types, and an integrated prohibition on landing species out of season for both commercial and recreational sectors which—when combined with the provision for red snapper seasons at 50 C.F.R. § 622.193(y)    allows for a limited amount of red snapper landings each year. These measures prevent overfishing (at least in theory) because they are calibrated to landings estimates derived from $F_{MSY}$-based calculations in stock assessments.

The function of granting the States' EFPs for 2026 and beyond would be to throw this management framework out the window. To be clear, the regulatory text would remain in the Code of Federal Regulations, but it would cease to have the effect of preventing overfishing on South Atlantic red snapper. A far larger amount of red snapper landings would be permitted under the EFPs than otherwise would be permitted under 50 C.F.R. Part 622 Subpart I, and this would render the general prohibition/affirmative landings structure in that Subpart ineffective.

By temporarily removing the regulatory measures that prevent overfishing on South Atlantic red snapper, NMFS, in granting the States' EFPs, would place the fishery in violation of National Standard 1 and 16 U.S.C. § 1853(a)(1) as well as potentially other statutory provisions relating to overfishing.

### III.    EFPs May Not Be Used to Waive the Statutory Requirements for Annual Catch Limits and Preventing Overfishing.

The Magnuson-Stevens Act does not authorize NMFS to exempt fishing activities from the statute's basic conservation and management requirements. NMFS issues exempted fishing permits pursuant to its internal regulations at 50 C.F.R. § 600.745 which address scientific research activity, exempted fishing, and exempted educational activity. At paragraph (b)(1) of that section, the agency asserts that it "may authorize…the target or incidental harvest of species managed under an FMP or fishery regulations that would otherwise be prohibited." However, the MSA only provides express authority for the agency to issue experimental fishing permits that promote conservation and research that supports sustainable management.

NMFS's authority to issue EFPs rests on 16 U.S.C. § 1867(d), part of a Cooperative Research and Management section Congress added in 2006. That provision directed NMFS to "promulgate regulations that create an expedited, uniform, and regionally-based process to promote issuance, where practicable, of experimental fishing permits."[62]

Notably, the word "exempt" or "exempted" appears nowhere in this provision. The plain text of 16 U.S.C. § 1867(d) addresses experiments; it does not actually state that such experiments may be exempted from the substantive requirements of the Act or any other legal requirements.

Furthermore, the context of 16 U.S.C. § 1867 as a whole demonstrates that this section is meant to promote cooperative research and data-collection projects that support management and promote conservation. A Report from the Senate Committee on Commerce, Science, and Transportation regarding the 2006 MSA Amendments explained that the new section would fund "research and management activities that are consistent with the goals of the Magnuson-Stevens Act," prioritizing conservation-oriented research on issues like bycatch reduction and habitat protection.[63] It is apparent that Congress meant sec. 1867(d) to promote experimental fishing activities that serve research and

---

[62] Pub. L. No. 109–479, § 204, 120 Stat. 3575, 3614–15 (Jan. 12, 2007), codified at 16 U.S.C. § 1867(d).
[63] S. Rep. No. 109–229, at 38–39.

13

management needs, advance conservation objectives, and are consistent with the MSA's goals—which include, above all else, preventing and ending overfishing. Nothing in this section or anywhere else in the MSA allows NMFS to use EFPs to exempt an entire fishery sector from the statute's most basic requirements.

Approving the States' EFPs, as explained above, would directly violate core conservation mandates in the Act—the prohibition on overfishing and the requirement for annual catch limit management. Nothing in 16 U.S.C. § 1867(d) allows this result.

Finally, as an independent matter, approving the States' EFPs would violate NMFS's own regulations at 50 C.F.R. § 600.745(b). Those regulations require EFP applications to include "the amount[] of . . . harvest necessary to conduct the [proposed] exempted fishing," among other things.[64] None of the States' EFPs specifies such an amount—and in fact, each expressly declines to do so.[65] Moreover, NMFS's regulations provide specific grounds for denial of EFP applications, which include reasons such as failing to include material information in the application, harming fish stocks, using EFPs to functionally allocate harvest, and creating enforcement problems.[66] Here, the States' EFPs appear to meet every reason for denial listed in NMFS's regulations.

