**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SOUTHEASTERN FISHERIES
ASSOCIATION, INC.; SLASH CREEK
WATERWORKS, INC.; STRAWBERRY,
INC.; JEFFREY ODEN; JACK COX, JR.;
and ANTONIO GIAMBANCO.

No. 1:26-cv-01533-RC

                Plaintiffs,

     v.

HOWARD LUTNICK, in his official capacity
as Secretary of Commerce; and NATIONAL
MARINE FISHERIES SERVICE

                Defendants

**DECLARATION OF MARTHA GUYAS**
**IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR STAY**

I, Martha Guyas, declare as follows:

1.    I am Martha Guyas, the Southeast Fisheries Policy Director of the American Sportfishing Association. I am over the age of eighteen, am competent to make this declaration, and submit this declaration in support of Intervenor-Defendants American Sportfishing Association ("ASA") and Coastal Conservation Association ("CCA") in opposition to Plaintiffs' Motion for Preliminary Injunction or Stay. The facts stated in this declaration are based on my personal knowledge. This includes work with ASA and CCA, my review of organizational records and public fisheries-management materials, the March 10, 2026, public comment submitted jointly by ASA and CCA to the National Marine Fisheries Service ("NMFS") regarding the South Atlantic red snapper exempted fishing permits ("EFPs") (the "ASA/CCA Comment") (attached as Exhibit 1), and publicly available materials before NMFS in connection with the challenged EFPs (the "NMFS Record").

1 of 15

Exhibit A

2.    ASA and CCA supported the state-led EFP proposals because those proposals offer a practical, conservation-oriented, and data-driven path forward for a South Atlantic red snapper fishery that has been managed under severe recreational restrictions for more than fifteen years despite the stock's substantial rebuilding progress. ASA and CCA submitted the ASA/CCA Comment to NMFS on March 10, 2026, urging prompt approval of the EFP applications submitted by Florida, Georgia, South Carolina, and North Carolina. *See* ASA/CCA Comment at 1–3.

3.    ASA is the nation's trade association representing the recreational fishing industry. In the ASA/CCA Comment, ASA explained that it supports conservation, access, and sound fisheries management on behalf of approximately 800 member companies and the 57 million Americans who fish recreationally each year. *See* ASA/CCA Comment at 1. ASA's membership includes sportfishing manufacturers, retailers, wholesalers, and angler advocacy groups, and those businesses equip recreational anglers who pursue South Atlantic red snapper throughout its range. *See* Declaration of Glenn Hughes in Support of American Sportfishing Association's Motion to Intervene as a Defendant ("Hughes Decl.") ¶¶ 2, 4, ECF No. 9-1. ASA safeguards and promotes the social, economic, and conservation values of sportfishing in America, which ASA has described as producing a $230 billion per year impact on the national economy. *See* Hughes Decl. ¶ 2. ASA's advocacy work includes policy, science, and conservation efforts directed toward clean waters, sustainable fisheries, and access to both. *See* Hughes Decl. ¶ 3.

4.    CCA is a national nonprofit organization founded in 1977 and dedicated to ensuring sustainable, science-based management of marine resources and enhancing access for recreational angling. *See* ASA/CCA Comment at 1. CCA has active chapters throughout the coastal United States and more than 100,000 members. *See* Declaration of Patrick Murray in Support of Coastal Conservation Association's Motion to Intervene as a Defendant ("Murray Decl.") ¶ 2, ECF No. 9-

2. CCA's purpose is to advise and educate the public on conservation of marine resources. *See* Murray Decl. ¶ 2. CCA has participated in national fisheries debates, supported scientific and habitat projects, and worked to protect the interests of recreational anglers while promoting sustainable coastal resources. See Murray Decl. ¶¶ 2, 5–6.

5.      ASA and CCA are among the national recreational angling organizations that have worked to support efforts to improve science, data collection and management for South Atlantic fisheries including state-led programs. *See* ASA/CCA Comment at 1. Both organizations have actively participated as recreational fishing stakeholders in the scientific and management discussions concerning South Atlantic red snapper and have advocated for meaningful data collection and management improvements for this fishery. *See* Hughes Decl. ¶¶ 5–6; Murray Decl. ¶¶ 5–6. The South Atlantic red snapper fishery is important to recreational anglers, coastal communities, and the recreational fishing industry. South Atlantic recreational fishing produces substantial economic activity through expenditures on boat fuel, tackle, bait, ice, supplies, for-hire charter and headboat operations, hotels, restaurants, tourism businesses, marinas, and boat repair services. *See* ASA/CCA Comment at 17–18. ASA and CCA's members include recreational anglers and businesses that benefit from reasonable, predictable access to sustainably managed South Atlantic red snapper. *See* Hughes Decl. ¶¶ 4–5; Murray Decl. ¶¶ 4–5.

