**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SOUTHEASTERN FISHERIES ASSOCIATION, INC., et al., | ) ) ) | |
| *Plaintiffs* | ) ) | |
| v. | ) ) | Case No. 1:26-cv-01533-RC |
| HOWARD LUTNICK, in his official capacity as Secretary of Commerce, et al., | ) ) ) | |
| *Defendants* | ) ) ) | |

_____ )

**FEDERAL DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR STAY**

**TABLE OF CONTENTS**

Page

INTRODUCTION ...............................................................................................................1

STATUTORY AND REGULATORY BACKGROUND.................................................2

FACTUAL BACKGROUND...............................................................................................3

    I.    The Snapper-Grouper FMP...................................................................................3

    II.   Fishery Monitoring .................................................................................................4

    III.  Exempted Fishing Permits .....................................................................................7

PRELIMINARY INJUNCTION STANDARD................................................................9

STANDARD OF REVIEW ...............................................................................................10

ARGUMENT.......................................................................................................................11

    I.    Emergency Injunctive Relief is Unavailable. ....................................................12

    II.   Even if Preliminary Relief is Available, Plaintiffs Fail to Meet the High Bar for Such Relief......................................................................................................15

        A.    Plaintiffs Are Unlikely to Succeed on the Merits. ........................................15

            1.   Plaintiffs fail to state a claim for violations of MSA provisions applicable only to FMPs, not EFPs. .................................................................15

            2.   EFPs Further the MSA's Substance and Goals. .....................................16

            3.   The EFPs Are Not Arbitrary and Capricious.........................................20

        B.    Plaintiffs Fail to Establish Irreparable Harm from the EFPs. ...................25

            1.   Plaintiffs' Claimed Economic Injuries Are Legally Insufficient.........26

            2.   Plaintiffs' Novel Fish Stock Harm is Reparable and Generalized. ......29

            3.   Generalized Commercial Fishing Harm Does Not Suffice.................31

        C.    The Balance of the Harms and Public Interest Favor NMFS. ...................32

CONCLUSION....................................................................................................................33

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Am. Trucking Ass'n's. v. EPA*,
    283 F.3d 355 (D.C. Cir. 2002) ............................................................................... 20

*Blue Water Fishermen's Ass'n v. NMFS*,
    158 F.Supp.2d 118 (D. Mass. 2001) ....................................................................... 13

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
    419 U.S. 281 (1974) ................................................................................................. 11

*Camp v. Pitts*,
    411 U.S. 138 (1973) ................................................................................................. 11

*Cape Cod Com. Hook Fishermen's Ass'n v. Daley*,
    30 F.Supp.2d 111 (D. Mass. 1998) .................................................................... 13, 16

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ............................................................................... 26

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ................................................................................................. 21

*CityFed Fin. Corp. v. Off. Of Thrift Supervision*,
    58 F.3d 738, 747 (D.C. Cir. 1995) ......................................................................... 10

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................................................. 31

*Coleman v. PACCAR, Inc.*,
    424 U.S. 1301 (1976) ............................................................................................... 33

*Connecticut v. Daley*,
    53 F.Supp.2d 147 (D. Conn. 1999) ......................................................................... 13

*Conserve Southwest Utah v. U.S. Department of the Interior*,
    No. 26-317 (RDM), 2026 WL 569034 (D.D.C. Mar. 1, 2026) ............................... 29

*Dall. Safari Club v. Bernhardt*,
    453 F. Supp. 3d 391 (D.D.C. 2020) ..................................................................... 9, 10

*DSE, Inc. v. United States*,
    169 F.3d 21 (D.C. Cir. 1999) ................................................................................. 33

*Env't Def. Fund, Inc. v. Costle*,
    657 F.2d 275 (D.C. Cir. 1981) ........................................................................... 11, 21

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ................................................................................................. 11

*Fund for Animals v. Clark*,
    27 F.Supp.2d 8 (D.D.C. 1998) ............................................................................... 30

*Fund for Animals v. Norton*,
281 F.Supp.2d 209 (D.D.C. 2003) ................................................................ 30

*Fund for Animals, Inc. v. Espy*,
814 F. Supp. 142 (D.D.C. 1993) ................................................................ 30

*Hall v. Johnson*,
599 F.Supp.2d 1 (D.D.C. 2009) ................................................................ 10

*J. H. Miles & Co., Inc. v. Brown*,
910 F. Supp. 1138 (E.D. Va. 1995) ................................................................ 19

*Kāpaʻa v. Trump*,
794 F.Supp.3d 793 (2025) ................................................................ 14

*Kimberlin v. U.S. Dep't of Justice*,
150 F.Supp.2d 36 (D.D.C. 2001) ................................................................ 16

*Kramer v. Mosbacher*,
878 F.2d 134 (4th Cir. 1989) ................................................................ 13

*Lindel Fair v. United States*,
C.A. No. C-93-022, slip op. (S.D. Tex., May 2, 1995) ................................................................ 23

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ................................................................ 25

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ................................................................ 29

*Luokung Tech. Corp. v. Dep't of Def.*,
538 F. Supp. 3d 174 (D.D.C. 2021) ................................................................ 27, 28

*Marsh v. Or. Natural Res. Council*,
490 U.S. 360 (1989) ................................................................ 10

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) ................................................................ 9, 10

*Mexichem Specialty Resins, Inc. v. EPA*,
787 F.3d 544 (D.C. Cir. 2015) ................................................................ 26, 27, 29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................ 11

*Munaf v. Geren*,
553 U.S. 674 (2008) ................................................................ 9

*N.C. Fisheries Ass'n v. Evans*,
172 F.Supp.2d 792 (E.D. Va. 2001) ................................................................ 19

*N.C. Fisheries Ass'n v. Gutierrez*,
550 F.3d 16 (D.C. Cir. 2008) ................................................................ 2

*Nat. Res. Def. Council v. EPA*,
529 F.3d 1077 (D.C. Cir. 2008) ................................................................ 18

*Nat. Res. Def. Council v. Kempthorne*,
525 F. Supp. 2d 115 (D.D.C. 2007) ............................................................................ 21

*Nat. Res. Def. Council v. Nat'l Marine Fisheries Serv.*,
71 F.Supp.3d 35 (D.D.C. 2014) ................................................................................. 18

*Nat. Res. Def. Council v. Raimondo,*
Civ. No. 23-982 (BAH), 2024 WL 4056653 (D.D.C. 2024) .................................... 18

*Nat'l Fisheries Inst. v. Mosbacher*,
732 F. Supp. 210 (D.D.C. 1990) ............................................................................... 19

*Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Rsrv. Sys.*,
773 F.Supp.2d 151 (D.D.C. 2011) ............................................................................ 28

*Nat'l Min. Ass'n v. Jackson*,
768 F.Supp.2d 34 (D.D.C. 2011) .............................................................................. 27

*New York v. Evans*,
162 F.Supp.2d 161 (E.D.N.Y. 2001) ......................................................................... 23

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................................................. 10, 32

*Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Sec'y of Com.*,
494 F. Supp. 626 (N.D. Cal. 1980) ........................................................................... 13

*Population Inst. v. McPherson*,
797 F.2d 1062 (D.C. Cir. 1986) ................................................................................ 29

*Reid v. Mayorkas*,
759 F. Supp. 3d 15 (D.D.C. 2024) ...................................................................... 26, 28

*Sea Containers Ltd. v. Stena AB*,
890 F.2d 1205 (D.C. Cir. 1989) ................................................................................ 31

*Sierra Club v. Env't Prot. Agency*,
793 F. Supp. 3d 158 (D.D.C. 2025) .......................................................................... 25

*Slash Creek Waterworks, Inc. v. Raimondo*,
Civ. No. 23-1755 (RC), 2025 WL 358770 (D.D.C. Jan. 31, 2025) ...................... 3, 4, 12, 19

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
No. CV 16-1534 (JEB), 2021 WL 2036662 (D.D.C. May 21, 2021) ..................... 31

*Starbound, LLC v. Gutierrez*,
Case No. C07-0910-JCC, 2008 WL 1752219 (W.D. Wa. Apr. 15, 2008) ............... 23

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
438 F.3d 937 (9th Cir. 2006) .................................................................................... 14

*Trawler Diane Marie, Inc. v. Brown*,
918 F. Supp 921 (E.D. N.C.) ..................................................................................... 19

*U.S. Postal Serv. v. Gregory*,
534 U.S. 1 (2001) ...................................................................................................... 21

iii

*United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.,*
  No. 3:21-CV-00247-JMK, 2023 WL 3467496 (D. Alaska May 15, 2023) ........................................ 13

*W. Watersheds Project v. Vilsack,*
  No. 23-8081, 2024 WL 4589758 (10th Cir. Oct. 28, 2024) ................................................. 21

*Wild Fish Conservancy v. Thom,*
  No. C20-417-RAJ-MLP, 2020 WL 8675751 (W.D. Wash. June 9, 2020)(1) ...................................... 13

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ........................................................................................ 9, 10, 26

*Wis. Gas Co. v. FERC,*
  758 F.2d 669 (D.C. Cir. 1985) ........................................................................... 26

**Statutes**

5 U.S.C. § 705 .................................................................................................. 10, 12

5 U.S.C. § 706 .................................................................................................. 11, 15, 24

5 U.S.C. § 706(2)(A) ............................................................................................ 11, 20

5 U.S.C. § 706(2)(A)-(D) ........................................................................................ 2, 11

5 U.S.C. § 706(2)(C) ............................................................................................ 24

16 U.S.C. § 1801(a)(6) .......................................................................................... 2

16 U.S.C. § 1802(11) ........................................................................................... 2

16 U.S.C. § 1811(a) ............................................................................................ 2

16 U.S.C. § 1851(a) ............................................................................................ 2, 16

16 U.S.C. § 1801(a)(6) .......................................................................................... 2

16 U.S.C. § 1851(a) ............................................................................................ 16

16 U.S.C. § 1851(a)(1) .......................................................................................... 15, 16, 23

