UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

SOUTHEASTERN FISHERIES
ASSOCIATION, INC., et al.,

*Plaintiffs,*

v.

HOWARD LUTNICK, in his official
capacity as Secretary of Commerce, et al.,

*Defendants*

</td><td>

Civil Action No. 26-cv-1533

</td></tr>
</table>

## DECLARATION OF TIMOTHY R. PETTY, Ph.D.

Pursuant to 28 U.S.C. § 1746, I, Timothy R. Petty, Ph.D., declare as follows:

1.      I am the Assistant Secretary of Commerce for Oceans and Atmosphere and Deputy Administrator for the National Oceanic and Atmospheric Administration ("NOAA" or the "Agency"), and I have served in this role since January 5, 2026. In my current role, I am responsible for the strategic vision, policy direction and oversight of NOAA's oceans, mapping, and fishery programs. Furthermore, I executed each of the subject Exempted Fishing Permits ("EFPs") at issue in this litigation. I provide this declaration in support of Defendants' opposition to Plaintiffs' motion for a preliminary injunction or stay in the above-captioned case. I make the following statements based upon my personal knowledge and information provided to me in my official capacity.

1

2.     The National Marine Fisheries Service ("NMFS") issued four EFPs to the Florida Fish and Wildlife Conservation Commission ("FWC"), Georgia Department of Natural Resources ("GDNR"), South Carolina Department of Natural Resources ("SCDNR"), and North Carolina Division of Marine Fisheries ("NCDMF"). *See Exempted Fishing Permit to Test a State-Based Data Collection and Management System for the Recreational Harvest of Red Snapper off Florida for 2026*, Permit No. 26-SERO-01 ("26-SERO-01"); *Exempted Fishing Permit to Test a State-Based Data Collection and Management System for the Recreational Harvest of Red Snapper off Georgia for 2026*, Permit No. 26-SERO-02 ("26-SERO-02"); *Exempted Fishing Permit to Test a State-Based Data Collection and Management System for the Recreational Harvest of Red Snapper off South Carolina for 2026*, Permit No. 26-SERO-03 ("26-SERO-03"); *Exempted Fishing Permit to Test a State-Based Data Collection and Management System for the Recreational Harvest of Red Snapper off North Carolina for 2026* ("26-SERO-04").

3.     NMFS issued the EFPs under the authority of the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801 *et seq.*, and its implementing regulations at 50 C.F.R. § 600.745 governing exempted fishing.

I.    **Factual and Procedural Background**

      **A. Overview of the EFPs**

4.     The EFPs exempt participating fishermen in the respective states from certain specific Federal regulations implementing the fishery management plan that are applicable to the recreational harvest of red snapper in the South Atlantic during the 2026 fishing year. These regulations include:

      a.  50 C.F.R. § 622.181(c)(2), which restricts combining harvest limits of red snapper in federal waters with any harvest limitation in state waters, limits the harvest and

2

possession of red snapper to the specified season, and applies these limitations to a federally permitted for-hire vessel in both state and federal waters;

b. 50 C.F.R. § 622.183(b)(5)(i), which specifies when the recreational season will occur each year; and

c. 50 C.F.R. § 622.193(y)(2), which specifies the annual catch limit ("ACL") and accountability measures applicable to the recreational harvest of red snapper.

5. The activities conducted under the EFPs are intended to improve data on recreational fishing effort, catch, and discards of red snapper, and inform the development of a long-term state-led management strategy for the recreational sector of the snapper-grouper fishery. The EFPs will be effective through December 31, 2026.

6. Pursuant to the EFPs, "[u]nless specifically exempted or required by this EFP, all other federal regulations continue to apply." *E.g.*, 26-SERO-01 at 2.

7. The EFPs include provisions to limit the amount of catch during these state managed seasons. An overview of the limitations imposed by each EFP is as follows:

a. The North Carolina EFP's requirements include, *see* 26-SERO-04 at 2–3:

i. Allowable fishing gear is limited to hook-and-line.

ii. Properly licensed private anglers and paying anglers on a for-hire vessel can harvest red snapper within the defined season only.

iii. On a private vessel, the more restrictive of the bag limit or vessel limit applies. The daily bag limit per person is one red snapper. The vessel limit is four red snapper per day. For example, if a private vessel has two anglers, the maximum number of red snapper allowed on the vessel is two. If a private vessel has five anglers, the maximum number of red snapper allowed on the vessel is four.