## IV.     The Proposed EFPs Do Not Improve Data Collection in a Meaningful Way.

Recreational data collection is important. In the Southeast region, recreational fishing is the largest source of fishing mortality for many managed species. South Atlantic Red snapper is a good example, with around 90% of total catch in recent years coming from the recreational sector.[67] The recreational fishery (both for-hire and private angler components) remains open-access, and regional population growth combined with increases in available technologies has led to a steady increase in fishing pressure.[68]

Accurate and precise data on recreational fishing helps to enable successful management for the fishery as a whole. Scientists use recreational fishing data in stock assessments, where it can inform estimates of population size and removals. On the management side, recreational data is used in calculating the length of fishing seasons, ensuring allocations are respected, and analyzing different configurations for fishing opportunities.

Currently, recreational fishing catch and effort data are collected through surveys administered by the Marine Recreational Information Program (MRIP) which is a data collection partnership composed of over 25 surveys administered among states, commissions and federal entities. While the "MRIP general survey" is primarily composed of estimates from the MRIP Fishing Effort Survey (FES, a mail-based survey) and Access Point Angler Intercept Survey (APAIS, a dock-side survey), the MRIP partnership

---

64 50 C.F.R. § 600.745(b)(2)(v).

65 See Florida EFP Application at 3; Georgia EFP Application at 8; South Carolina EFP Application at PDF 8; North Carolina EFP Application at PDF 10–11.

66 50 C.F.R. § 600.745(b)(3)(iii).

67 See generally SEDAR 73 Update, supra Note 33, at 31, 33 (Tables 11 and 13) (time series of landings and dead discard estimates).

68 See generally Steven J. Cooke et al., Technological Innovations in the Recreational Fishing Sector: Implications for Fisheries Management and Policy, 31 Revs. Fish Biology & Fisheries 253 (2021); Kyle W. Shertzer et al., Recreational sector is the dominant source of fishing mortality for oceanic fishes in the Southeast United States Atlantic Ocean, 26 Fisheries Mgmt. & Ecol. 621 (2019).

includes Florida's State Reef Fish Survey (SRFS), several other state sampling programs, and charter fishing surveys, such as Southeast Region Headboat Survey.[69]

Ocean Conservancy supports the MRIP partnership and believes it plays an important role in our national system of data collection. We also see the potential for further improvements in recreational data collection through this partnership. In fact, through the MRIP partnership, there are existing pathways for standing up new data collection programs and implementing them for use in science and management. If the South Atlantic states demonstrate a desire and an ability to administer scientifically rigorous data collection programs to supplement MRIP, such programs could be a useful addition to the recreational data toolkit, however, they should follow the prescribed pathways for development.

The States' EFPs criticize surveys administered by MRIP (notably the FES), alleging insufficiently accurate and precise data,[70] and offer the view that states could improve upon data collection—at least for the private angler component of the recreational fishery. Further, each of the EFPs are characterized as a "pilot program" which, by definition, is a small-scale, preliminary test of a new idea, product or process to evaluate the feasibility and effectiveness before a full-scale rollout. However, all of these EFPs lack experimental design, and EFPs from all the states lack limits on the number of participants. While the EFPs propose to collect additional information, it is unclear how the EFPs would *improve* data collection and how the EFP methods could ultimately integrate with the existing datasets. Unfortunately, the reality is that there is very little information available that suggests the data collected from the EFPs could be used in science or for management purposes in the future.

Fundamentally when considering transitioning methodologies, new programs should improve data quality compared to legacy methods. Metrics to evaluate improvements include things like improving the accuracy and/or precision of catch and effort estimates; timeliness of data; and achieving higher sampling rates at reduced cost to taxpayers and license holders. Ocean Conservancy stresses that any new data collection programs must be well-designed and follow the established pathways for development and implementation. For the reasons discussed below, the States' EFPs fail to improve data quality.