6.      The EFPs challenged in this litigation were approved after Florida, Georgia, South Carolina, and North Carolina proposed state-led pilot programs to test improved recreational data collection and management strategies for South Atlantic red snapper. *See* Nat'l Marine Fisheries Serv., *Exempted Fishing Permit to Test a State-Based Data Collection and Management System for the Recreational Harvest of Red Snapper off Florida for 2026*, Permit No. 26-SERO-01, at 1 (May    1,    2026),    https://www.fisheries.noaa.gov/s3/2026-05/fl-fwc-efp-26-sero-01-

final_05012026.pdf ("Florida Permit"); Nat'l Marine Fisheries Serv., *Exempted Fishing Permit to Test a State-Based Data Collection and Management System for the Recreational Harvest of Red Snapper off Georgia for 2026*, Permit No. 26-SERO-02, at 1 (May 5, 2026), https://www.fisheries.noaa.gov/s3/2026-05/ga-dnr-efp-26-sero-02-final_05052026.pdf ("Georgia Permit"); Nat'l Marine Fisheries Serv., *Exempted Fishing Permit to Test a State-Based Data Collection and Management System for the Recreational Harvest of Red Snapper off South Carolina for 2026*, Permit No. 26-SERO-03, at 1 (May 4, 2026), https://www.fisheries.noaa.gov/s3/2026-05/sc-dnr-efp-26-sero-03-final_05042026.pdf ("South Carolina Permit"); Nat'l Marine Fisheries Serv., *Exempted Fishing Permit to Test a State-Based Data Collection and Management System for the Recreational Harvest of Red Snapper off North Carolina for 2026*, Permit No. 26-SERO-04, at 1 (May 5, 2026), https://www.fisheries.noaa.gov/s3/2026-05/nc-dmf-efp-26-sero-04-final_05052026.pdf ("North Carolina Permit"); ASA/CCA Comment at 1, 15–17. Under the approved EFPs, Florida's 2026 season begins May 22 and runs for 39 days total, split between summer and fall, while Georgia, South Carolina, and North Carolina are authorized to open 62-day seasons beginning July 1, 2026. *See* Florida Permit at 2–3; Georgia Permit at 2; South Carolina Permit at 2–3; North Carolina Permit at 2–3. During those seasons, harvest will be constrained through state-specific measures that include restrictive bag limits, vessel limits, and—where applicable—aggregate and minimum-size limits. *See* Florida Permit at 2–3; Georgia Permit at 2–3; South Carolina Permit at 2–3; North Carolina Permit at 2–4.

7. Plaintiffs seek a preliminary injunction or stay preventing implementation of the EFPs, contending that the permits will cause overfishing, exceed annual catch limits, and create a de facto reallocation of harvest privileges. *See* Pls.' Mot. at 1, 3; Plaintiffs' Memorandum of Points

and Authorities in Support of Motion for Preliminary Injunction or Stay ("Pls.' Mem.") at 1–2, ECF No. 6-1. If granted, the requested injunction would eliminate the 2026 recreational fishing opportunities created by the EFPs and prevent the states from collecting the baseline data those EFPs are designed to generate. *See* Florida Permit at 1, 3–4; Georgia Permit at 1, 3–4; South Carolina Permit at 1, 3–4; North Carolina Permit at 1, 3–4; Pls.' Mot. at 1–3; ASA/CCA Comment at 1, 15–17. Because the 2026 seasons are time-limited and scheduled to occur in May through August 2026, lost access and lost data collection opportunities cannot realistically be recreated later in this litigation.

8.      South Atlantic red snapper has been subject to extremely limited recreational harvest since 2010. Recreational harvest was closed in 2010 and, since then, has occurred only through short and sporadic mini-seasons. *See* ASA/CCA Comment at 2–3 & Appx. A.