16 U.S.C. § 1851(a)(4) .......................................................................................... 15

16 U.S.C. § 1853(a) ............................................................................................ 16

16 U.S.C. § 1853(a)(1)(A) ...................................................................................... 14

16 U.S.C. § 1853(a)(15) ........................................................................................ 15, 16

16 U.S.C. § 1854 ............................................................................................... 27

16 U.S.C. § 1855 ............................................................................................... 27

iv

16 U.S.C. § 1855(f) ............................................................................................................ 13, 14

16 U.S.C. § 1855(f)(1) .................................................................................................... 2, 12, 13

16 U.S.C. § 1855(f)(1)(A) ..................................................................................................... 13

16 U.S.C. § 1855(f)(1)(B) ................................................................................................. 10, 13

16 U.S.C. § 1855(f)(3)(A) ..................................................................................................... 13

16 U.S.C. § 1855(f)(3)(B) ..................................................................................................... 15

16 U.S.C. § 1855(f)(4) .......................................................................................................... 13

16 U.S.C. § 1867(d) ........................................................................................................... 2, 25

16 U.S.C. § 1881(g)(3) ........................................................................................................... 5

## Regulations

50 C.F.R. § 600.745 .................................................................................... 2, 15, 20, 24

50 C.F.R. § 600.745(a) ....................................................................................................... 24

50 C.F.R. § 600.745(b) ....................................................................................................... 24

50 C.F.R. § 600.745(b)(1) ..................................................................................................... 3

50 C.F.R. § 600.745(b)(2)(viii) .......................................................................................... 21

50 C.F.R. § 622.5(c)(1)(i) ...................................................................................................... 5

50 C.F.R. § 622.181(c)(2) ...................................................................................................... 9

50 C.F.R. § 622.183(b)(5)(i) .................................................................................................. 9

50 C.F.R. § 622.193(y)(2) ...................................................................................................... 9

## Rules

Fed. R. Civ. P. 12(b)(6) ....................................................................................................... 16

Fed. R. Civ. P. 65(c) .......................................................................................................... 33

## Federal Register

74 Fed. Reg. 33204 (July 10, 2009) ................................................................................... 24

74 Fed. Reg. 42786 (Aug. 25, 2009) .............................................................................. 2, 24

83 Fed. Reg. 35428 (July 26, 2018) ............................................................................. 3, 4, 17

88 Fed. Reg. 33838 (May 25, 2023) ..................................................................................... 4

v

89 Fed. Reg. 50530 (June 14, 2024) ................................................................................... 4

90 Fed. Reg. 24527 (June 11, 2025) .......................................................................... passim

91 Fed. Reg. 6827 (Feb. 13, 2026) ...................................................... 6, 8, 19, 20, 23

## Other Authorities

11A Wright & Miller's Federal Practice & Procedure § 2948.1 .................................................. 26

**INTRODUCTION**

The National Marine Fisheries Service ("NMFS") has long sought to improve red snapper fishery management for both recreational and commercial sectors. But it faces a seemingly intractable problem. To improve its management practices, NMFS needs better data on the recreational harvest of red snapper collected over a period long enough to yield meaningful information, yet recreational seasons are too short to gather any such data. Exempted fishing permits ("EFPs") help provide a solution. Granted to Florida, Georgia, South Carolina, and North Carolina, EFPs pilot test state electronic data collection and management strategies for the recreational harvest of red snapper in the South Atlantic and increase public access in the process. This attempt to break the data-quality cycle was the product of close engagement between NMFS and the applicants and significant information sharing focused on the prospective effect of extended fishing on the red snapper stock. This iterative process also led NMFS to grant the permits on a one-year renewable basis, allowing the states the opportunity to improve data collection while preserving NMFS's ability to ensure successful stock management. And when published for public comment, these EFP applications received overwhelming public support, with over 99% of the approximately 11,000 comments expressing support for permit issuance. This was unsurprising: To cut the Gordian knot of red snapper fishery management, nearly everyone agrees that an innovative solution is necessary.

Plaintiffs, apparently, disagree. In seeking to enjoin the opening of the red snapper recreational fishing season, Plaintiffs ask this court to halt any state-led data collection to help improve NMFS's red snapper harvest management. That gambit defies common sense. But perhaps more importantly, it also runs headlong into the bar on preliminary injunctive relief under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"). The MSA's statutory prohibition on interim relief is meant precisely for cases like this one—where a preliminary injunction would prematurely disrupt agency action essential to the management and maintenance of a fishery. Yet

1

there are other problems with Plaintiffs' request for extraordinary relief. Even if that relief were available as a matter of law, Plaintiffs would be unable to show a likelihood of success on the merits (because the EFPs fully comply with the MSA and other relevant authorities), unable to demonstrate irreparable harm (because their purported economic and other injuries are legally insufficient and factually speculative), and unable to tip the equities or the public interest in their favor (because better data and more fish help everyone). This Court should deny Plaintiffs' motion and allow the states to improve red snapper fishery management practices for the benefit of the fishery and fishermen alike.

<u>**STATUTORY AND REGULATORY BACKGROUND**</u>

The MSA establishes a national program for conservation and management of fishery resources with federal jurisdiction over such resources within the exclusive economic zone ("EEZ"). 16 U.S.C. §§ 1801(a)(6), 1811(a). Under the MSA, the EEZ extends from the seaward boundary of each coastal State out to 200 nautical miles. *Id.* § 1802(11). Fisheries are regulated through fishery management plans ("FMPs"), amendments to FMPs, and implementing regulations. *See N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008). Specifically, all FMPs and their implementing regulations must be consistent with the MSA's ten National Standards. 16 U.S.C. § 1851(a). Actions taken by NMFS under regulations implementing an FMP are subject to limited judicial review in accordance with the APA. 16 U.S.C. § 1855(f)(1); 5 U.S.C. § 706(2)(A)-(D).

MSA Section 318(d) authorizes NMFS to issue EFPs, including those here. 16 U.S.C. § 1867(d) (authorizing NMFS to "promulgate regulations that create an expedited, uniform, and regionally-based process to promote issuance, where practicable, of experimental fishing permits."). NMFS promulgated 50 C.F.R. § 600.745 based on this authority. *See* MSA Experimental Permitting Process, EFPs, & Research Activity, 74 Fed. Reg. 42786 (August 25, 2009). Per that provision,

an EFP allows "the target or incidental harvest of species managed under an FMP or fishery regu-

lations that would otherwise be prohibited" for limited reasons such as testing, data collection, and

exploratory fishing. 50 C.F.R. § 600.745(b)(1).

**FACTUAL BACKGROUND**

**I.      The Snapper-Grouper FMP**

NMFS manages red snapper resources in the federal waters throughout the South Atlantic.

Under the MSA, NMFS sets catch limits and adjusts the lengths of fishing seasons, among other

management measures, to ensure that the overfished red snapper stock in the South Atlantic can

rebuild to a healthy condition by 2044, as provided in a 35-year rebuilding program. 90 Fed. Reg.

245527, 24528-29 (June 11, 2025). The Court is well familiar with this management regime, as it

recently affirmed that regime in *Slash Creek Waterworks, Inc. v. Raimondo,* Civ. No. 23-1755

(RC), 2025 WL 358770 (D.D.C. Jan. 31, 2025), *appeal pending*, No. 25-5042 (D.C. Cir. Jan. 30,

2026).

To briefly recap the fishery management procedures at issue in *Slash Creek Waterworks,*

from 2018-2023, NMFS set opening and closing dates for the commercial and recreational South

Atlantic red snapper fishing seasons, respectively, under the final rule implementing Amendment

43 to the FMP for the Snapper-Grouper Fishery of the South Atlantic Region ("Snapper-Grouper

FMP"), 83 Fed. Reg. 35428 (July 26, 2018) ("Amendment 43 Final Rule"). The Amendment 43

Final Rule specified procedures for setting an annual catch limit ("ACL") divided among commer-

cial and recreational fishermen, as well as accountability measures to ensure compliance with the

ACL. *Id.* Citing the "extreme uncertainty" associated with red snapper recreational discard esti-

mates, the Amendment 43 Final Rule did not utilize estimates of recreational dead discards for

purposes of accountability measures. *Id.* at 35429. Instead, Amendment 43 utilized the length of

the fishing season as the in-season accountability measure. *Id.* at 35435.

3

The 2023 Temporary Rule, 88 Fed. Reg. 33838 (May 25, 2023), initially challenged in *Slash Creek Waterworks* set the opening and closing dates of the 2023 commercial and recreational fishing seasons using the procedure created in Amendment 43. The 2024 Interim Rule, 89 Fed. Reg. 50530 (June 14, 2024), replaced the 2023 Temporary Rule.