3

    iv.    On a for-hire vessel, the more restrictive of either the bag limit per paying angler or a vessel limit applies. The bag limit for a captain and crew on a charter or headboat trip is zero.

    1.    On a charter vessel with six or fewer paying passengers, the bag limit per paying angler is one red snapper per day or the vessel limit is four red snapper. For example, if a charter vessel trip has five anglers, the maximum number of red snapper on the vessel is four.

    2.    On a headboat with more than 6 paying passengers, the bag limit per paying angler is one red snapper per day or the vessel limit is 20 fish. For example, if a headboat trip has 15 anglers, the maximum number of red snapper on the vessel is 15. If a headboat trip has 25 anglers, the maximum number of red snapper on the vessel is 20.

b.  The South Carolina EFP's requirements include, *see* 26-SERO-03 at 2:

    i.    Allowable fishing gear is limited to hook-and-line.

    ii.    Properly licensed private anglers and paying anglers on a for-hire vessel can harvest red snapper within the defined season only.

    iii.    The daily bag limit per person is one red snapper. The bag limit for a captain and crew on charter or headboat trip is zero.

    iv.    The minimum size limit for red snapper is 20 inches in total length.

c.  The Georgia EFP's requirements include, *see* 26-SERO-02 at 2:

    i.    The allowable fishing gear is the same as existing federal regulations for the snapper-grouper fishery.

ii.    Properly licensed private anglers and paying anglers on a for-hire vessel can harvest red snapper within the defined season only.

iii.    The daily bag limit per person is one red snapper. The bag limit for a captain and crew on charter for hire or headboat is zero.

d.    The Florida EFP's requirements include, *see* 26-SERO-01 at 2–3:

i.    The allowable fishing gear is limited to hook-and-line and spear.

ii.    Participants must use a descending device or venting tool if a fish will be released and is experiencing barotrauma.

iii.    Properly licensed private anglers and paying anglers on a for-hire vessel can harvest red snapper within the defined season only.

iv.    The imposition of a 10-fish aggregate bag limit: The species limits apply while each species is open for recreational harvest. If a participant reaches any combination of 10 fish from the aggregate, they must stop bottom fishing for federally managed snapper-grouper species for the remainder of the trip. If a particular species in the aggregate is not open for recreational harvest, the bag limit for that species is zero. The bag limit for a captain and crew on charter or headboat trip is zero. Recreational vessel limits for all snapper-grouper species are not exempt under this EFP and continue to apply.

1.    One fish can be a red snapper.

2.    One fish can be a gag, black, or scamp grouper.

3.    Up to two fish can be red, yellowfin, yellowmouth, coney, graysby, red hind, or rock hind grouper.

4.    One fish can be a red porgy, blueline or golden tilefish.

5

5. One fish can be a greater amberjack.

6. Up to two fish can be black sea bass.

7. Up to five fish can be gray triggerfish.

8. Up to five fish can be vermilion or mutton snapper.

9. Up to seven fish can be schoolmaster, gray, lane, yellowtail, queen, silk, or blackfin snapper.

10. Up to two fish can be cubera snapper if each measures 30 inches or longer in total length. This applies as a bag limit within the 10-fish aggregate and as a maximum vessel limit, whichever is more restrictive, consistent with 50 C.F.R. § 622.181(c)(1).

8. Under each EFP, participating private anglers and for-hire operators are required to have the necessary state license(s) and federal permit(s) where fishing will occur and where they will land red snapper. Each fishing trip must begin and end at landing locations in their respective state. *See, e.g.*, 26-SERO-01 at 2.

9. Florida's season is 39 days, and will be split into summer (May 22–June 20 (30 days)) and fall seasons. (Oct 2–4, Oct 9–11, Oct 18–20 (9 days)). North Carolina, South Carolina, and Georgia's seasons open July 1 and will run for 62 consecutive days, aligning with wave 4 of the NOAA Fisheries Marine Recreational Information Program ("MRIP") survey.

**B. Management of the Recreational Harvest of Red Snapper**

10. Federal management of the recreational harvest of red snapper has faced various challenges in recent years, including rising discard rates, truncated seasons, and criticisms of the adequacy of red snapper-specific data.