### A. There is an Existing Pathway for New Data Collection Programs, However, the EFPs Circumvent this Process.

Processes and institutions exist to help the States design robust data collection programs. There are two core components that can be immediately leveraged by the States for new data collection programs that have been ignored: Partnerships and Data Standards.

As an initial step, states should consult with the NOAA Fisheries Office of Science and Technology (OST) MRIP Team to discuss the potential for collaboration and data collection opportunities through the existing partnership pathways. MRIP is congressionally mandated and funded, and as such, it is going to remain an important partnership for all entities interested in collecting recreational fisheries data. The partnership entails collaboration among state, federal, commission and other data-collection partners

---

[69] See NOAA Fisheries, Recreational Fishing Surveys, https://www.fisheries.noaa.gov/recreational-fishing-data/recreational-fishing-surveys (last visited Mar. 3, 2026).

[70] See, e.g., Florida EFP Application at 2; Georgia EFP Application at 2; South Carolina EFP Application at PDF 4; North Carolina EFP Application at PDF 4.

and includes regular coordination meetings, statistical support and financial assistance. As part of this, the Atlantic Coastal Cooperative Statistics Program (ACCSP) is a cooperative state-federal program that standardizes and centralizes marine fisheries data along the U.S. Atlantic Coast.[71] The States should engage ACCSP to establish data warehousing and access protocols, including public access and standardized error reporting. This is core ACCSP work, and the states should leverage that capability.

The second component is data standards. There are National Recreational Fishing Survey and Data Standards which were developed to ensure statistical rigor and data quality from recreational data surveys.[72] These data standards recently underwent peer-review by the National Academies of Sciences, Engineering, and Medicine, and were found to be well designed.[73] These data standards serve as an entry point for new recreational data collection programs and provide mostly sequential guidelines for the development of survey design, review, funding and transparency of data. The West Coast state surveys follow these standards and the Gulf states are in the process of achieving these standards. Adherence to data standards remains aspirational in the Gulf, for instance, most states don't make their catch and effort information publicly accessible, and only one state produces estimates of uncertainty (PSEs), however, progress is being made with the development of a centralized database by the Gulf States Marine Fisheries Commission.

The proposed South Atlantic EFPs, however, would circumvent this process entirely. Specifically, the new methodologies proposed include both voluntary and mandatory collection programs that lack experimental design or consideration of improved data outcomes (i.e., improved timeliness of data, precision, or reduced cost). Florida proposes to add a voluntary smartphone-based app for private angler self-reporting, on an optional basis to report red snapper catch and discards during the proposed 39-day season.[74] Meanwhile, North Carolina, South Carolina, and Georgia, propose to make mandatory for private anglers a self-reporting app—VESL—which is already in use by South Carolina for the for-hire sector. The app would be limited to red snapper only and would be used only during July and August (i.e. the proposed open season for red snapper for those three states). Compliance would be enforced by state law enforcement and/or natural resource agency staff, who would check authorization codes through access point intercepts.[75] While the use of VESL helps "standardize" the data collected, that does not ensure the data collected is statistically robust or that the experimental design is sound. A major challenge with these newly proposed programs is that as non-probability-based sampling systems, voluntary angler self-reporting programs suffer from significant biases in the data they collect. The biases arise from several sources, including low participation rates and high attrition, selection for avidity, and underreporting of null values. Because of these statistical issues, the usefulness of voluntarily self-reported data has been very limited. Even when "mandatory," angler self-reporting programs usually are regarded as non-probability-based sampling rather than as censuses.

---

[71] See Atlantic Coastal Cooperative Statistics Program, https://www.accsp.org (last visited Mar. 3, 2026).

[72] See NOAA Fisheries, Recreational Fishing Survey and Data Standards https://www.fisheries.noaa.gov/recreational-fishing-data/recreational-fishing-survey-and-data-standards (updated Dec. 1, 2025).