9.      The recent recreational seasons have been especially constrained. Federal managers allowed only a one-day recreational season in 2024 and a two-day recreational season in 2025. *See* ASA/CCA Comment at 3 & App. A; Hughes Decl. ¶ 8; Murray Decl. ¶ 8. Those short seasons create derby-style conditions in which any anglers that wish to lawfully retain red snapper must fish during one or two days. *See* ASA/CCA Comment at 3–5, 17. These derby-style conditions are poor fishery-management policy because they undermine safety, frustrate angler compliance and confidence, and reduce the practical value of access for anglers and coastal businesses.

10.      The NMFS Record reflected substantial rebuilding success. The ASA/CCA Comment explained that the stock is no longer undergoing overfishing, is no longer overfished, and is nearly rebuilt approximately twenty years ahead of the 2044 rebuilding deadline. *See* ASA/CCA Comment at 1–3. The ASA/CCA Comment further explained that the Atlantic red snapper population is the healthiest it has been in observed history, with record high numbers of

fish. *Id.* That rebuilding success is inconsistent with a management narrative that treats the stock as incapable of supporting carefully structured, state-monitored recreational harvest under temporary pilot programs.

11.    The central management problem for South Atlantic red snapper is not that recreational anglers have had excessive lawful harvest opportunity in recent years; rather, the problem is that severe closures have contributed to recreational catch data deficiencies and created a system in which red snapper are frequently encountered and released during closed seasons. *See* ASA/CCA Comment at 3–5. The ASA/CCA Comment explained that estimates of the number of fish that die upon release (dead discards) constitute approximately 93% of the current total ACL, with approximately 475,000 fish counted as dead discards out of a total ACL of 509,000 fish. *Id.* at 4–5. The recreational sector is limited to harvesting only 22,797 fish, approximately 4.5% of the total ACL, which has resulted in one- or two-day seasons. *Id.*

12.    ASA and CCA have serious concerns about the reliability of the federal Marine Recreational Information Program (MRIP), which provides recreational catch and effort estimates that are used to manage this fishery. MRIP was designed to sample two-month intervals, not extremely short fishing pulses like one- or two-day red snapper openings and is a generalized survey that is not tailored to gather information on red snapper or the snapper grouper fishery. *See* ASA/CCA Comment at 3–4. The ASA/CCA Comment explained that MRIP percent standard errors for red snapper catch estimates in the four South Atlantic states have consistently ranged from 40% to over 100%, exceeding MRIP's own reliability thresholds for management use. *Id.* at 4; *see also* ASA Comments on Draft Environmental Impact Statement and Proposed Rule for Secretarial Amendment (Amendment 59) to the Fishery Management Plan for the Snapper-Grouper Fishery of the South Atlantic Region (dated March 17, 2025), Appx. 1 (attached as Exhibit

2). The ASA/CCA Comment regarding the South Atlantic red snapper exempted fishing permits also noted that NOAA has acknowledged that MRIP-FES may overestimate recreational fishing effort by up to 40% in some fisheries. *See* ASA/CCA Comment at 2, 4.

13.     The EFPs are designed to address these data shortcomings. In my view, the EFP framework is the best practical way currently available to obtain the best scientific information available ("BSIA") for future management because it will collect fishery-specific, near real-time information from anglers actually participating in the fishery, rather than continuing to rely on data sources that the ASA/CCA Comment identifies as unreliable for one- and two-day openings. *See* Florida Permit at 1, 3–4; Georgia Permit at 1, 3–4; South Carolina Permit at 1, 3–4; North Carolina Permit at 1, 3–4; ASA/CCA Comment at 1–2, 14–15. Florida will use its State Reef Fish Survey ("SRFS"), require anglers fishing under the EFP to declare their trip via before leaving the dock and use voluntary post-trip reporting via smartphone applications to gather data from EFP participants. *See* Florida Permit at 1, 3–4. Georgia, South Carolina, and North Carolina will implement mandatory electronic reporting through the VESL application, creating near real-time census-based reporting rather than relying solely on probability-based sampling. *See* Georgia Permit at 3–5; South Carolina Permit at 3–5; North Carolina Permit at 3–5. The state programs also include coordination among the states and with NOAA, including implementation coordination and annual review meetings. *See* Florida Permit at 4–4; Georgia Permit at 4–4; South Carolina Permit at 4–4; North Carolina Permit at 4–4.