Following a settlement in *Gray v. Raimondo*, No. 1:24-cv-01431 (D.D.C. Jan. 29, 2024), NMFS promulgated a final rule for Amendment 59 to the Snapper-Grouper FMP. 90 Fed. Reg. 24527, 24533 (June 11, 2025) ("Amendment 59 Final Rule"). Instead of setting an annual catch limit that includes only landings, the rule "increase[d] the total [annual catch limit] to 509,000 fish, separated into 34,000 fish as landings and 475,000 fish as dead discards." *Id.* at 24529. The Amendment 59 Final Rule also revised the overfishing limit (to 551,000 fish) and the acceptable biological catch to 509,000 fish to account for dead discards and provide a buffer to account for scientific uncertainty. *Id.* "While the total ACL of 509,000 fish represents both landed catch (34,000 fish) and dead discards (475,000 fish), the sector ACLs only represent landed catch. *Id.* at 24535. Therefore, in-season monitoring of the sectors is based on landed catch and any in-season closure or length of a sector's fishing season is based on landings and not the discard estimates. *Id.* In other words, the Amendment 59 Final Rule maintained the existing ACL mechanism for red snapper—consisting of a recurring limit on landings and corresponding accountability measures for landings. *See id.* A lawsuit challenging Amendment 59 is stayed pending resolution of the appeal in the *Slash Creek Waterworks*, Civ. No. 23-1755, matter. *See Slash Creek Waterworks, Inc. v. Lutnick,* No. 25-cv-02140 (D.D.C. Aug. 20, 2025).

## II.   Fishery Monitoring

Federal management of recreational harvest of red snapper has faced various challenges in recent years, including rising discard rates, truncated seasons, and criticisms of the adequacy of red snapper-specific data. Declaration of Timothy R. Petty, Ph.D. ("Petty Decl.") ¶ 10 (attached as

Exhibit 1). What's more, recreational fisheries differ from commercial fisheries in several key respects. NMFS's methods for monitoring the fisheries differ accordingly. During the commercial red snapper fishing season, NMFS monitors the commercial quotas by reviewing weekly reported landings provided by each state's fish dealers. 50 C.F.R. § 622.5(c)(1)(i). But because recreational landings do not result in transactions with fish dealers, a dealer-based reporting system for the recreational sector is not possible. NMFS's efforts to set the recreational fishing seasons have been complicated, in part, by the lack of real-time data on recreational harvest.

Before 2008, NMFS collected data on the recreational harvest of red snapper through the Marine Recreational Fishery Statistics Survey, which generated effort and catch data primarily through onsite interviews with anglers and offsite telephone surveys. In 2008, Congress directed NMFS to "establish a program [by January 1, 2009] to improve the quality and accuracy of information . . . with a goal of achieving acceptable accuracy and utility for each individual fishery." 16 U.S.C. § 1881(g)(3)(A). Shortly thereafter, NMFS began implementing its improved recreational data collection program: the Marine Recreational Information Program ("MRIP"). The MRIP included projects to evaluate and improve existing methods for sampling and estimating data on recreational harvest. NMFS collects data on red snapper recreational fisheries from: (1) the red snapper-specific surveys for private recreational and charter vessel anglers conducted by South Atlantic states, (2) angler surveys conducted through MRIP, and (3) the Southeast Region Headboat Survey. *See* April 25, 2023 Information Memorandum (attached as Exhibit 2).

Some commercial fishermen believe that NMFS's data collection process does not account for fishing mortality resulting from red snapper catch and discards by recreational fishermen. *See, e.g.*, 90 Fed. Reg. at 24532 (Comment 4) ("Recreational data is uncertain and the estimated discard mortality rate from the SEDAR 73 Update Assessment (2024) is severely inflated and the stock status information and determination is based on this uncertain data."). But at the same time, some

recreational anglers have expressed concerns that recreational fishing seasons in recent years are unnecessarily short and create safety concerns on the water. *See, e.g.*, *id.* at 24535 (referencing comments by the Florida Fish and Wildlife Commission and the U.S. Coast Guard). Indeed, the 2025 recreational fishing season was open for only two days (July 11–12) and was based on a recreational ACL of 22,797 fish (~263,815 pounds) or 4.5% of the total ACL. Petty Decl. ¶ 15. And the 2024 recreational red snapper season was even shorter still—restricted to a *single day* (July 12). *Id.*

Unsurprisingly, stakeholders in both sectors have urged fishery managers to better monitor recreational catch to improve the quality and reliability of fishery stock assessments used to manage the red snapper stock. As NMFS itself explained in its Federal Register notice announcing receipt of the EFP applications, "fishery managers have been challenged to satisfy fishermen's desires for longer fishing seasons as red snapper encounter rates have increased in response to rebuilding measures, resulting in forgone yield because more fish are estimated to be dying after release." Snapper-Grouper FMP; Request for EFP Comments, 91 Fed. Reg. 6827, 6828 (Feb. 13, 2026); Petty Decl. ¶ 16. A common critique centers on the adequacy of MRIP data collection, which states, anglers, and other stakeholders alike have argued do not furnish reliable catch estimates for red snapper landings or discards. *Id.* ¶ 18. This, they contend, is due to the truncated seasonal openings for harvest versus the multi-month wave data collection design, resulting in low intercept rates of anglers and high percent standard error ("PSE") estimates. *Id.* As NMFS acknowledged in its Federal Register notice, PSE "estimates in th[e] fishery are high, which are generated from [MRIP], indicating low precision and significant uncertainty that would benefit from improved data collection efforts and approaches." 91 Fed. Reg. at 6828; Petty Decl. ¶ 19.

//

//

### III.    Exempted Fishing Permits

In November 2025, Florida, Georgia, South Carolina, and North Carolina submitted their EFP applications. The states sought EFPs to pilot test their state electronic data collection and management strategies for the recreational harvest of red snapper in state and federal waters for up to three years beginning in 2026. Florida proposed to pilot test using its State Reef Fish Survey ("SRFS") and a voluntary smartphone application. Georgia, North Carolina, and South Carolina proposed use of the application VESL by Bluefin Data, LLC for electronic data collection. NMFS reviewed the EFP applications closely and sent letters to each state in early 2026, requesting additional information. And as explained, the purpose of these EFPs is to improve data on recreational fishing effort, catch, and discards of red snapper in the South Atlantic to inform the development of a long-term red snapper state management strategy. *See* Feb. 6, 2026 Information Memorandum (attached as Exhibit 3).

In their applications, each state proposed an intended season length (ranging from 39 to 62 days). Yet critically, they proposed other limitations on participation and harvest under their EFPs, which include licensing requirements, bag limits, vessel limits, and size limits. For example, Florida proposed a 39-day season length after considering several variables including catch and effort data, biological and ecological data, overlap with Florida's Gulf red snapper season, and angler preferences. Dkt. No. 7-6 at 12. Florida anglers and licensed for-hire captains fishing under the EFP will catch and harvest red snapper and use two methods to report relevant information: (1) the mandatory SRFS and (2) a voluntary smartphone web-based application during trips where a red snapper is harvested. *Id.* Citing the need to develop baseline data to manage Atlantic red snapper, Florida did not project landings estimates for this fishing season "as any such estimate would be highly uncertain and not scientifically defensible." *Id.* The other three states proposed 62-day seasons to coincide with an equivalent portion of MRIP data. Dkt. Nos. 7-7 at 4, 7-8 at 7, 7-9 at 10.

7

These states will all require the use of the electronic reporting platform known as VESL for data collection. *Id.* And, like Florida, these states did not think they could project reliable landings estimates for this fishing season. Dkt. Nos. 7-7 at 8; 7-8 at 8; 7-9 at 10-11.

NMFS reviewed the EFP applications and sent letters to each state on January 9, 2026. Those letters requested additional information on the proposed projects and their prospective effect on the management of the recreational harvest of red snapper. And these exchanges culminated in the states' submission of revised EFP applications in January 2026. After determining the EFP applications warranted further consideration, NMFS requested public comments on the applications through a Federal Register notice, *see* 91 Fed. Reg. 6827, and at the Council meeting during the week of March 2, 2026. NMFS received over 11,000 comments in response to the Federal Register notice, more than 99% of the comments supported the proposed pilot projects. Petty Decl. ¶ 30.

As relevant here, some supportive commenters noted that South Atlantic red snapper represents a major "conservation success story" because—as reflected in SEDAR 73 (2024) and consistent with the revised proxy in Amendment 59—overfishing is no longer occurring. *Id.* Other comments indicated that the red snapper population was at record-high levels, justifying the proposed longer state-managed seasons (which would replace shorter federal seasons with more consistent monthly access). *Id.* And others asserted that the MRIP survey is inadequate for tracking red snapper catches and discards because it is unable to provide stable estimates of effort and landings—leading to precautionary management measures (e.g., short seasons and rigid quota closures). *Id.* Commenters also stressed that existing state-led red snapper management programs in the Gulf of America have demonstrated the benefits of adaptive, state-specific data collection, which provides an opportunity to gather better data, involve anglers more directly in the management process, and explore innovative approaches complemented by federal oversight. *Id.* Accordingly, many commenters represented that state-level data collection and management will mitigate scientific

uncertainty and restore public confidence in stock management. *Id.* In short, commenters emphasized that the pilot projects will enable the states to modernize management approaches in the South Atlantic and ultimately permit managers to convert uncertain estimates into landed catch. *Id.*

NMFS memorialized its decision to issue the EFPs in an April 24, 2026 Decision Memorandum for Secretary Howard W. Lutnick (attached as Exhibit 4). In early May 2026, NMFS issued the EFPs to Florida, Georgia, South Carolina, and North Carolina. Dkt. Nos. 7-1 – 7-4. The EFPs exempt participating fishermen in each state from certain federal regulations implementing the FMP that would otherwise apply to the red snapper recreational harvest during the 2026 fishing year. These include:

- 50 C.F.R. § 622.181(c)(2), which restricts combining harvest limits of red snapper in federal waters with any harvest limitation in state waters, limits the harvest and possession of red snapper to the specified season, and applies these limitations to a federally permitted for-hire vessel in both state and federal waters;

- 50 C.F.R. § 622.183(b)(5)(i), which specifies when the recreational season will occur each year; and

- 50 C.F.R. § 622.193(y)(2), which specifies the ACL and accountability measures applicable to the recreational harvest of red snapper.