11.     SEDAR 73 (2021), the peer-reviewed stock assessment for Atlantic red snapper, concluded that the population was overfished. However, the update to SEDAR 73 (2024) indicated that the stock would not be overfished using a different overfishing threshold, and further demonstrated that the stock was progressing toward rebuilding with higher-than-expected recruitment during 2014–2021.

12.     As Plaintiffs note, the overfishing threshold for South Atlantic red snapper was updated in Amendment 59 to the Fishery Management Plan for Snapper-Grouper Fishery of the South Atlantic Region, in which NMFS set the proxy for fishing mortality at maximum sustainable yield (i.e., the $F_{MSY}$ proxy) consistent with maintaining the existing rebuilding plan adopted in Amendment 17A to the Snapper-Grouper FMP. Based on the SEDAR 73 Update Assessment (2024), the $F_{MSY}$ proxy that maintains the existing rebuilding plan is equivalent to $F_{2021-2023}$. *See* Snapper-Grouper Fishery of the South Atlantic; Amendment 59, 90 Fed. Reg. 24,527, 24,529 (June 11, 2025) ("Amendment 59").

13.     The current stock status, based on Amendment 59 indicates overfishing is no longer occurring following the changes to the overfishing proxy. *See id.*

14.     The total ACL is 509,000 fish, of which 475,000 are attributed to dead discards, permitting only 6.7% of the total ACL to be harvested.

15.     Recreational fishing seasons for red snapper authorized by NMFS have been extremely short in recent years. The 2025 recreational fishing season was open for only two days (July 11–12) and was based on a recreational ACL of 22,797 fish (~263,815 pounds) or 4.5% of the total ACL. *See* NOAA Fisheries, *NOAA Fisheries Announces Changes to the Management of Red Snapper in the South Atlantic Region and the 2025 Fishing Seasons* (June 6, 2025), https://www.fisheries.noaa.gov/bulletin/noaa-fisheries-announces-changes-

management-red-snapper-south-atlantic-region-and-2025. The 2024 recreational red snapper season was restricted to a *single day* (July 12). *See* NOAA Fisheries, *Interim Rule and 2024 South Atlantic Red Snapper Season*, https://www.fisheries.noaa.gov/action/interim-rule-and-2024-south-atlantic-red-snapper-season (last updated Jan. 30, 2025).

16.    As NOAA explained in its Federal Register notice published on February 13, 2026, announcing receipt of the EFP applications, "fishery managers have been challenged to satisfy fishermen's desires for longer fishing seasons as red snapper encounter rates have increased in response to rebuilding measures, resulting in forgone yield because more fish are estimated to be dying after release." 91 Fed. Reg. 6,827, 6,828 (Feb. 13, 2026).

17.    Indeed, anglers have long voiced their concerns to NMFS in various fora, as well as to the South Atlantic Fishery Management Council.

18.    A common critique centers on the adequacy of data collection pertaining to recreational fishing, namely NOAA's MRIP, which states, anglers, and other stakeholders alike have argued do not furnish reliable catch estimates for red snapper landings or discards. This, they contend, is due to the narrow seasonal openings for harvest versus the multi-month wave data collection design, resulting in low intercept rates of anglers and high percent standard error ("PSE") estimates.

19.    As NOAA acknowledged in its Federal Register notice, PSE "estimates in th[e] fishery are high, which are generated from [MRIP], indicating low precision and significant uncertainty that would benefit from improved data collection efforts and approaches." *Id.*

20.    Extremely short seasons, which in turn, lead to compressed fishing effort during the limited openings, is not consistent with NOAA's MRIP data collection program, which was designed to sample two-month survey intervals (known as "waves"), not derby-style

8

micro-seasons of one or two days, thus compounding data deficiencies. To mitigate these challenges, NMFS has used Florida' specialized East Coast Red Snapper ("ECRS") survey—which the state has conducted since 2012—to monitor landings during the recreational mini-seasons in the South Atlantic. *See* Chloe Ramsay & Ellie Corbett, *Florida East Coast Red Snapper (ECRS) Mini-Season Sampling*, at 1 (Apr. 11, 2025), sedarweb.org/documents/sedar-90-dw-18-florida-east-coast-red-snapper-ecrs-mini-season-sampling/ ("Since 2012, the state of Florida has conducted a specialized East Coast [ECRS] survey to provide more precise and timely estimates of Red Snapper effort and catch during the recreational mini-seasons in the South Atlantic."). Along with other data sources, NMFS has, however, continued to rely upon MRIP data for Georgia, South Carolina, and North Carolina.