[73] See National Academies Consensus Study Report Highlights: Promoting the Quality of Data on Marine Recreational Fishing (Jan. 2026), available at https://nap.nationalacademies.org/resource/29282/Marine_Recreational_Fishing_Report_Highlights.pdf.

[74] See generally Florida Fish & Wildlife Conservation Commission, FWC's Atlantic Red Snapper Exempted Fishing Permit (EFP) Project, https://myfwc.com/fishing/saltwater/recreational/atlantic-red-snapper-efp (last visited Mar. 3, 2026).

[75] See Georgia EFP Application at 4; South Carolina EFP Application at PDF 9; North Carolina EFP Application at PDF 8.

A clear pathway is already established: After beginning a dialogue with NOAA OST and other MRIP partners, the States should develop a survey plan (Standard 1.1), survey design (Standard 2), develop data processing, editing, and quality control procedures (Standard 3) and pursue MRIP-certification (Standard 5.1) for their sampling designs. One of the foundational outcomes of pursuing the data standards is review of the proposed experimental design as a part of pursing certification.[76] Certification assures the survey administrator that the design and estimation methods are eligible for technical and financial support for implementation. Beyond certification, the standards include elements such as developing calibrations (a well-researched and documented issue),[77] producing publicly accessible data and estimates of uncertainty, producing annual reports and undergoing peer-review. All MRIP surveys are expected to adhere to the data standards as a condition of receiving ongoing funding support and in turn, are provided reasonable assurance that data produced can be integrated into science and management.

### B.       The States' EFPs Do Not Propose Any New Data Collection for the Largest Component of Red Snapper Total Catch: Out-of-Season Discards.

The States' EFPs heavily criticize the MRIP general survey-catch estimates and frame up their proposals as responses to what they believe are unrealistically high estimates of red snapper catch.[78] By far the largest component of catch for South Atlantic red snapper is recreational dead discards,[79] most of which occur out of season.[80] Dead discards are what drive management of the stock because they occur at such a high level, only a small amount of catch is left over for landings.[81]

Yet the States' EFPs do nothing to improve data collection for out-of-season recreational discards. Both the voluntary red snapper app proposed by Florida and the mandatory VESL app proposed by the other states would be used only during the open season for red snapper. When read carefully, the States' EFPs either explicitly or implicitly acknowledge that out-of-season discards would continue to be estimated by the MRIP general survey.[82]

To the extent the States wish to pursue app-based angler self-reporting, a survey program could be designed collaboratively with the goal of supplementing the MRIP general survey. But at this point, if the concern is to address the key driver of high recreational catch estimates, the States should be focusing

---

[76] NOAA Fisheries, Policy 04-114: Recreational Fishery Catch and Effort Survey Design (Sept. 21, 2023), available at https://www.fisheries.noaa.gov/s3/2023-09/Policy-04-114-Final-9.21.23-508-Compliant-signed-JC.pdf.

[77] Office of Science & Technology, NOAA Fisheries, Recommended Use of the Current Gulf of Mexico Surveys of Marine Recreational Fishing in Stock Assessments (rev. Aug. 2020), available at: https://media.fisheries.noaa.gov/dam-migration/94100569.pdf.

[78] See Florida EFP Application at 2; Georgia EFP Application at 2; South Carolina EFP Application at PDF 4; North Carolina EFP Application at PDF 4.

[79] See SEDAR 73 Update, supra Note 33, at 29 (Table 9).

[80] See SEDAR 90 Data Workshop Report, supra Note 30, at 132 (Table 4.10.12) (listing season length in recent years).

[81] See, e.g., 90 Fed. Reg. at 24,528 (" Most of the red snapper fishing mortality is attributed to dead discards in the recreational sector.").

[82] See, e.g., Georgia EFP Application at 12 ("Georgia will continue to conduct MRIP related data collection throughout the year."); South Carolina EFP Application at PDF 9 ("This proposal does not address catch estimates or discard rates for the other four fishing waves.").