14.     These data improvements are not incidental to the EFPs; they are a principal purpose of the pilot programs. *See* Florida Permit at 1; Georgia Permit at 1; South Carolina Permit at 1; North Carolina Permit at 1; ASA/CCA Comment at 1, 14–15. The EFPs will allow states to collect baseline information on catch, effort, discards, angler behavior, biological characteristics,

and program implementation under longer seasons than the fishery has experienced in recent years. *See* Florida Permit at 3–4; Georgia Permit at 3–4; South Carolina Permit at 3–4; North Carolina Permit at 3–4; ASA/CCA Comment at 5, 14–16. That baseline information is necessary because past one- and two-day derby seasons are a poor basis for predicting angler behavior under more realistic, extended seasons. *See* ASA/CCA Comment at 4–5.

15.     The EFPs also incorporate multiple conservation safeguards. *See* Florida Permit at 2–5; Georgia Permit at 2–4; South Carolina Permit at 2–4; North Carolina Permit at 2–4; ASA/CCA Comment at 5–6, 15–17. The states will use fixed season lengths as a harvest constraint, with Florida limited to 39 total days and Georgia, South Carolina, and North Carolina limited to 62 days during MRIP Wave 4. *See* Florida Permit at 2–3; Georgia Permit at 2; South Carolina Permit at 2–3; North Carolina Permit at 2–3. The states will apply conservative bag limits of one red snapper per person, and North Carolina will apply additional vessel limits for private anglers, charter vessels, and headboats. *See* Florida Permit at 2–3; Georgia Permit at 2–3; South Carolina Permit at 2–3; North Carolina Permit at 2–4. Florida's program will require participants to fish under a 10-fish snapper-grouper aggregate that includes one red snapper, after which anglers must stop bottom fishing for reef fish. See Florida Permit at 2–3.

16.     The reporting requirements are equally important. Participants in Georgia, South Carolina, and North Carolina must obtain trip authorization codes and report catch data within 24 hours after trip departure time, which creates a near real-time reporting structure for EFP participants. *See* Georgia Permit at 3–5; South Carolina Permit at 3–5; North Carolina Permit at 3–5. Florida will use SRFS, require advanced trip declarations, and make a similar voluntary reporting option available to anglers. *See* Florida Permit at 3–4. The states will also collect catch, discard, and related biological or trip information to support future stock assessments and

management. *See* Florida Permit at 3–4; Georgia Permit at 3–4; South Carolina Permit at 3–4; North Carolina Permit at 3–4; ASA/CCA Comment at 16.

17.     Plaintiffs' theory assumes that longer seasons necessarily produce a linear or near-linear increase in fishing mortality. *See* Pls.' Mem. at 24–31. ASA and CCA do not agree that derby-season catch rates can simply be extrapolated across a much longer season without accounting for effort decompression, weather, angler behavior, other fishing opportunities, and state reporting and harvest constraints. Peer-reviewed literature cited in the ASA/CCA Comment indicates that extended Gulf red snapper seasons can relax compressed effort, and one cited study found that increasing the number of days in the private recreational season reduced fishing effort by more than 60%. *See* ASA/CCA Comment at 4–5. That is directly relevant because the current South Atlantic system compresses effort into one- or two-day mini-seasons.

18.     The EFPs are also designed to reduce regulatory waste by allowing anglers to retain a limited number of red snapper during defined seasons rather than requiring release of fish that may not survive. *See* ASA/CCA Comment at 6, 9–10, 15–16. Under current management, an angler who catches red snapper when the season is closed must release it, even when release mortality is likely. *Id*. at 9–10, 16. The EFPs are designed to convert some of those otherwise discarded fish into utilized harvest while simultaneously collecting better catch and effort data. *Id*. That conservation and utilization benefit is one reason ASA and CCA support the EFPs.

19.     The timing of the state seasons further supports the conservation rationale for the EFPs. Georgia, South Carolina, and North Carolina proposed 62-day seasons aligned with MRIP Wave 4, July 1 through August 31, to provide a known constraint on effort while allowing comparison with MRIP data from past open seasons, which typically occurred in July. *See* Georgia Permit at 2; South Carolina Permit at 2–3; North Carolina Permit at 2–3; ASA/CCA Comment at

16. The ASA/CCA Comment explained that restricting harvest to this period can maximize conservation benefits by converting dead discards into utilized harvest during a period when fishing effort is high and environmental conditions can reduce survival of released fish. *See* ASA/CCA Comment at 10, 16. Florida's season structure includes a 30-day opening beginning on May 22 to avoid peak spawning season, followed by a 9-day fall weekend component. This season was also designed to overlap with Florida's 140-day Gulf red snapper season so that recreational red snapper fishing effort is distributed throughout the state rather than concentrated on the Atlantic coast. *See* Florida Permit at 2; ASA/CCA Comment at 16.