Each EFP is valid only through December 31, 2026. *See* Dkt. Nos. 7-1 – 7-4.

### PRELIMINARY INJUNCTION STANDARD

Injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Dall. Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 397 (D.D.C. 2020) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)). A court may only grant this extraordinary remedy "upon a clear showing that the plaintiff is entitled to such relief[,]" *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008) (citation omitted), and should do so sparingly, *Mazurek v. Armstrong*,

520 U.S. 968, 972 (1997) (per curiam).

The standard for obtaining injunctive relief through either a temporary restraining order or a preliminary injunction is well established. *See Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("The same standard applies to both temporary restraining orders and to preliminary injunctions." (citation omitted)). A plaintiff must show that: (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." *Dall. Safari Club*, 453 F. Supp. 3d at 398 (quoting *Winter*, 555 U.S. at 20). "But if a court concludes that a movant has not demonstrated irreparable harm, it need not even consider the remaining factors." *Dall. Safari Club*, 453 F. Supp. 3d at 398 (citing *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The standard for seeking such a stay is the same as the standard for seeking a preliminary injunction. *See Nken*, 556 U.S. at 433-34. Under the APA, a reviewing court may "issue all necessary and appropriate process[es] to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" if it is "necessary to prevent irreparable injury[.]" 5 U.S.C. § 705. When considering a request to stay agency action, courts should bear in mind that the public is "generally entitled to the prompt execution" of an agency action "that the legislature has made final[,]" so a stay "is not a matter of right, even if irreparable injury might otherwise result to the [plaintiff.]" *Nken*, 556 U.S. at 427 (citation omitted).

## STANDARD OF REVIEW

The APA provides the standard of review applicable to the merits of Plaintiffs' claims, regardless of whether their cause of action lies under the MSA's judicial review provision or the APA's. 16 U.S.C. § 1855(f)(1)(B); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989). A court

10

may set aside final agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Review under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid." *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (citations omitted). A reviewing court is forbidden from "substituting its judgment for that of the agency." *Id.* at 283.[1]

A reviewing court may reverse an agency's decision under the "arbitrary and capricious" standard only "if the agency has relied on factors which Congress has not intended it to consider, [has] entirely failed to consider an important aspect of the problem, [or has] offered an explanation for [that] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The APA also limits the scope of judicial review of a final agency action to "the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citation omitted); *see also* 5 U.S.C. § 706. The "focal point for judicial review [of an agency decision] should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).

<u>**ARGUMENT**</u>

The Court should deny Plaintiffs' Motion for Preliminary Injunction for two reasons. First, the MSA bars emergency injunctive relief against fishery openings; instead, it contemplates an

---

[1] The APA "mandates judicial affirmance if a rational basis for the agency's decision is presented . . . even though [a court] might otherwise disagree[.]" *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 283 (1974) (citations omitted). An agency's treatment of the evidence need not be a "paragon of clarity[,]" as long as the reviewing court can discern a "rational basis" for the agency's treatment of the evidence. *Id.* at 289-90.

expedited and orderly resolution based on standard administrate law procedures. And second, Plaintiffs fail to satisfy any of the four preliminary injunction factors: they cannot succeed on the merits because the EFPs violate neither the MSA or APA; they cannot show any irreparable harm from the EFPs based on economic injury or speculative stock injury; and they cannot tip the equities or public interest in their favor given the overwhelming public support for the EFPs. Either way, Plaintiffs' emergency request fails.

I.      **Emergency Injunctive Relief is Unavailable**.

At the threshold, Plaintiffs' requested injunctive relief is unavailable under the MSA, which bars preliminary injunctive relief. The relevant provision of the MSA -- Section 305(f)(1) -- states:

> Regulations promulgated by the Secretary under this chapter and actions [taken by the Secretary under regulations which implement an FMP] shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of Title 5 . . . except that –
>
> (A) *section 705 of such Title is not applicable*, and
>
> (B) the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of such Title.

16 U.S.C. § 1855(f)(1) (emphasis added). In turn, APA Section 705 provides that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Taken together, these provisions mean that, under the MSA, regulations promulgated by the Secretary and actions taken by the Secretary under regulations implementing an FMP cannot be preliminarily enjoined by a court.

Numerous courts—including this one—have recognized the reality that Congress has expressly precluded the availability of preliminary injunctive relief in the MSA. *See, e.g., Slash Creek Waterworks*, 2025 WL 358770, at *6 (under the MSA, "[a] district court may not enter injunctive

12

relief." (citing 16 U.S.C. § 1855(f)(1)(A), (B)) (citation modified)); *Kramer v. Mosbacher*, 878 F.2d 134, 137 (4th Cir. 1989) ("The exclusion of Section 705 powers prevents a reviewing court from issuing the sort of preliminary injunction granted by the district court").[2] Importantly, the MSA's bar on preliminary or emergency injunctive relief works alongside other provisions in the statute to forestall premature disruption of agency actions that are essential to the management and maintenance of a fishery. Corresponding provisions, in turn, promote expedient resolution of fishery cases, including: (i) a 30-day statute of limitations, 16 U.S.C. § 1855(f)(1); (ii) a 45-day, rather than 60-day, period for the Secretary to answer the complaint and file the administrative record, *id.* § 1855(f)(3)(A); and (iii) the ability for a plaintiff to seek expedited review, *id.* § 1855(f)(4). Section 1855's bar on preliminary injunctive relief thus works hand-in-glove with the statutory procedures enabling expedited review of fisheries cases. Awarding Plaintiffs' their requested relief here would not only contravene the letter of Section 1855(f), but it would also upend this carefully contemplated remedial scheme. Put differently, this is not just the best reading of the plain text, but the only reading that makes sense of the MSA's carefully structured review provisions.

Plaintiffs cannot evade the MSA's bar on preliminary injunctions by characterizing their case as an APA rather than an MSA challenge. It is blackletter law that actions challenging a rule

---

[2] The cases reaching the same conclusion are legion. *See, e.g., Wild Fish Conservancy v. Thom*, No. C20-417-RAJ, 2020 WL 8675751, at *6 (W.D. Wash. June 9, 2020) ("Section 1855(f)(1)(A) precludes preliminary injunctive relief." (citation omitted)), *R & R adopted*, No. C20-417-MLP, 2021 WL 781074 (W.D. Wash. Mar. 1, 2021); *Blue Water Fishermen's Ass'n v. NMFS*, 158 F.Supp.2d 118, 123 n. 20 (D. Mass. 2001) (same); *United Cook Inlet Drift Ass'n v. NMFS*, No. 3:21-CV-00247, 2023 WL 3467496, at *2 n.14 (D. Alaska May 15, 2023) (same); *Connecticut v. Daley*, 53 F.Supp.2d 147, 156 (D. Conn. 1999), *aff'd* 204 F.3d 413 (2d Cir. 2000) (MSA "expressly forbids a reviewing court from postponing the effective date of the Secretary's action while it conducts its review" (citation omitted)); *Cape Cod Com. Hook Fishermen's Ass'n v. Daley*, 30 F.Supp.2d 111 (D. Mass. 1998) (MSA prohibits injunctive relief in case challenging experimental fishing permits issued pursuant to 50 C.F.R. § 600.745); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Sec'y of Com.*, 494 F. Supp. 626, 627-29 (N.D. Cal. 1980) ("On its face, Section 305(d) precludes the grant of a preliminary injunction[.]").

13

or action issued under the MSA are subject to the MSA's judicial review limitations even if the claims are pleaded as violations of other laws. In *Turtle Island Restoration Network v. U.S. Department of Commerce,* the Ninth Circuit held that the 30-day statute of limitations set forth in the MSA's judicial review provision applied to an action, even though Plaintiffs ostensibly asserted claims under the Endangered Species Act, the Migratory Bird Treaty Act, the APA, and the National Environmental Policy Act ("NEPA"). 438 F.3d 937, 944-45 (9th Cir. 2006). The court reasoned that the "three key aspects of § 1855(f)—the thirty-day time limitation, the bar on preliminary injunctive relief, and the provision for expedited review—demonstrate Congress's intent to ensure that regulations promulgated under the Magnuson Act are effectuated without interruption and that challenges are resolved swiftly." *Id.* at 948. Here, too*,* the Court should conclude that Plaintiffs' MSA-based APA claims are not eligible for preliminary injunctive relief.[3]

Finally, Plaintiffs' attempted end-run around the MSA's bar is at odds with itself. The challenged EFPs are Secretarial actions providing exemptions from the regulations implementing the Snapper-Grouper FMP. Crucially, however, even assuming the challenged EFPs are neither regulations nor actions taken under regulations implementing an FMP, Plaintiffs *themselves* frame their sole claim for relief as implicating alleged violations or "conflicts" with substantive provisions of the MSA pertaining to regulations and actions implementing FMPs. *See, e.g.,* Dkt. No. 1 ¶ 136 ("Thus under the Exempted Fishing Permits, Defendants will be managing the fishery in direct conflict with the statutory requirement at 16 U.S.C. Section 1853(a)(15).").[4] Either the MSA's

---

[3] Plaintiffs' reliance, *see* Dkt. No. 6-1 at 20, on *Kāpaʻa v. Trump*, 794 F.Supp.3d 793 (D. Haw. 2025) is unavailing because both plaintiffs and defendants in that case agreed that 16 U.S.C. § 1855(f) was inapplicable, *Kāpaʻa*, 764 F. Supp. 3d at 811.