21.     The EFPs therefore aim to address these persistent data collection "challenge[s] by improving recreational catch estimation and reducing discards so fishing opportunities can increase." *See* 91 Fed. Reg. at 6,828.

22.     In short, the purposes of the EFPs are to improve data on recreational fishing effort, catch, and discards of red snapper in the South Atlantic and to inform the development of a long-term state-led management strategy for the recreational harvest of red snapper.

23.     Additional aims of the EFPs are to provide recreational fishermen on privately owned vessels and the owners or operators of charter vessels or headboats increased fishing opportunities for red snapper, and to collect related biological, social, and economic information from the fishery.

      **C. NMFS Publishes the EFP Applications for Public Comment and Discussion at the South Atlantic Fishery Council Meetings.**

24. Set against this backdrop, in November 2025, NMFS received applications from the four state agencies for EFPs to pilot test state electronic data collection and management strategies for the recreational harvest of red snapper, beginning in 2026.

25. NMFS presented the EFP applications to the South Atlantic Fishery Management Council at its December 2025 public meeting.

26. The Council agreed with the utility of the EFP projects and expressed support for the issuance of the EFPs to enhance recreational data collection and reduce recreational dead discards.

27. The Council stated that the EFP projects are an innovative management tool representing a departure from the status quo, which has proved ineffective.

28. NMFS reviewed the EFP applications and sent letters to each of the states in January 2026, requesting additional information. On January 23, 2026, the states submitted revised EFP applications.

29. After determining the applications warranted further consideration, NMFS requested public comments on the applications through a Federal Register notice, *see* 90 Fed. Reg. 6,827, and at the Council meeting during the week of March 2, 2026.

30. NMFS received over 11,000 comments in response to the Federal Register notice on the EFP applications, more than 99% of which supported the proposed pilot projects.

31. Several broad themes across the supportive comments are worth highlighting here. Some commenters noted, for example, that South Atlantic red snapper represents a major "conservation success story" because—as reflected in SEDAR 73 (2024) and consistent with the revised proxy in Amendment 59—overfishing is no longer occurring. Some comments indicated that the red snapper population was at record-high levels, thereby justifying the

10

proposed longer state-managed seasons (which would replace shorter federal seasons with more consistent monthly access). Other commenters asserted that the MRIP survey is inadequate for tracking red snapper catches and discards because it is unable to provide stable estimates of effort and landings—leading to precautionary management measures (e.g., short seasons and rigid quota closures). Commenters further stressed that existing state-led red snapper management programs in the Gulf of America have demonstrated the benefits of adaptive, state-specific data collection, which provides an opportunity to: gather better data, involve anglers more directly in the management process, and explore innovative approaches complemented by Federal oversight.

32.    In light of the above, many commenters represented that state-level data collection and management will mitigate scientific uncertainty and restore public confidence in stock management. In short, the pilot projects will enable the states to modernize management approaches in the South Atlantic and ultimately permit managers to convert uncertain estimates into landed catch.

### III.    The EFPs Are Squarely Within NMFS's Statutory and Regulatory Authority and Serve the MSA's Foundational Goals.

33.    By providing a mechanism for improved data collection in service of the Fishery Management Plan for Snapper-Grouper Fishery of the South Atlantic Region, the EFPs are plainly consistent with the MSA's requirements.

34.    The MSA is the foundational statute authorizing EFPs. Specifically, the statutory authority for NOAA's EFP regulations is contained in Section 318(d) of the MSA, which required NMFS to "promulgate regulations that create an expedited, uniform, and regionally-based process to promote issuance, where practicable, of experimental fishing permits." 16

U.S.C. § 1867(d). NMFS completed the requisite rulemaking in 2009. *See* 74 Fed. Reg. 42,786 (Aug. 25, 2009).