17

on dead discards—and the two self-reporting programs proposed in the States' EFPs miss the mark in this regard.

### C.    The Changes in Data Collection Programs and Methods Makes Data Streams Inconsistent, Not Comparable, and May Render the Data Unsuitable for Use.

The hasty proposals to prop up new data collection programs create biases and inconsistencies in data streams that may confuse the agency's ability to estimate catch during the 2026 season and project catch into the future. For new programs to be established, they must be operated alongside existing data collection for years to provide a smooth transition. Without this, a shift from federal to state management would be unlikely to result in sustainable management and rebuilding of the stock for the benefit of both commercial and recreational fishing.

Before any new data sources can be used in management they must be calibrated. This means running the new data collection program side-by-side (benchmarking) with existing data collection programs that serve as the basis for management quantities (ACLs, OFLs, etc.). This concept has been discussed at length in the Gulf and referred to as calibration or developing a common currency.[83] For South Atlantic red snapper, this means running new state-based mandatory self-reporting systems in parallel with the MRIP general survey for enough time to determine a reliable calibration ratio between the two, and ensuring there are periodic benchmarks that occur after the surveys have been calibrated to ensure any deviations over time are addressed.

All of this is doable—but it takes time, resources, and commitment. North Carolina, South Carolina and Georgia propose to establish mandatory angler self-reporting using the VESL app, with 2026 as the launch year. They propose to treat the self-reported data as a census from the start, with no analysis of compliance rates or bias. They further propose to use data collected in 2026 as the basis for management in 2027 and 2028, apparently in the place of the MRIP general survey.

Without the requisite framework for consistency among the state data collection programs,[84] managers will lack data in consistent units, meaning they won't have what they need for measuring the catch from one state against another or comparing it to the catch limit. As stated above, in itself, this creates a legal vulnerability to the EFPs as catch cannot be compared to the catch limits.[85] There is no mention of correction factors, biases or statistical methods in the EFPs. Bluntly, it is statistically indefensible to begin generation of brand new data streams and use them solely for catch accounting against limits set using well-established, long-term data sets.[86] All three states indicate they will not be applying any correction factors for under-coverage or other reasons. This remains important even if a self-reporting

---

[83] See NOAA Fisheries, Red Snapper Data Calibrations and Catch Limit Modifications, https://www.fisheries.noaa.gov/action/red-snapper-data-calibrations-and-catch-limit-modifications (updated June 18, 2025).

[84] NOAA Fisheries, Procedural Directive 04-114-01: Guidance and Procedures for the Transition Process for Modification of Recreational Fishing Catch and Effort Methods (Jan. 17, 2025), available at: https://www.fisheries.noaa.gov/s3/2025-01/04-114-01-Revision-EAH.pdf.

[85] See Recommended Use of the Current Gulf of Mexico Surveys, supra Note 77, at 4 ("Options 1a and 4 are the only possibilities for the South Atlantic region, as there are no competing state surveys, but Option 4 is statistically indefensible. Having catch estimates that are comparable both across states and throughout the historical time series should be the top priority.").

[86] Id.

system achieves high compliance rates, yet none of the EFPs commits to—or even mentions—analyzing statistical biases or coverage gaps. This alone could render the data unusable.

In its current state, the proposed self-reporting program will not be able to provide catch numbers that are independently usable or statistically defensible. We reiterate that the best first step is for NOAA and the States to review the existing data standards and begin a dialogue with NOAA OST through MRIP teams to determine options for developing new data collection methods that are well-designed.

For these reasons, Ocean Conservancy recommends NMFS deny the EFPs and all parties return to the drawing board to work through program design in earnest.

*          *          *

Thank you for your consideration.  Please do not hesitate to reach out with any questions or concerns.

Sincerely,

**Meredith Moore**
Director, Fish Conservation, Ocean Conservancy

**Catherine Bruger**
Manager, Fish Conservation, Ocean Conservancy