20.     The EFPs also address safety concerns created by ultra-short derby seasons. When anglers have only one or two days to fish for a highly valued species, they may feel pressure to fish in marginal weather, crowd limited reef areas, and prioritize the brief opening over prudent trip planning. *See* ASA/CCA Comment at 10, 17. The ASA/CCA Comment noted that the United States Coast Guard, NOAA Law Enforcement, and state law enforcement agencies have cautioned against derby seasons for Atlantic red snapper because of unsafe fishing conditions. *Id*. at 17. A 39- or 62-day season allows anglers to choose safer weather windows and distribute effort across a broader period. *Id*.

21.     The EFPs are also important to coastal communities. One- and two-day seasons make it difficult for charter captains, headboats, hotels, restaurants, marinas, tackle shops, and other coastal businesses to plan or market red snapper fishing opportunities. *See* ASA/CCA Comment at 10, 17–18. Extended seasons allow recreational fishing activity to occur across a meaningful period, rather than concentrating all economic activity into a single weekend or two-day window. *Id.*

22.     Plaintiffs' requested injunction would harm ASA, CCA, their members, recreational anglers, for-hire operators, fishing-related businesses, and coastal communities by eliminating the very access, safety, data, and economic benefits that the EFPs are designed to provide. *See* ASA/CCA Comment at 1, 17–18; Hughes Decl. ¶¶ 12–13; Murray Decl. ¶¶ 12–13. Recreational fishing businesses such as for-hire operations have already invested in supplies and services in preparation for Florida's anticipated opening on May 22. Plaintiffs' requested relief would also prevent the states and NMFS from learning from the 2026 pilot programs, thereby prolonging the same cycle of unreliable data, short derby seasons, distrust, and litigation that has burdened this fishery for years. *See* ASA/CCA Comment at 14–19. Given the wide-spread media coverage and outreach to anglers in preparation for the EFPs, NOAA's ability to effectively notify the angling public of cancellation, postponement, or any other modifications to EFPs ahead of the anticipated start of Florida's EFP in less than 48 hours from the Court's scheduled hearing is highly questionable. Changing course on the EFPs at the 11th hour would introduce considerable uncertainty about recreational fishing opportunities for Atlantic red snapper in 2026.

23.     The EFPs follow a proven federal-state pathway. NOAA issued similar EFPs to Gulf states in 2018 and 2019 to test state-led management of Gulf red snapper before long-term state management began in 2020. *See* ASA/CCA Comment at 11–12; Hughes Decl. ¶ 10; Murray Decl. ¶ 10; https://www.fisheries.noaa.gov/southeast/science-data/state-recreational-red-snapper-management-exempted-fishing-permits. Since 2020, state-collected, NOAA-certified data has been used as best scientific information available for managing the private recreational sector in the Gulf. *See* ASA/CCA Comment at 11–14. The Gulf experience demonstrates that state data programs can expand access while maintaining conservation requirements within federal guardrails. *Id*.

24.     The South Atlantic EFPs build on that model. Florida will use SRFS, which is already NOAA-certified and has been expanded to the Atlantic coast. *See* ASA/CCA Comment at 12, 14–15. Georgia, South Carolina, and North Carolina will use mandatory electronic reporting approaches comparable in concept to successful Gulf reporting programs. *Id*. at 12–15. The South Atlantic states will also coordinate among themselves and with NOAA, which mirrors the intergovernmental coordination that helped make the Gulf program successful. *Id*. at 13, 15–16.

25.     ASA and CCA do not support abandoning conservation requirements. ASA and CCA support the EFPs precisely because they are a structured way to improve conservation outcomes, improve data quality, reduce waste from dead discards, promote safety, and restore trust in fishery management. *See* ASA/CCA Comment at 5–10, 15–19. The EFPs do not abandon science-based management; they will generate the science needed to characterize, monitor, and manage the fishery more effectively. *Id*. at 15. This assures that the best available science is used in all future fisheries management decisions for red snapper.

26.     Plaintiffs characterize the EFPs as an effort to "sidestep" the Magnuson-Stevens Act and increase recreational landings without accountability. *See* Complaint ¶¶ 101–105, ECF No. 1; Pls.' Mem. at 13–15. That characterization is inconsistent with ASA and CCA's understanding of the EFPs and the ASA/CCA Comment. The EFPs include defined seasons, bag limits, vessel limits, reporting requirements, biological sampling, interstate coordination, and annual review mechanisms. *See* Florida Permit at 2–4; Georgia Permit at 2–4; South Carolina Permit at 2–4; North Carolina Permit at 2–4; ASA/CCA Comment at 5–6, 15–17. Those are the very definition of accountability tools, not the absence of accountability.