[4] *See also id* ¶¶ 139 ("Thus under the [EFPs], Defendants will be managing the fishery in direct conflict with the statutory requirement at 16 U.S.C. Sections 1851(a)(1) and 1853(a)(1)(A) (and elsewhere, as the requirement to prevent overfishing is embedded throughout the Act)."), 142

14

standards *and* the judicial review provisions apply, or neither do. Plaintiffs cannot have their cake and eat it too.

## II.    Even if Preliminary Relief is Available, Plaintiffs Fail to Meet the High Bar for Such Relief.

Plaintiffs' motion likewise fails under the four-factor test for preliminary injunctive relief. No matter how much they argue otherwise, Plaintiffs have not met and cannot meet their burden on any of the factors.

### A.    Plaintiffs Are Unlikely to Succeed on the Merits.

Plaintiffs' merits case fails on every level. They cannot state a claim for relief under the MSA provisions they invoke. They cannot explain how the EFPs are inconsistent with the MSA's substance or goals. And they cannot show how the EFPs are arbitrary and capricious.[5]

### 1.    Plaintiffs fail to state a claim for violations of MSA provisions applicable only to FMPs, not EFPs.

Plaintiffs fail to state a claim based on alleged violations of the MSA's substantive provisions. NMFS issued the EFPs under MSA Section 318(d) and regulations codified at 50 C.F.R. § 600.745 that implement that provision. But Plaintiffs rely on other MSA provisions (16 U.S.C. §§ 1851(a)(1), 1853(a)(15)) that do not apply to such agency actions. Indeed, NMFS issues EFPs to provide an *exemption* from FMPs for certain purposes such as data collection. For example, Plaintiffs allege that the EFPs conflict with Section 301's requirement that any FMPs prepared, and any regulation promulgated to implement any such plan prevent overfishing. Dkt. No. 1 ¶¶ 139,

---

("Thus under the [EFPs], Defendants will be managing the fishery in direct conflict with the statutory requirement at 16 U.S.C. Section 1851(a)(4) (and associated case law).").

[5] To the extent Plaintiffs seek to expedite a decision on the merits, *see* Dkt. No. 6-1 at 16-17, that request is inappropriate. Judicial review of both MSA and APA claims is based on an administrative record. 16 U.S.C. § 1855(f)(3)(B); 5 U.S.C. § 706. Federal Defendants have not yet had the opportunity to respond to Plaintiffs' Complaint much less produce the administrative record.

142 (citing 16 U.S.C. § 1851(a)(1)). By its own terms, Section 301 applies to "[a]ny fishery management plan prepared, and any regulation promulgated to implement any such plan[.]" 16 U.S.C. § 1851(a). Plaintiffs themselves acknowledge that the EFPs are "plainly" not regulations or FMPs. Dkt. No. 6-1 at 22. Because the EFPs are not FMPs or regulations – indeed, they are *exemptions* from certain parts of the otherwise applicable FMP or regulations -- they do not violate or otherwise conflict with MSA Section 301.

Plaintiffs also allege that the EFPs conflict with Section 303's requirement that any FMP shall "establish a mechanism for specifying annual catch limits. . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." Dkt. No. 1 ¶ 135 (citing 16 U.S.C. § 1853(a)(15)). By its own terms, Section 303 pertains to "[a]ny fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery[.]" 16 U.S.C. § 1853(a). But, again, Plaintiffs themselves acknowledge that the EFPs are not FMPs. Dkt. No. 6-1 at 22.

Plaintiffs fail to state a claim that the EFPs violate or "conflict" with the substantive provisions of Sections 301 and 303 because these provisions pertain to FMPs and regulations, not EFPs. *Cape Cod Com. Hook Fishermen's Ass'n,* 30 F. Supp. 2d at 114 ("The issuance of the experimental fishing permits, though undertaken as part of the Council's formulation of its recommendations to the Secretary for changes in the management plan, is not an action that has been 'approved' by the Secretary and put into effect 'by regulation.'" (citation omitted)). And because Plaintiffs are unlikely to succeed on the merits of their sole claim for relief, their suit is subject to dismissal under Federal Rule of Civil Procedure 12(b)(6). *Kimberlin v. U.S. Dep't of Justice*, 150 F. Supp. 2d 36, 41 (D.D.C. 2001), *aff'd*, 318 F.3d 228 (D.C. Cir. 2003).

### 2. <u>EFPs Further the MSA's Substance and Goals</u>.

Even if Plaintiffs could state a claim for a violation of the MSA' s substantive provisions,

the EFPs nevertheless further the MSA's substantive aims and fishery management goals. At bottom, the EFPs are intended to improve the quality of data NMFS and the Council use for management decisions. Thus, while MSA Section 301 does not constrain the EFPs, they clearly further the MSA's objective that management measures be based on the best scientific information available. *See* 16 U.S.C. § 1851(a)(2). Better, more adaptive data will also help achieve the MSA's other foundational objectives, such as preventing overfishing while achieving optimum yield, taking into account the importance of fishery resources to fishing communities, and promoting the safety of human life at sea. *See id.* § 1851(a)(1), (8), (10).

Plaintiffs' arguments that the EFPs will harm the red snapper stock are entirely speculative. Because recreational fishermen have not been legally permitted to retain snapper caught outside the short recreational fishing seasons for the past several years, Plaintiffs' estimates of fishing mortality that will be caused by the EFPs are necessarily informed by previous years' estimates of dead discards. *See* Dkt. No. 6-1 at 29 ("Recreational landings will skyrocket under the Exempted Fishing Permits, as discussed above, and dead discards will not decrease anywhere near enough to offset the increased landings." ). But in the Amendment 43 Final Rule, NMFS "determined that, given the extreme uncertainty associated with the red snapper recreational discard estimates, relying on those discard estimates for the management of red snapper is not appropriate[.]" 83 Fed. Reg. at 35429.[6] For similar reasons, Plaintiffs' argument that the EFPs will result in a *de facto* reallocation

---

[6] Contrary to the characterizations of Amicus Environmental Defense Fund, Dkt. No. 17-2 at 26, NMFS did not suddenly change its position regarding the extreme uncertainty associated with recreational discard estimates. The cited Amendment 59 Final Rule states that "The SEDAR 73 (2021) and SEDAR 73 Update Assessment (2024), and the management measures in this final rule are based on the best scientific information available." 90 Fed. Reg. at 24533. That statement plainly referred to the overall validity of the SEDAR 73 Update Assessment (2024) (Dkt. No. 7-17) and did not contradict the Amendment 43 Final Rule's determination regarding the "extreme uncertainty" of existing recreational discard estimates. 83 Fed. Reg. at 35429. To the contrary, as explained in detail above, the Amendment 59 Final Rule continued the Amendment 43 practice of

of South Atlantic red snapper from the commercial sector to the recreational sector, *see* Dkt. No. 6-1 at 31, is also entirely speculative. Considering the limitations of the existing data on recreational red snapper harvests and discards, the Court should defer to NMFS' s interpretation of existing recreational discard data and deny Plaintiffs' request (based on *their* interpretation of the existing data) to enjoin NMFS from working cooperatively with the States to develop *improved* data regarding the current status of red snapper stocks. *Nat. Res. Def. Council v. EPA*, 529 F.3d 1077, 1086 (D.C. Cir. 2008) (an agency has wide latitude in choosing which data and methods to rely upon and the agency' s choice will be upheld as long as it acted reasonably in its choice).

Even if Plaintiffs could adduce reliable scientific data, *see* Dkt. No. 6-1 at 30, such information would not necessarily demonstrate a violation of the MSA' s substantive provisions. The relevant inquiry under National Standard 1 does not scrutinize whether the NMFS's fishery management regime should be deemed sufficiently likely to prevent overfishing at a specific point in time. Instead, it concerns whether that regime is consistent with the achievement of optimum yield *on a continuing basis* while also preventing overfishing. *Nat. Res. Def. Council v. NMFS*, 71 F. Supp. 3d 35, 65 (D.D.C. 2014) (Brown Jackson, J.) (observing that "the [MSA] does not direct the NMFS to consider minimizing overfishing *exclusively*, nor does it require the agency to prioritize that factor to the exclusion of all other considerations[,]" and that, "had Congress charged the Secretary with merely preventing overfishing, the Secretary likely would have responded with eliminating fishing altogether") (citation modified); *Nat. Res. Def. Council v. Raimondo*, Civ. No. 23-982, 2024 WL 4056653, at *20 (D.D.C. 2024) ("[G]iven the discretion the MSA gives NMFS, and the significant year-to-year swing in data with no guarantee that the swings are due to actual fishing

---

refraining from using the uncertain recreational discard estimates to inform the development of in-season accountability measures. *See* 90 Fed. Reg. at 24535.

trends rather than poor datasets, defendants rationally concluded that a slightly more conservative reduction—albeit one that can still be as high as a 40-percent reduction—is prudent to ensure that any changes are in the right direction.").[7] Again, the existing rebuilding program that the Court reviewed and upheld in *Slash Creek Waterworks* remains in effect. The Court should reject Plaintiffs' request to measure the Agency's MSA compliance based on a shorter yardstick. On issues such as this, *i.e.*, determining implementing measures to achieve rebuilding and prevent overfishing, the Court should defer to the Secretary's reasoned decision in "making difficult policy judgments and choosing appropriate conservation and management measures based on [the agency's] evaluation of the relevant quantitative and qualitative factors." *National Fisheries Institute v. Mosbacher*, 732 F. Supp. 210, 223 (D.D.C. 1990).