35.     The relevant implementing regulation for EFPs is found at 50 C.F.R. § 600.745. Under § 600.745(b)(1), a NMFS Regional Administrator or Director may authorize for, among other things, limited testing, public display, data collection, exploratory fishing, and compensation fishing, the target or incidental harvest of species managed under a fishery management plan or fishery regulations that would otherwise be prohibited. An EFP exempts participants only from those regulations specified in the EFP. All other applicable regulations remain in effect. *Id.* § 600.745(b)(1).

36.     Indeed, each of the four EFPs states its purpose identically: The issuing state agency "intends the activities conducted under the EFP to improve data on recreational fishing effort, catch, and discards of red snapper, and to inform the development of a long-term state-led management strategy for this recreational fishery." 26-SERO-01 at 1; 26-SERO-02 at 1; 26-SERO-03 at 1; 26-SERO-04 at 1.

37.     Critically, the regulatory exemptions authorized by the EFPs—from 50 C.F.R. §§ 622.181(c)(2), 622.193(y)(2), and 622.8(b)(5)(i), respectively—are not a retreat from conservation; they are the mechanism through which NMFS has chosen to test better management.[1]

38.     As a general matter, § 600.745(b) expressly authorizes NMFS to exempt otherwise-prohibited fishing for "data collection" and "limited testing" purposes. *See* 50 C.F.R. § 600.745(b)(1). Each EFP was issued only after NMFS determined the applications

---

[1] To be sure, the regulations and the EFPs they authorize do not provide a blanket exemption from the Fishery Management Plan's requirements for authorized fishing. To the contrary, as detailed below, the EFPs contain measures to limit recreational fishing effort.

"warrant[ed] further consideration," solicited public comment in the Federal Register, and consulted with the South Atlantic Fishery Management Council, the U.S. Coast Guard, and the affected state agencies. *See* 91 Fed. Reg. at 6,832. That process reflects agency action consistent with, not contrary to, the MSA.

39.    More to the point, the deficiencies of existing MRIP data demonstrate the value in improving data collection on recreational fishing effort, catch, and discards of red snapper in the South Atlantic and thus facilitate the development of a long-term state-led management strategy for the recreational harvest of red snapper. This objective is plainly consonant with the MSA.

40.    MRIP itself cautions against relying on estimates with a PSE exceeding 30% and does not support the use of estimates with a PSE above 50%; yet, PSEs for state-level red snapper harvest estimates under prior short seasons have routinely exceeded those thresholds. NOAA has further acknowledged that the MRIP Fishing Effort Survey may overestimate recreational catch and effort,[2] potentially by as much as 40%. *See* SCDNR EFP Application, at 4 (Jan. 23, 2026). What is more, as noted above, MRIP was designed to sample two-month survey intervals (known as "waves"), not derby-style micro-seasons of one or two days—hence why, for example, NMFS has employed Florida's ECRS data as a substitute for MRIP data for recreational mini-seasons.

---

[2] *See generally* NOAA Fisheries Service, Off. of Science and Tech., *Evaluating Measurement Error in the MRIP Fishing Effort Survey* (May 2023). https://apps-st.fisheries.noaa.gov/rpts/main/public_docs/Evaluating%20Measurement%20Error%20in%20the%20FES%20Consolidated%20Final%20w%20Review.pdf?method=PUB_MANUSCRIPT&id=32268.

41.    Compounding the problem, short derby-style seasons compress fishing effort, leading to higher landings as anglers race to catch fish when the season is open. Furthermore, as the Categorical Exclusion for the EFPs stated:

a.    "The proposed EFP applications state that the projects will not increase fishing mortality because recreational effort for snapper-grouper species already occurs year-round regardless of season length. The applicants cite past research, as well as state management of red snapper in the Gulf of America, which indicate that extended fishing seasons reduce overall fishing effort by preventing the 'derby-style' effort compression seen in shorter fishing seasons. Therefore, the applicants determined that the projects are not expected to result in increased effort or fishing mortality to harvest red snapper in the South Atlantic, and that, if there were impacts, they would be minimal and not result in significant effects to the red snapper stock or to the snapper-grouper fishery as a whole." Noah Silverman, Categorical Exclusion (CE) Memorandum for Four Exempted Fishing Permit Applications for the Recreational Harvest of South Atlantic Red Snapper in 2026 (RIN 0648-XF539), at 2–3; Pls. Mot. for Prelim. Inj. or Stay at 27–28 (citing *id.*).