27.     Plaintiffs also claim that the EFPs will harm commercial fishermen by setting back the stock's rebuilding plan and prolonging commercial restrictions. *See* Complaint ¶¶ 148–153;

Pls.' Mem. at 37–43. ASA and CCA agree that sustainable management of the red snapper stock is essential for all sectors. See ASA/CCA Comment at 1, 5–10. Based on the ASA/CCA Comment and the NMFS Record, any direct harm to commercial harvesting opportunities is purely speculative, and if it does occur at all, it should be minimal because stock rebuilding is nearly 20 years ahead of the 2044 rebuilding deadline, the EFPs do not revise existing sector allocations or affect commercial opportunities to harvest red snapper, and because the projects are not expected to increase overall fishing mortality because recreational snapper-grouper effort already occurs year-round. See ASA/CCA Comment at 9; Pls.' Mem. at 27–28. Any remaining uncertainty reinforces the need for the EFPs' monitoring, reporting, progress-report, final-report, and annual-review safeguards, rather than an injunction that prevents those data from being collected. See Florida Permit at 3–4; Georgia Permit at 3–4; South Carolina Permit at 3–4; North Carolina Permit at 3–4. ASA and CCA disagree that enjoining state data-collection and pilot management programs is in the long-term interest of the fishery. Maintaining the status quo would perpetuate reliance on data systems that are ill-suited to this fishery and would continue one- and two-day derby seasons that produce safety risks, effort compression, regulatory waste, and distrust. See ASA/CCA Comment at 3–5, 15–17.

28.    The EFPs are particularly important because recreational anglers have complied with severe conservation restrictions for years while the stock rebuilt faster than expected. See ASA/CCA Comment at 2–3; Hughes Decl. ¶ 8; Murray Decl. ¶ 8. Those anglers now face the possibility that Plaintiffs' requested injunction will eliminate the first meaningful opportunity to test a more rational, state-led approach to data collection and access. See Pls.' Mot. at 1–3; ASA/CCA Comment at 1, 15–19. If the 2026 pilot programs are stopped before they occur, ASA, CCA, their members, and the states will lose information that cannot be obtained from continued

one- or two-day openings. The better course is to allow the state-led pilot programs to proceed under the monitoring, reporting, and review mechanisms described above.

29.    ASA and CCA have long advocated for meaningful recreational data collection and management improvements for South Atlantic red snapper. *See* ASA/CCA Comment at 1, 14–15. The EFPs provide a real-world opportunity to test those improvements under the controlled conditions reflected in the permits and the NMFS Record. *See* Florida Permit at 1, 3–4; Georgia Permit at 1, 3–4; South Carolina Permit at 1, 3–4; North Carolina Permit at 1, 3–4; ASA/CCA Comment at 15–17. ASA and CCA expect to work closely with state and federal fisheries managers during implementation to help support responsible, transparent, and successful management of this fishery. See ASA/CCA Comment at 18–19.

30.    The public interest is served by allowing the EFPs to proceed. Proceeding with the EFPs will enable state and federal managers to collect improved data, test alternative recreational management tools, reduce derby-style safety risks, provide reasonable access to an abundant and culturally important fishery, and support coastal businesses. *See* ASA/CCA Comment at 1–2, 10, 15–19. Enjoining the EFPs would preserve a status quo that has produced severely restricted seasons, high uncertainty, compressed effort, stakeholder frustration, and limited ability to learn how anglers behave under more realistic season structures. *Id*. at 2–5, 15–17.

31.    ASA and CCA respectfully urge the Court to deny Plaintiffs' Motion for Preliminary Injunction or Stay and allow the approved EFPs to proceed so that the states and NMFS can implement the 2026 pilot programs, collect critical data, and evaluate the results through the progress-report, final-report, coordination, and review mechanisms built into the permits. *See* Florida Permit at 3–4; Georgia Permit at 3–4; South Carolina Permit at 3–4; North Carolina Permit at 3–4; ASA/CCA Comment at 18–19.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 18, 2026.

Martha Guyas
Southeast Fisheries Policy Director
American Sportfishing Association