Finally, to the extent the EFPs provide the states an exemption from the applicability of the existing regulatory regime that this Court reviewed and upheld in *Slash Creek Waterworks*, 2025 WL 358770 at *2, that exemption is only temporary. The EFPs are valid only through December 31, 2026. Dkt. Nos. 7-1 – 7-4. NMFS will have to issue new EFPs to allow the states' respective pilot projects to continue for up to three years, as initially proposed. As Plaintiffs fail to acknowledge, all the applications envision the potential for future changes in the authorized activities based on information gained during preceding years. *See* 91 Fed. Reg. at 6827 ("The outcomes of the 2026 EFPs would guide the need for, and possible refinement of, future EFP applications in

---

[7] *See also Trawler Diane Marie, Inc. v. Brown*, 918 F. Supp 921, 929 (E.D.N.C. 1995), *aff'd*, 91 F.3d 134 (4th Cir. 1996) (affirming interim decision to close the scallop fishery, which promoted the long-term achievement of optimum yield for the fishery); *J. H. Miles & Co. v. Brown*, 910 F. Supp. 1138, 1148 (E.D. Va. 1995) ("management measures must aim to achieve, on a continuing basis, the optimum yield from each fishery, not the optimum yield in a single year"); *N.C. Fisheries Ass'n v. Evans*, 172 F. Supp. 2d 792, 800 (E.D. Va. 2001) ("Based on the way optimum yield is defined under Amendment 2 to the summer flounder FMP, overages in a particular segment of the fishery from year to year do not preclude attainment of optimum yield.")

2027 and 2028."), 6829 ("FWC would use the data collected in 2026 to inform the season length and structure established by the state for 2027 and 2028 in collaboration with NMFS."); *id.* ("GADNR anticipates that the outcome of the 2026 pilot will inform a decision to extend the program through 2027 and 2028."); *see also, e.g.*, Dkt. No. 7-6 at 9 ("Baseline data from year 1 would be used to estimate landings projections for future years and inform specific season structures for 2027-2028. This model is already used in the Gulf and FWC would similarly work with NOAA Fisheries regarding any changes to be implemented in the South Atlantic."); Dkt. No. 7-7 at 6 ("The outcome of the 2026 EFP will provide guidance on the need and refinement of future EFP applications. Currently Georgia is considering an additional two years, which would cover 2027 and 2028."); Dkt. No. 7-8 at 11 (same).

Thus, as results from year one are analyzed, the states may shorten requested seasons or otherwise alter the activities conducted under the EFPs in years two and three to further constrain harvest as necessary or alter data collection to improve the results of the study effort. *See* 91 Fed. Reg. at 6827, 6829; *see, e.g.*, Dkt. No. 7-6 at 9. All such changes would be reviewed by NMFS and incorporated as appropriate in deciding whether to issue EFPs in following years.

Plaintiffs are unlikely to succeed on the merits of their sole claim for relief, Dkt. No. 1 ¶¶ 131-153. The EFPs are consistent with the MSA provisions on which Plaintiffs rely and Plaintiffs fail to carry their burden to show otherwise.

### 3.    The EFPs Are Not Arbitrary and Capricious.

To the extent Plaintiffs assert any reviewable APA-based claims challenging NMFS's decision to issue EFPs under 50 C.F.R. § 600.745, the Court must uphold that decision unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Plaintiffs bear the burden of showing that NMFS's issuance of the EFPs violated the APA. *Am. Trucking Ass'ns. v. EPA*, 283 F.3d 355, 362 (D.C. Cir. 2002) (administrative action

20

presumed to be valid); *see also Costle*, 657 F.2d at 283 (same). In other words, owing to the presumption of regularity that attaches to agency action, Plaintiffs must explain why the challenged actions and conduct are purportedly arbitrary and capricious. *See U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("not[ing] that a presumption of regularity attaches to the actions of Government agencies" (citation omitted)); *Nat. Res. Def. Council v. Kempthorne*, 525 F. Supp. 2d 115, 120 (D.D.C. 2007) ("an agency action is 'entitled to a presumption of regularity'" (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971)); *W. Watersheds Project v. Vilsack*, No. 23-8081, 2024 WL 4589758, at *6 (10th Cir. Oct. 28, 2024) ("We 'accord agency action a presumption of validity,' and therefore, 'the burden is on the petitioner to demonstrate that the action is arbitrary and capricious.'" (citation omitted)). NMFS stands behind its action. But procedurally, NMFS has no obligation to show that the challenged actions and conduct were not arbitrary and capricious. It is Plaintiffs who must show arbitrariness and capriciousness—and they fail to do so.

An overview of NMFS' evaluation of the EFP applications belies any charge of arbitrary or capricious agency action in this case. After receiving the EFP applications, and consistent with the review procedures set forth at 50 C.F.R. § 600.745(b)(2)(viii), NMFS requested additional information from the applicants, including information regarding potential effects on red snapper stocks. The states submitted revised EFP applications in January 2026. Dkt. No 7-6 (Florida's application); Dkt. No. 7-7 (Georgia's application); Dkt. No. 7-8 (South Carolina's application); Dkt. No. 7-9 (North Carolina's application). In so doing, the states incorporated much of the additional information NMFS requested or were otherwise responsive to NMFS's questions.

In response to NMFS's request, Florida's revised application cited the SEDAR 73 Update Assessment, *available at* https://sedarweb.org/documents/sefsc-2024-update-to-sedar-73-south-atlantic-red-snapper-assessment/ (last visited May 18, 2026), which indicated that red snapper is no

longer overfished. Dkt. No. 7-6 at 8. Because fishing effort in Florida for snapper grouper species occurs year-round the Florida EFP is not expected to increase effort and poses no more of a risk to the Atlantic red snapper stock than do current levels of effort estimated by NOAA. *Id.* at 16. Given that fishing effort is not anticipated to increase, an overall increase in landed catch is expected to provide greater angler fishing opportunities while reducing the number of fish that are released and later die.

Georgia, South Carolina, and North Carolina likewise observed that, although the EFP will increase the targeted trips for red snapper, recreational fishing resulting in the catch of red snapper should not increase. Dkt. No. 7-7 at 8 (Georgia); Dkt. No. 7-8 (South Carolina). North Carolina also reasoned that no significant impact on the red snapper population is expected because North Carolina is at the northern edge of the stock's range and not every private angler will fish all allowed days. Dkt. No. 7-9 at 11. The states cited reports by Powers and Anson (2018), Dkt. No. 7-13, and Topping *et al.* (2019), Dkt. No. 7-14, which indicated that extending the duration of the season could *reduce* effort and harvest rates, as anglers would have more opportunities to fish and would be less likely to concentrate effort into a truncated time frame. Dkt. No. 7-7 at 8 (Georgia); Dkt. No. 7-8 at 12 (South Carolina); Dkt. No. 7-9 at 11 (North Carolina).

Florida also noted that extending the red snapper recreational fishing season would address the problem of "effort compression" that creates unsafe conditions at sea due to short fishing seasons that last only a few days. Dkt. No. 7-6 at 8 (Florida); *see also* Dkt. No. 7-8 at 4 (South Carolina). Effort compression is sometimes characterized as a "race for fish" or "derby" conditions. In addition to creating a risk to human health and safety due to the pressure to fish (for example, in

adverse weather), derby conditions often result in the fishery closing prematurely, before the applicable quotas are harvested, or too late, after the TAC has already been exceeded.[8] Indeed, courts have recognized the phenomenon of "derby-style" fishing and its efforts upon fishing effort and fishery management alike. *See*, *e.g.*, *New York v. Evans*, 162 F. Supp. 2d 161, 168 n. 5 (E.D.N.Y. 2001) ("'Derby-style' fishing is 'a race to fish' in which fisherman are encouraged due to limitations on a fishery to attempt to catch as much of a species as quickly as possible in order to maximize their harvest before a season or fishery is closed.").[9]

As noted above, after determining the states' revised applications warranted further consideration, NMFS submitted the revised applications for public comments in a *Federal Register* notice, 91 Fed. Reg. 6827 (Feb. 13, 2026), and at the South Atlantic Fishery Management Council meeting in March 2026. NMFS received 11,298 comments in response to the *Federal Register* notice. Ex 3 at 1. Nearly all these comments supported the proposed pilot projects. *Id.* Some commenters stated that state-led pilot programs offer an important opportunity to gather better data, involve anglers more directly in the management process, and explore innovative approaches complemented by federal oversight. *Id.* at 2.

---

[8] Dkt. No. 7-5 at 2–3 ("The applicants cite past research, as well as state management of red snapper in the Gulf of America, which indicate that extended fishing seasons reduce overall fishing effort by preventing the 'derby-style' effort compression seen in shorter fishing seasons. Therefore, the applicants determined that the projects are not expected to result in increased effort or fishing mortality to harvest red snapper in the South Atlantic, and that, if there were impacts, they would be minimal and not result in significant effects to the red snapper stock or to the snapper-grouper fishery as a whole.").

[9] *See also Lindel Fair v. United States*, C.A. No. C-93-022, slip op. at 2 (S.D. Tex. May 2, 1995) (attached as Exhibit 5) ("In 1992, the [commercial] red snapper quota was filled in just 53 days, resulting in a number of social, economic, and fishery conservation consequences, including lower red snapper prices, unemployment, and a quota overrun of 600,000 pounds."); *Starbound, LLC v. Gutierrez*, Case No. C07-0910, 2008 WL 1752219, at *8 (W.D. Wash. Apr. 15, 2008) ("Defendants articulated a rational connection between new entry and an increased race for fish that could have presented an imminent and serious conservation problem for the Fishery.").