42.    The EFPs are intended to break this cycle: By extending seasons to 39 days for Florida, *see* 26-SERO-01, and 62 days for Georgia, South Carolina, and North Carolina, *see* 26-SERO-02, 26-SERO-03, 26-SERO-04, the EFPs align recreational fishing with the two-month MRIP survey waves for which the program was designed to collect data.

a.    For Georgia, South Carolina, and North Carolina, the July 1–August 31 window precisely coincides with MRIP wave 4, which historically captures the highest rates of recreational effort and discards, and will permit direct cross-validation of a state survey estimate against its corresponding MRIP wave. *See* 90 Fed. Reg. at 6,830 (noting that the

14

"timing [of the 62-day recreational fishing season] was selected because wave 4 historically represents the period with the highest rates of recreational fishing effort and discards").

43.    Florida's FWC, will deploy its established State Reef Fish Survey ("SRFS"), while Georgia, South Carolina, and North Carolina will each deploy the VESL electronic reporting application by Bluefin Data, LLC. *See* 26-SERO-01, 26-SERO-02, 26-SERO-03, 26-SERO-04.

44.    ***The EFPs Permit Year 1 Qualitative Assessments, Allowing Quantitative Data to Follow in Years 2 and 3.*** To further reduce risk, each EFP is granted for a one-year period which will allow for further consideration and evaluation at each step of the process. The states intend to use the data collected in 2026 ("Year 1") to inform the season duration and structure in 2027 and 2028 ("Year 2" and "Year 3," respectively). *See, e.g.*, 90 Fed. Reg. at 6,829 ("FWC would use the data collected in 2026 to inform the season length and structure established by the state for 2027 and 2028 in collaboration with NMFS"); *id.* (noting that "GADNR anticipates that the outcome of the 2026 pilot will inform a decision to extend the program through 2027 and 2028").

45.    NMFS properly exercised its regulatory discretion by relying on a qualitative Year 1 assessment grounded in the regulatory structure of 50 C.F.R. § 600.745(b), which imposes no requirement of a precise quantitative harvest estimate as a precondition to EFP issuance. *Cf. id.* § 600.745(b)(3)(v)(A) ("The Regional Administrator or Director should attach, as applicable, terms and conditions to the EFP, consistent with the purpose of the exempted fishing and as otherwise necessary for the conservation and management of the fishery resources and the marine environment, including, but not limited to: . . . [t]he maximum

15

amount of each regulated species that can be harvested and landed during the term of the EFP, *including trip limitations, where appropriate*." (emphasis added)).

46.    Critically, the EFPs expressly acknowledge their own experimental character. *See, e.g.*, 26-SERO-02 ("For 2026, the primary focus is on initial survey development, feasibility testing, and potential benchmarking. Results may not be fully comparable to current certified recreational surveys. It will be the responsibility of [the state agency], in collaboration with NMFS and other partners, to clearly communicate the experimental status of data collected and how it will be initially used." (footnote omitted)); *accord* 26-SERO-03, 26-SERO-04.

47.    The EFPs impose a reporting architecture designed to generate the quantitative data that will support rigorous assessment in Years 2 and 3. Georgia, South Carolina, and North Carolina must each provide NMFS with weekly unadjusted in-season harvest data through the VESL app every Tuesday following the prior week's fishing activity. 26-SERO-02, 26-SERO-03, 26-SERO-04. Georgia and South Carolina must deliver final absolute harvest and discard values to NMFS by October 31, 2026. *See* EFP Nos. 26-SERO-02, 26-SERO-03. And all four states must submit draft progress reports to NMFS by November 30, 2026, and comprehensive final reports by January 31, 2027. EFP Nos. 26-SERO-01, 26-SERO-02, 26-SERO-03, 26-SERO-04.

48.    At the close of 2026, agency personnel from each state will meet with NMFS staff to assess outcomes and propose improvements for a subsequent EFP application. That Year 1 data—covering extended-season effort across a full MRIP wave 4 interval for three states and a structurally comparable period for Florida—will constitute the quantitative baseline on which to anchor the Year 2 assessment and any future Fishery Management Plan amendment.