Contrary to Plaintiffs' assertion that EFPs are subject to the substantive provisions of 16 U.S.C. § 1851(a)(1), *see* Dkt. No. 6-1 at 34 (quoting 74 Fed. Reg. at 42788), the quoted language applies to EFPs for "conservation engineering" projects, rather than fishing. And contrary to Amicus Environmental Defense Fund's assertion that the use of EFPs must be limited to research vessels engaged in testing a scientific hypotheses, *see* Dkt. No. 17-2 at 11-12, the applicable regulation provides that the EFPs may be issued where, as here, the permitted activity is fishing. 50 C.F.R. § 600.745(b). Scientific research activities are instead permitted under an altogether separate provision. *Id.* § 600.745(a). And in its Decision Memorandum, Exhibit 4, NMFS properly recognized that the authorized data collection will be achieved *through fishing* pursuant to the EFPs. NMFS noted that "[t]he EFPs have the ability to substantially increase recreational fishing opportunities and improve data collection, while acknowledging that some commenters raised concerns about potential adverse impacts to red snapper stocks." *Id.* at 5. NMFS addressed potential adverse impacts to red snapper stocks in its NEPA categorical exclusion determination.[10] Dkt. No. 7-5. NMFS credited the applicants' determinations that the states' pilot projects are not expected to result in increased effort or fishing mortality to harvest red snapper in the South Atlantic, and that, if there were impacts, they would be minimal and not result in significant effects to the red snapper stock or to the snapper-grouper fishery as a whole. *Id.* at 3.

In short, the record before the Court does not indicate that the harvest permitted under the EFPs would detrimentally affect the well-being of red snapper stock. Considering the information submitted by the applicants and all public comments received, and consistent with the EFP application review procedures set forth in 50 C.F.R. § 600.745, NMFS reasonably decided to issue the

---

[10] Categorical exclusions are "categories of actions that do not individually or cumulatively have a significant effect on the human environment." NEPA; Categorical Exclusions, 74 Fed. Reg. 33204, 33204-05 (July 10, 2009).

24

EFPs. On these facts, Plaintiffs cannot demonstrate that the NMFS's decision was arbitrary and capricious, 5 U.S.C. § 706.

To the extent Plaintiffs and Amicus Environmental Defense Center allege NMFS lacked authority to issue the EFPs, *see* Dkt. No. 1 ¶ 146; Dkt. No. 6-1 at 35; Dkt. No. 17-2 at 10-11, Plaintiffs fail to demonstrate that NMFS's actions were "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(C). MSA Section 318(d) authorizes NMFS to issue EFPs including those at issue in this case. 16 U.S.C. § 1867(d). As Plaintiffs acknowledge, neither the MSA itself nor the agency's regulations define "experimental fishing." Dkt. No. 6-1 at 33 ("'Experimental fishing' is nowhere defined in the Act. . . ."). Because the MSA itself does not define "experimental fishing" the relevant question is whether the Agency's interpretation of the MSA is consistent with the "best reading" of the statute. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) ("When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits."). Here, Congress directed NMFS to "create an expedited, uniform, and regionally-based process to promote issuance, where practicable, of experimental fishing permits." 16 U.S.C. § 1867(d). The best reading of the MSA, based on the plain language of this provision, is that Congress did not limit NMFS's discretion to promulgate regulations or issue EFPs under the same. The Court should uphold the Agency's exercise of its authority.

### B.    **Plaintiffs Fail to Establish Irreparable Harm from the EFPs.**

Plaintiffs also fail on the irreparable harm prong as they have not met their burden of showing that the EFPs will cause the requisite severe, certain unrecoverable economic losses or harm to their connection to fish stocks or the commercial fishing industry. Denial of Plaintiffs' motion is warranted on this basis alone. *Sierra Club v. EPA*, 793 F. Supp. 3d 158, 164 (D.D.C. 2025) ("If a

25

movant does not show irreparable harm, the Court can deny the motion for injunctive relief without reaching the other preliminary injunction factors." (citation omitted)).

To constitute irreparable harm, the injury alleged must be "both certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is a clear and present need for equitable relief." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (citation modified). The movant must "substantiate" its "claim that irreparable injury is 'likely' to occur" with evidence. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (citation omitted). The Supreme Court has made clear that this standard is a rigorous test, and that an injunction may be granted on nothing less than a showing "that irreparable injury is *likely* in the absence of an injunction[.]" *Winter*, 555 U.S. at 22 (citations omitted); *see also* 11A Wright & Miller's Federal Practice & Procedure § 2948.1 ("[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury."). The D.C. Circuit likewise "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Plaintiffs fail to meet this high bar.

### 1.     Plaintiffs' Claimed Economic Injuries Are Legally Insufficient.

Plaintiffs fail to show certain or severe potential economic injuries from the EFPs -- they concede this alleged harm is likely insufficient to meet the irreparable harm standard. Dkt. No. 6-1 at 40. It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wisconsin Gas Co.*, 758 F.2d at 674. Some courts have found "that unrecoverable losses in wages may represent irreparable harm when they are 'sufficiently severe to warrant emergency relief.'" *Reid v. Mayorkas*, 759 F. Supp. 3d 15, 28 (D.D.C. 2024) (citation omitted). "But this is not to say that the existence of *any* unrecoverable financial injury from an entity that enjoys sovereign immunity means irreparable harm can be established. Rather, the economic harm in question must be

26

sufficiently 'significant.'" *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 192 (D.D.C. 2021) (citation omitted).

Plaintiffs' alleged economic injury relies on a causal chain that becomes more speculative with each new link. To start, Plaintiffs claim that if the EFPs did not take effect, the red snapper stock would not be reduced, and NMFS *could* increase the red snapper trip limits for commercial fishermen earlier than it might otherwise. Dkt. No. 6-1 at 39. And, the argument goes, if NMFS increased commercial trip limits, Plaintiffs could fish for more red snapper, which in turn could increase their income. Dkt. No. 6-4 ¶ 9; Dkt. No. 6-5 ¶ 12; Dkt. No. 6-6 ¶ 13. But Plaintiffs' causal chain rests entirely on uncertain and attenuated assumptions. It is far from certain that the EFPs will "set back" the recovery of red snapper stock as Plaintiffs claim. And even without the EFPs, there is no guarantee that NMFS would increase the red snapper catch limits for commercial fishermen. Nor is it certain that if NMFS increased catch limits for commercial fisherman, that it would do so earlier if the Court were to enjoin the EFPs. The MSA does not require NMFS to take any particular action—or any action at all—after finding that adequate progress has been made toward ending overfishing and rebuilding the fish stock. Instead, the MSA leaves any next steps to the agency's discretion, *see* 16 U.S.C. §§ 1854, 1855, rendering the chain of events that Plaintiffs claim could cause their alleged economic harm manifestly uncertain.

Plaintiffs fail to show certain economic injury —they point only to conclusory statements as evidence that their income or revenue could increase at some point in the future, which is insufficient to establish irreparable harm. *Mexichem Specialty Resins, Inc.*, 787 F.3d at 555 (irreparable harm must be certain); *Nat'l Mining Ass'n v. Jackson*, 768 F.Supp.2d 34, 52 (D.D.C. 2011) (holding the movant failed to show irreparable harm where the declarant did "not offer a projection of anticipated future losses, tie that to an accounting of the company's current assets, or explain with any

specificity how he arrived at the conclusion that he would be forced out of business in eighteen months"); *see* Dkt. No. 6-4 ¶ 9; Dkt. No. 6-5 ¶ 12; Dkt. No. 6-6 ¶¶ 13-14.

Nor have Plaintiffs shown that any economic injury they may face is sufficiently severe to establish irreparable harm. Plaintiffs do not assert that their alleged economic injuries will be severe. *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Rsrv. Sys.*, 773 F. Supp. 2d 151, 181 (D.D.C. 2011) (holding no irreparable harm where the plaintiff did "not provide specific details regarding the extent to which his business will suffer or even assert that this unrecoverable monetary harm will be severe" (citation omitted)). And Plaintiffs have not provided any supporting, specific documentation regarding their financial positions, let alone documentation showing that they would face severe financial distress if NMFS does not raise the red snapper trip limits for commercial fishermen in a certain amount of time. *See Reid*, 759 F. Supp. 3d at 28 (D.D.C. 2024) ("Nor have Plaintiffs provided any documentation to the Court to show that their financial positions are 'sufficiently severe.'" (citation omitted)).[11] Beyond conclusory statements, Plaintiffs fail to show with any specificity that they would make more money catching and selling red snapper as opposed to the other species of fish that they catch and sell. *See* Dkt. No. 6-5 ¶ 21; Dkt. No. 6-6 ¶ 14. Nor do Plaintiffs demonstrate that they suffer from severe financial distress now or that the possibility of fishing for more red snapper in the future would remedy severe financial distress.

Plaintiffs alleged economic harms thus fail establish irreparable harm, foreclosing their requested preliminary relief.

---

[11] The *Reid* court found that the plaintiffs established some irreparable harm "due to dramatically decreased wages." 759 F. Supp. 3d at 28. Plaintiffs also cite a case where the Court found the plaintiff demonstrated that it would suffer severe financial harm. Dkt. No. 6-1 at 37; *see Luokung Tech. Corp.*, 538 F. Supp. 3d at 192 ("The Court finds that Luokung faces this type of 'significant' unrecoverable economic injury here."). But these cases only highlight what Plaintiffs are missing here—information supporting their claims that the EFPs will impose economic harms, let alone severe economic harms.