16

49.     NMFS will thus then benefit from trip-level, near-real-time harvest data from an expanded season that is comparable with MRIP's survey design.

50.     ***The EFPs Provide Conservation Controls.*** Crucially, exempting participants from the ACL accountability measures at 50 C.F.R. § 622.193(y)(2) does not mean fishing without conservation controls. The four EFPs layer multiple, complementary safeguards that collectively constrain harvest and protect the stock during the pilot period. These include (as summarized above):

a.     ***Uniform bag and vessel limits across all four states.*** Each participant is limited to one red snapper per person, per day, and captains and crew of charter and headboat trips are prohibited from retaining any red snapper under all four EFPs. 26-SERO-01, 26-SERO-02; 26-SERO-03, 26-SERO-04.

i.     North Carolina imposes an additional vessel limit of four fish per day for private vessels and charter boats carrying six or fewer anglers, and a 20-fish vessel limit for large-capacity headboats—whichever is more restrictive. 26-SERO-04. South Carolina adds a 20-inch total length minimum size limit, consistent with its existing state-water regulations. 26-SERO-03.

ii.     Florida further embeds the red snapper bag limit within a 10-fish snapper-grouper aggregate cap, requiring participants to cease all bottom fishing upon reaching that combined limit regardless of how many of the 10 fish are red snapper. 26-SERO-01.

iii.     These graduated restrictions ensure that no individual state's EFP becomes a vehicle for disproportionate harvest.

b. ***Temporal segmentation and effort dilution.*** Florida's 39-day season is divided into two distinct segments—a continuous summer opening from May 22 through June 20 and three separate weekend-only segments in October (October 2–4, 9–11, and 16–18)— deliberately spreading effort across a non-contiguous calendar, and preventing the concentration of effort that inflated MRIP estimates under prior short seasons. *See* 26-SERO-01.

    i.    For Georgia, South Carolina, and North Carolina, the uniform 62-day July 1–August 31 window distributes fishing mortality across the season rather than compressing it. 26-SERO-02, 26-SERO-03, 26-SERO-04. Trip origination and termination requirements—each EFP requiring trips to begin and end at in-state landing locations—further limit participation to engaged local communities and facilitate enforcement oversight.

c. ***Gear restrictions and discard mortality mitigation.*** Florida, South Carolina, and North Carolina limit gear to hook-and-line only. 26-SERO-01, 26-SERO-03, 26-SERO-04. Florida further prohibits powerheads and requires participants to use a descending device or venting tool for any fish experiencing barotrauma. 26-SERO-01. Moreover, NMFS's recommendations accompanying the Georgia, South Carolina, and North Carolina EFPs emphasize that "[r]ed snapper mortality from discards represents the greatest source of mortality for this stock" and call on all anglers to collect discard data both during and outside the open season. 26-SERO-02, 26-SERO-03, 26-SERO-04. Taken together, these measures directly address the discard mortality problem that the 2021 SEDAR 73 stock assessment identified as a principal driver of overfishing.

18

d. ***Mandatory reporting and real-time in-season monitoring.*** Georgia, South Carolina, and North Carolina require each private angler to obtain a unique trip authorization code before departing and to submit a complete trip report—including counts of red snapper kept and released alive or dead—within 24 hours of trip departure. A subsequent trip cannot be authorized until the prior report is submitted. 26-SERO-02, 26-SERO-03, 26-SERO-04.

i. This architecture provides NMFS and state enforcement agencies with near-real-time visibility into cumulative harvest that was absent under prior short seasons.

51. Taken together, the above controls represent a more adaptive conservation framework than the existing mechanism of federal management. The EFP framework—uniform one-fish-per-person bag limits, temporal segmentation, gear restrictions, discard mitigation requirements, trip-level mandatory reporting, near-real-time in-season monitoring, NMFS oversight, and a structured multi-year data benchmarking plan—is precisely the kind of adaptable, science-driven approach the MSA envisions.

52. In sum, NMFS's decision to issue the EFPs was not a departure from the Act; it was an exercise of reasoned scientific judgment in accordance with Section 318(d) of the MSA.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 18, 2026.

Timothy R. Petty, PhD.
Assistant Secretary of Commerce for Oceans and Atmosphere and
Deputy Administrator for NOAA