### 2.    Plaintiffs' Novel Fish Stock Harm is Reparable and Generalized.

Failing to show irreparable economic injury, Plaintiffs turn to a novel theory of harm. They claim the EFPs will set back the red snapper stock's rebuilding plan, that Plaintiffs identities and values are interdependent with fish and fishing, and that the setback will hit them "like a punch in the gut." Dkt. No. 6-1 at 37-40. But these allegations do not rise to the level of irreparable harm or a cognizable harm specific to an interest in the red snapper stock.

Plaintiffs' alleged harm stemming from the alleged impacts to the red snapper stock is simply not irreparable. They do not contend that issuing the EFPs will prevent the red snapper fish stock from recovering, nor do they provide any evidence that would support such a conclusion. Instead, Plaintiffs state that issuing the EFPs will "set back" or delay the rebuilding of the stock. *See* Dkt. No. 6-4 ¶ 18; Dkt. No. 6-5 ¶ 22. Thus, the relief that Plaintiffs claim will redress their alleged harms would not be "beyond remediation," just delayed. *See Mexichem Specialty Resins*, 787 F.3d at 555. But delayed relief cannot establish irreparable harm. *See Population Inst. v. McPherson*, 797 F.2d 1062, 1082 (D.C. Cir. 1986) ("While we recognize that delay may cause some difficulties for those groups, we cannot agree that irreparable harm will result.").[12] Moreover, alleged harm to the stock from fishing under the EFPs (if realized) may be remediated by subsequent changes to the EFPs in future years. Petty Decl. ¶¶ 44, 47, 48.

Plaintiffs also do not establish a cognizable interest that would be irreparably injured by any further delay in their ability to fish for red snapper. It is well settled that "the desire to use or observe an animal species . . . is undeniably a cognizable interest." *Lujan v. Defenders of Wildlife*, 504 U.S.

---

[12] *Conserve Southwest Utah v. U.S. Department of the Interior*, No. 26-317, 2026 WL 569034 (D.D.C. Mar. 1, 2026), does not help Plaintiffs. There, the court found irreparable harm based on the plaintiffs' expert's testimony "that vegetation and soil damaged by blading and other construction activities "will not return to pre-surface[-]disturbance conditions in our lifetime," and "that full recovery 'may never occur.'" *Id.* at 20 (citation omitted). Plaintiffs make no similar showing here.

29

555, 562-63 (1992). But Plaintiffs do not claim any particular interest in red snapper or fishing for red snapper. Instead, Plaintiffs assert a generalized interest in the health of fisheries based on their connection to fish and fishing. But Plaintiffs fail to point to a single case—*any at all*—recognizing such an interest as cognizable. Even if it were, Plaintiffs do not show that the EFPs harm, let alone irreparably harm, their ability to "catch fish," "think about fish," "eat fish," "buy and sell fish," "talk about fish," or "find fish." Dkt. No. 6-1 at 38.

Plaintiffs' own cases show that their alleged injury does not rise to the level of irreparable harm. In those cases, the courts found that the movants established connections with not just the particular species, but the particular animals at issue. *See Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 221 (D.D.C. 2003) ("Plaintiffs in this case claim . . . to have developed relationships with and aesthetic interests in particular swans located in Maryland, not with all swans in the Atlantic Flyway."); *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) ("The record shows that the individual plaintiffs live near and enjoy the bison in the [federal lands at issue]. The individual plaintiffs enjoy observing, photographing and generally commiserating with the animals."); *Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993) ("Each of them enjoys the neighboring Yellowstone bison in much the same way as a pet owner enjoys a pet[.]"). Those courts also found that the deaths of the particular animals in which the plaintiffs had an interest would irreparably harm the movants because it would sever their connection to those specific animals. *See Norton*, 281 F. Supp. 2d at 221; *Clark*, 27 F. Supp. 2d at 14; *Espy*, 814 F. Supp at 151. No similar interest has been claimed here: Plaintiffs allege no connection to specific red snapper, nor do they claim that they would be harmed by the deaths of certain red snapper. Quite the contrary; Plaintiffs hope to fish for *more* red snapper in the future. To find that this causes Plaintiffs irreparable harm

30

would require the Court to reach the puzzling conclusion that by depriving Plaintiffs of the opportunity to catch (i.e., kill) more red snapper, the EFPs somehow sever Plaintiffs' connection to the red snapper stock.

Accordingly, Plaintiffs have failed to establish that their connection to fish stocks generally will be irreparably harmed by the EFPs, rendering preliminary injunctive relief improper.

### 3.   <u>Generalized Commercial Fishing Harm Does Not Suffice</u>.

Plaintiffs also cannot establish irreparable harm via alleged injuries to the commercial fishing community. The moving party must show that *it*—not some other entity—will suffer irreparable harm if preliminary injunctive relief is not granted. *See Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C. Cir. 1989) ("[P]reliminary relief is to be granted only if the moving party establishes that . . . it will suffer irreparable harm if the injunction is not granted[.]").

Plaintiffs cannot do so here. To begin, they claim that the commercial fishing community has been shrinking "as individuals become demoralized and leave the industry," and that Plaintiffs actively work to keep the community of commercial fishing alive. Dkt. No. 6-1 at 40-42. Yet Plaintiffs fail to explain how their "injury" differs from the fishing community at large.[13] Nor do Plaintiffs explain how enjoining the EFPs *in this case* will remedy the "steady erosion" of commercial fishermen, which they contend has been occurring for decades. Dkt. No. 6-1 at 41-42; *see Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. CV 16-1534, 2021 WL 2036662, at *63 (D.D.C. May 21, 2021) (finding no irreparable harm where plaintiffs did not explain how the injunction "would remedy these longstanding, deep-rooted feelings stemming from the continued

---

[13] Plaintiffs' failure to articulate their alleged injury also calls into question whether Plaintiffs have standing sufficient to challenge the EFP, because they have not established an injury that is (i) "concrete, particularized, and actual or imminent"; (ii) "fairly traceable to the challenged action"; and (iii) "redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted).

refusal to respect the rights of the Tribes throughout the nation's history" (citation modified)). Put differently, any alleged harm to commercial fisheries is both too generalized and too untraceable to the EFPs here.

For all these reasons, Plaintiffs fail to establish irreparable harm, and the Court should deny their motion for preliminary injunction.

### C.        The Balance of the Harms and Public Interest Favor NMFS.

The final two factors in the standard for preliminary and injunctive relief —balancing the equities and the public interest—"merge" in cases where the relief is sought against the United States. *Nken*, 556 U.S. at 435. Here, these factors weigh in favor of opening the South Atlantic recreational red snapper fishery and allowing for the improved collection of recreational fishing data.

The EFPs are intended to help address a chronic issue with red snapper fishery management: how to collect data to more accurately measure the number of red snapper caught by private recreational anglers. The EFPs provide an opportunity to further develop methodology for collecting relevant data. Florida will pilot test its SRFS and a voluntary smartphone application, which are designed to improve data collection on recreation fishing efforts and the catch and discards of red snapper. Dkt. No. 7-1 at 1-3. North Carolina, South Carolina, and Georgia will pilot test the VESL application by Bluefin Data, LLC. Dkt. No. 7-2 at 1-3; Dkt. No. 7-3 at 1-3; Dkt. No. 7-4 at 1-3. As many of the thousands of commenters noted, the proposed state-level data collection will mitigate scientific uncertainty. Petty Decl. ¶ 32. This information is intended to benefit the fishery in the

long term by improving future red snapper management. *Id.* And improved red snapper fishery management, of course, is in the public interest: more fish benefits everyone.[14]

Thus, the third and fourth factors tip in favor of the government.[15]

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion for preliminary injunction. The MSA judicial review provision bars such relief. Moreover, Plaintiffs fail to meet their heavy burden to demonstrate irreparable harm, a likelihood of success on the merits, or that the balance of the harms or public interest favors an injunction.

Dated: May 18, 2026          Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

PETER M. TORSTENSEN, JR.
Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Meredith L. Flax*
MEREDITH L. FLAX, Deputy Section Chief
D.C. Bar No. 468016
MARK ARTHUR BROWN, Senior Trial Attorney
D.C. Bar No. 470050
KAMELA A. CASCHETTE, Trial Attorney

---

[14] Additionally, the EFPs are not expected to result in increased fishing mortality to red snapper and that any impacts would be minimal. Dkt. No. 7-5 at 3. Moreover, the EFPs promote human safety by eliminating "derby-style" fishing conditions, i.e., fishing where fishermen race to land their catch before the season closes. *Id.*; *see also* Petty Decl. ¶¶ 40-41.

[15] Finally, Federal Defendants note that Plaintiffs' demand for emergency relief also prejudices the public interest, which is not easily quantifiable or protected through a bond. *Coleman v. PACCAR, Inc.,* 424 U.S. 1301, 1307-08 (1976) ("Thus, even if the stay ordered by the Court of Appeals is ultimately dissolved and the Secretary's decision upheld on the merits, the goals of the federal motor vehicle safety program will have been dealt a serious setback."). If the Court issues an injunction, Plaintiffs should be required to post a bond pursuant to Federal Rule of Civil Procedure 65(c). *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (Rule 65(c) vests "broad discretion in the district court to determine the appropriate amount of an injunction bond[.]" (citation omitted)).

Wildlife & Marine Resources Section
Benjamin Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Tel: 202-532-3169 (Flax)
meredith.flax@usdoj.gov
mark.brown@usdoj.gov
kamela.caschette@usdoj.gov

*Counsel for Federal Defendants*

Of Counsel:

PATRICK L. BUTLER
Deputy General Counsel
Office of the General Counsel
United States Department of Commerce

MAXIMOS N. NIKITAS
Counsel
Office of the General Counsel
United States Department of Commerce

JOHN S. LUCE
General Counsel
National Oceanic and Atmospheric Administration
United States Department of Commerce