**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SOUTHEASTERN FISHERIES          :
ASSOCIATION, INC., *et al.*,          :

                                    :

     Plaintiffs,                :          Civil Action No.:     26-1533 (RC)

                                      :

     v.                      :          Re Document Nos.:    6, 15, 17

                                      :

HOWARD LUTNICK, *et al.*,          :

                                      :

     Defendants.              :

## <u>MEMORANDUM OPINION</u>

**Granting Plaintiffs' Motion for a Preliminary Injunction**

## I.  INTRODUCTION

Plaintiffs are commercial fishing businesses, trade organizations, and individual commercial fishermen. They challenge four fishing permits issued in early May 2026 by the Secretary of Commerce ("Secretary") and the National Marine Fisheries Service ("NMFS") (collectively, the "Government") to four South Atlantic states. The permits exempt certain recreational fishing data-collection activities from federal regulations promulgated under the Magnuson-Stevens Act ("MSA"), 16 U.S.C. § 1801 *et seq.*, the primary federal law governing fishery management. Plaintiffs contend that the Government violated the Administrative Procedure Act ("APA") by issuing the permits. They seek to preliminarily enjoin the permits from taking effect, or in the alternative to stay the permits, arguing that the permits are not a product of reasoned decision-making and will likely allow overfishing of South Atlantic red snapper in a manner inconsistent with the MSA's conservation requirements and its mandate to

prevent overfishing. For the reasons stated below, the Court **GRANTS** Plaintiffs' motion for a preliminary injunction.[1]

## II.  BACKGROUND

### A.  Legal Background

In response to concerns about overfishing, Congress enacted the MSA to "conserve and manage the fishery resources found off the coasts of the United States" and "promote domestic commercial and recreational fishing under sound conservation and management principles." *Fairweather Fish, Inc. v. Pritzker*, 155 F. Supp. 3d 1136, 1138 (W.D. Wash. 2016) (quoting 16 U.S.C. §§ 1801(b)(1), (3)). The MSA "establish[ed] an Exclusive Economic Zone extending seaward from each coastal state" and placed fisheries within that zone under the management authority of the NMFS. *Id.* (citing 16 U.S.C. § 1802). The NMFS has ultimate authority over federal fishing policy and oversight. *See* 16 U.S.C. § 1854; *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 101 (D.D.C. 2011).

The MSA also "created a comprehensive system for the conservation and management of domestic marine fisheries by establishing eight regional fishery management councils that are responsible for preparing fishery management plans." *Ctr. for Biological Diversity v. Ross*, No. 19-CV-03135, 2019 WL 7020195, at *2 (N.D. Cal. Dec. 20, 2019) (citing 16 U.S.C. §§ 1801(b)(1), 1852(h)). These councils work with the NMFS to oversee specific fisheries throughout the United States. *See* 16 U.S.C. §§ 1852(a), (h). The councils consist of federal, state, and territorial fishery officials; participants in commercial and recreational fisheries; and

---

[1] Plaintiffs request that the Court advance and consolidate a decision on the merits with their preliminary injunction motion under Federal Rule of Civil Procedure 65(a)(2). *See* Pls.' Mot. Prelim. Inj. ("Pls.' Mot.") at 7–9, ECF No. 6. Due to the highly expedited nature of these proceedings, the Court declines to do so.

individuals with scientific expertise in fishery conservation and management. *Id.* § 1852(b); *Conservation L. Found. v. Pritzker*, 37 F. Supp. 3d 254, 258–59 (D.D.C. 2014). All fishery management plans and implementing regulations "shall be consistent" with the MSA's ten "national standards" for fishery conservation and management and all other "applicable law." 16 U.S.C. §§ 1851(a), 1853(a)(1)(C).

In 2007, Congress amended the MSA, adding an "annual catch limit[]" requirement to the "[r]equired provisions" that all fishery management plans must contain. 16 U.S.C. § 1853(a)(15); Pub. L. No. 109-479, § 104, 120 Stat. 3575, 3584 (2007). The amendment also created a new Cooperative Research and Management Program and authorized the Secretary to establish an "experimental fishing permitting process." 16 U.S.C. § 1867(d); *see also* Experimental Permitting Process, 74 Fed. Reg. 42786, 42786 (Aug. 25, 2009). If a target or incidental harvest of species managed under a fishery management plan or fishery regulations is prohibited, the Secretary (through the NMFS Regional Administrator or Director) may authorize an Exempted Fishing Permit ("EFP") "for limited testing, public display, data collection, exploratory fishing, compensation fishing, conservation engineering, health and safety surveys, environmental cleanup, and/or hazard removal purposes." 50 C.F.R. § 600.745(b)(1).

### B. Factual Background

#### 1. South Atlantic Red Snapper

The South Atlantic red snapper has been historically prone to overfishing. Federal management of South Atlantic red snapper began in 1983, when the NMFS approved the original Snapper-Grouper Fishery Management Plan. NFMS, *Fishery Management Plan, Regulatory Impact Review, and Final Environmental Impact Statement for the Snapper-Grouper Fishery of the South Atlantic Region* (Mar. 1983), https://safmc.net/documents/snapper-grouper-fishery-

3

management-plan/ [https://perma.cc/NQM8-ZFT8]. At that time, the stock was already understood to be subject to overfishing, and the NMFS adopted a minimum size limit in an attempt to reduce mortality. *Id.* at pp. vii–viii, 7–8. Despite the restrictions imposed, high harvests caused the population to decline to historically low levels by 1990. *See* Pls.' Ex. 17 at 8, 12, ECF No. 7-17 As a result, the NFMS created a 15-year rebuilding plan in 1991, aiming to have healthy levels of stock by 2006. South Atlantic Fishery Management Council, *Amendment Number 4 for the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region*, p. 10 (Apr. 1991), https://safmc.net/documents/snapper-grouper-fishery-management-plan/ [https://perma.cc/938E-4RZK]. Additional management measures followed in the late 1990s, including limited-entry commercial permits and commercial capacity reduction requirements. *See* South Atlantic Fishery Management Council, *Final Amendment 8 to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region*, pp. xi–xii, 1, 34–62 (July 1997), https://safmc.net/documents/snapper-grouper-amendment-8/ [https://perma.cc/3UWW-VSQU]. Yet the stock failed to rebuild, prompting the NMFS in 2010 to extend the rebuilding timeline from 15 years to 35 years, pushing the rebuilding target date to 2044. *See* Amendment 17A, 75 Fed. Reg. 76874–75, 76887 (Dec. 9, 2010).

Over time, recreational fishing—and particularly recreational dead discards[2]—became the primary driver of red snapper mortality. *See e.g.*, Amendment 17A, 90 Fed. Reg. 24527, 24528–29 (June 11, 2025) ("Most of the red snapper fishing mortality is attributed to dead discards in the recreational sector.") (explaining that approximately 98 percent of red snapper discard mortalities from 2021–2023 came from the recreational sector); Amendment 43, 82 Fed. Reg. 1720 (Jan. 6, 2017) ("Discard mortality, particularly from the recreational sector, continues

---

[2] Dead discards are fish that are caught alive but die after release.

to be a significant source of overall mortality for red snapper."). Even when harvest seasons are closed, anglers targeting other species continue catching and discarding large numbers of red snapper, many of which die after release. *See* Amendment 59, 90 Fed. Reg. 24527, 24528–29 (June 11, 2025) (explaining that recreational fishermen catch and discard red snapper during closed seasons while targeting other snapper-grouper species that inhabit the same waters).

Repeated stock assessments in 2008, 2010, 2017, 2021, and 2024 consistently found South Atlantic red snapper both overfished and subject to overfishing, while identifying recreational dead discards as the principal source of fishing mortality. *See, e.g.*, Southeast Data, Assessment, and Review, *SEDAR 15 Stock Assessment Report 1 (SAR 1): South Atlantic Red Snapper*, pp. 12, 19 (Mar. 2009), https://sedarweb.org/documents/sedar-15-stock-assessment-report-south-atlantic-red-snapper/ [https://perma.cc/YX7B-5XMX]; Southeast Data, Assessment, and Review, *SEDAR 24 Stock Assessment Report: South Atlantic Red Snapper*, pp. 11, 15 (Oct. 2010), https://sedarweb.org/documents/sedar-24-stock-assessment-report-south-atlantic-red-snapper/ [https://perma.cc/TYF2-TZN9]; Southeast Data, Assessment, and Review, *SEDAR 41 Stock Assessment Report Revision 1: South Atlantic Red Snapper*, Section VII (Apr. 2017), https://sedarweb.org/documents/sedar-41-stock-assessment-report-south-atlantic-red-snapper-revision-1-april-2017/ [https://perma.cc/W4PM-YZ2H]; Southeast Data, Assessment, and Review, *SEDAR 73 Stock Assessment Report: South Atlantic Red Snapper*, Section II at 10, 64, 66 (Mar. 2021), https://sedarweb.org/documents/sedar-73-stock-assessment-report-south-atlantic-red-snapper/ [https://perma.cc/8P2D-HQZX]; Pls.' Ex. 17 at 8; *see also* Temporary Rule to Establish Management Measures for South Atlantic Red Snapper in 2017, 82 Fed. Reg. 50839–40 (Nov. 2, 2017); Amendment 43, 83 Fed. Reg. 35428 (July 26, 2018); Amendment 59, 90 Fed. Reg. 24527–28.

## 2. EFPs

Between May 1 and May 5, 2026, the Government issued EFPs to the states of Florida, Georga, South Carolina, and North Carolina ("States"). Pls.' Exs. 1–4, ECF No. 7-1–7-4. Each state sought to exempt data collection projects from certain federal fishery regulations. *See id*. The EFPs would allow the States to test data collection methods during an extended recreational fishing season for red snapper in state and federal waters of the South Atlantic. *Id.* The EFPs allow project participants—private and for-hire anglers—to recreationally harvest red snapper in South Atlantic federal waters during the following periods in 2026:

- Florida: May 22–June 20; October 2–4; October 9–11; and October 16–18.

- Georgia, North Carolina, and South Carolina: July 1 through August 31.

*Id.*

Each EFP exempts the recreational fishing done as part of the States' data collection projects from the following fishery regulations:

- 50 C.F.R. § 622.181(c)(2) (restricts combining harvest limits of red snapper in federal waters with any harvest limitation in state waters, limits the harvest and possession of red snapper to the specified season, and applies these limitations to a federally permitted for-hire vessel in both state and federal waters);

- 50 C.F.R. § 622.183(b)(5)(i) (specifies when the recreational season will occur each year);

- 50 C.F.R. § 622.193(y)(2) (specifies the annual catch limit and accountability measures applicable to the recreational harvest of red snapper).

Before approving the States' EFP applications, the NMFS issued a notice on the Federal Register, soliciting public comment on the applications. Of note, the NMFS received two

comment letters, each asserted that the EFPs relied on flawed assumptions and would lead to the overfishing of red snapper in contravention of the MSA. Pls.' Exs. 11–12, ECF Nos. 7-11, 7-12.

### C.  Procedural History

Plaintiffs filed this suit on May 5, 2026, challenging the Government's issuance of the permits under the APA. *See* Compl., ECF No. 1. Five days later, Plaintiffs filed a motion for a preliminary injunction, seeking to enjoin the permits from going into effect. Pls.' Mot. at 1. The American Sporting Association and the Coastal Conservation Association ("Defendant-Intervenors") filed an unopposed motion to intervene as of right under Federal Rule of Civil Procedure 24(a)(2), ASA & CCA Mot. Intervene, ECF No. 9, which the Court granted, Min. Order (May 15, 2026).[3] The Government and Defendant-Intervenors opposed Plaintiffs' motion for a preliminary injunction on March 18, 2026. Gov't's Opp'n, ECF No. 22; ASA & CCA Opp'n, ECF No. 20. The Court held a hearing on Plaintiffs' motion on May 20, 2026, providing Plaintiffs an opportunity to reply to the opposition briefs. Min. Entry (May 20, 2026). The Ocean Conservancy and the Environmental Defense Fund sought leave to file their respective amicus briefs in support of Plaintiffs, which the Court now grants.[4] *See* ECF Nos. 15, 17. Florida, South Caolina, and Georgia jointly filed an amicus brief in opposition to Plaintiffs.[5] *See* ECF No. 24. The motion is now ready for this Court's consideration.

---

[3] Defendant-Intervenors represent the interests of recreational fishermen and the businesses that support them. *See* Min. Order (May 15, 2026).

[4] "Courts have wide discretion in deciding whether to grant a third party leave to file an amicus brief." *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 58 (D.D.C. 2019). An amicus brief is appropriate where "the brief will assist the judge[] by presenting ideas, arguments, theories, insights, facts, or data that are not to be found in the parties' briefs." *Id.* (quoting *Voices for Choices v. Ill. Bell Tel. Co.*, 339 F.3d 542, 545 (7th Cir. 2003)). The Court finds the amicus briefs timely and helpful, as they present such ideas, arguments, and theories.

[5] The States' amicus brief was filed late in the evening the day before the hearing, far too late for this Court's consideration in light of the highly expedited nature of these proceedings.

### III.  LEGAL STANDARD

### A.  Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (alterations in original) (quoting *Winter*, 555 U.S. at 20). Where a federal agency is the defendant, the last two factors merge. *See Am. Immigr. Council v. DHS*, 470 F. Supp. 3d 32, 36 (D.D.C. 2020). "The moving party bears the burden of persuasion and must demonstrate, 'by a clear showing,' that the requested relief is warranted." *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

### B.  APA

Under the APA, the reviewing court "shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Agency action is arbitrary and capricious if an agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

## IV.  ANALYSIS

Plaintiffs contend that the Government's issuance of the States' EFPs was arbitrary and capricious in violation of the APA. The Court first addresses a threshold issue before turning to the preliminary injunction factors: whether Plaintiffs have demonstrated a likelihood of success on the merits, irreparable harm, that the balance of equities tips in their favor, and that an injunction serves the public interest. Because Plaintiffs have satisfied their burden on each factor, the Court grants Plaintiffs' motion for a preliminary injunction and enjoins the EFPs from taking effect.

### A.  Section 1855(f)

The Court must first address whether Plaintiffs' claim is subject to judicial review under 16 U.S.C. §§ 1855(f)(1)–(2). If so, preliminary injunctive relief is unavailable. *See Blue Water Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 158 F. Supp. 2d 118, 124 (D. Mass. 2001) (noting that Section 1855(f) "trades preliminary relief for expedited review"). The Court concludes that Plaintiffs' claim falls outside the purview of Section 1855(f), and preliminary relief is thus available.

Section 1855(f) of the MSA provides for judicial review of "regulations promulgated by the Secretary," as well as other "actions that are taken by the Secretary under regulations which implement a fishery management plan." 16 U.S.C. §§ 1855(f)(1)–(2). This encompasses "substantive challenges" to such regulations, as well as claims that the "NFMS, in promulgating regulations, violated 'other applicable law.'" *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 438 F.3d 937, 946 (9th Cir. 2006). Section 1855(f), however, does not preclude preliminary injunctive relief for other types of claims under the MSA. *See Kapa'a v. Trump*, 794 F. Supp. 3d 793, 811 (D. Haw. 2025) ("Even when § 1855(f) does not apply, judicial review of

9

[an MSA] claim may be available under the APA, which authorizes judicial review of final agency action 'for which there is no other adequate remedy in a court.'" (quoting 5 U.S.C. §704)); *see also N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 21 (D.C. Cir. 2008) (recognizing that APA review appears available for final agency action that violates the MSA).

As the statutory and regulatory framework here demonstrate, Plaintiffs do not challenge a regulation promulgated by the Secretary, nor any action taken by the Secretary under regulations which implement a fishery management plan. The authority of the Secretary to issue EFPs draws from Section 1867(d) of the MSA. *See* 16 U.S.C. § 1867(d) (directing the Secretary to promulgate regulations to create an "[e]xperimental permitting process"). The EFP permitting process is implemented under 50 C.F.R. Subpart H, which the regulations characterize as a "[g]eneral [p]rovision of [d]omestic [f]isheries." *See* 50 C.F.R. § 600.745(b) (detailing the EFP application and issuance process).

By contrast, the Secretary's authority to review, approve, and carry out fishery management plans derives from Sections 1854(a) and 1855(d) of the MSA. 16 U.S.C. §§ 1854(a) (requiring the Secretary to review and approve plans within a certain time limit), 1855(d) (giving the Secretary "general responsibility to carry out any fishery management plan or amendment"). According to the NMFS, "[t]he Snapper-Grouper [fishery management plan]," which encompasses red snapper, "is implemented by NMFS through regulations at 50 CFR part 622." Amendment 59, 90 Fed. Reg. 24527. The Snapper-Grouper fishery management plan regulations are thus contained in 50 C.F.R. § 622 *et seq.*, an entirely separate regulatory scheme. That scheme contains its own permitting structure for commercial and charter vessels, for instance, but it does not incorporate or reference EFPs. *See, e.g.*, 50 C.F.R. § 622.170; *id.* § 622.4.

Therefore, EFPs are agency actions taken independent of any fishery management plan. They arise from a separate statutory and regulatory framework (16 U.S.C. § 1867(d) and 50 C.F.R. § 600.745(b)) that operates alongside, but outside of, the Snapper-Grouper fishery management plan framework (50 C.F.R. §§ 622 *et seq.*). Thus, EFPs are not "regulations promulgated by the Secretary," nor are they "actions taken . . . under regulations which implement a fishery management plan." *See* 16 U.S.C. § 1855(f)(1)–(2).

This understanding aligns with the nature of Plaintiffs' claim. In determining whether a claim falls within the scope of Section 1855(f), "the decisive question is whether the regulations are being attacked." *Turtle Island Restoration Network*, 438 F.3d at 945. Plaintiffs' claim does no such thing. If Plaintiffs prevail, only the challenged actions, the EFPs, would be set aside; the underlying Snapper-Grouper Fishery Management Plan and its implementing regulations would remain fully intact. *Cf. id.* (holding that claims directed at "undo[ing] the regulations implementing the Fishery Management Plan amendment," which reopened a swordfish fishery, fell within the scope of Section 1855(f)). Preliminary relief is thus available under the APA, and Plaintiffs' claim can thus proceed.[6] *See* 5 U.S.C. § 705; *see also N.C. Fisheries Ass'n*, 550 F.3d at 21.

---

[6] The Government cites *Cape Cod Com. Hook Fishermen's Ass'n v. Daley*, 30 F. Supp 2d. 111 (D. Mass. 1998), for the proposition that the MSA prohibits injunctive relief for challenges to EFPs. Gov't's Opp'n at 13 n.2. But that case is of little help here. It was decided before Congress amended the MSA in 2007 to expressly authorize the Secretary to create an "experimental permitting process," separate and apart from the fishery management plan framework. Pub. L. 109–479, Jan. 12, 2007, 120 Stat 3575, 3614 (codified as 18 U.S.C. § 1867). Prior to that amendment, the NMFS considered its "[a]uthority to allow exempted fishing in any regulated fishery" as being "established through the governing [fishery management plan] and/or its implementing regulations." Foreign and Domestic Fishing; Scientific Research Activity and Exempted Fishing, 61 Fed. Reg. 10713 (Mar. 15, 1996) (characterizing "exempted fishing" as "an activity regulated under fishery management plans").

**B. Likelihood of Success on the Merits**

Plaintiffs are likely to succeed on the merits of their APA claim because, in granting the EFPs, the Government acted arbitrarily and capriciously by failing to consider an important aspect of the problem and by acting contrary to the NMFS's own regulations. Further, it is doubtful that Congress authorized the NFMS to circumvent the MSA and the fishery management framework through the EFP process.

1. The EFPs Must Comply with the MSA

Traditional tools of statutory interpretation show that any EFPs the NMFS issues must comply with the MSA. The MSA created a "[c]ooperative research and management program," 16 U.S.C. § 1867 (title), "to address needs identified under [Chapter 38 of Title 16] and any other marine resource laws enforced by the Secretary," *id.* § 1867(a). Chapter 38, titled "Fishery Conservation and Management," identifies several such needs, one of which includes placing fishery resources "under sound management" "before overfishing [causes] irreversible effects." *See id.* § 1801(8). It also identifies another need: "[t]he collection of reliable data" for "the effective conservation, management, and scientific understanding of the fishery resources of the United States." *Id.* § 1801(10). In turn, Section 1867(d) of the MSA authorizes the Secretary to issue "experimental permit[s]." *Id.* § 1867(d) (directing the Secretary to promulgate regulations to create an "experimental permitting process"). Under 50 C.F.R. § 600.745(b), the Secretary promulgated such a process. Under that process, the NMFS may issue EFPs "for limited testing, public display, data collection, exploratory fishing, compensation fishing, conservation engineering, health and safety surveys, environmental cleanup, and/or hazard removal purposes," if a target or incidental harvest of species managed under a fishery management plan or fishery regulations is prohibited (e.g., South Atlantic red snapper). 50 C.F.R. § 600.745(b).

12

Therefore, at a minimum, each EFP the agency issues—including data collection projects—must "address" (i.e., "to give attention to or deal with a matter or problem") the "needs" (i.e., "necessary dut[ies]" or "obligation[s]") Congress identified within Chapter 38, several of which emphasize the need to prevent overfishing.[7] *See, e.g.*, 16 U.S.C. § 1801(a)(6) ("[T]he conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, [and] to insure conservation . . . ."). This is evident from the plain language of the statutes concerning EFPs, their titles, and their place within the overall statutory scheme. *See Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *Don't Tear It Down v. Pa. Ave. Dev. Corp.*, 642 F.2d 527, 533 (D.C. Cir. 1980) ("[S]tatutory meaning is of course to be derived, not from the reading of a single sentence or section, but from consideration of an entire enactment against the backdrop of its policies and objectives."); *Yates v. United States*, 574 U.S. 528, 540 (2015) (plurality op.) (using a statute's position within a chapter of a particular title to determine the meaning of a statute and stating that "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998)); *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) ("[W]hen the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms.").

It is also consistent with the NMFS's longstanding practice and understanding of EFPs. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("[T]he longstanding practice

---

[7] *Address*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/address (last visited May 18, 2026); *Need*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/need (last visited May 18, 2026).

of the government—like any other interpretive aid—can inform a court's determination of what the law is." (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014)). When Congress amended the MSA to create a "[c]ooperative research and management program," 16 U.S.C. § 1867, and directed the Secretary to create an "[e]xperimental fishing permitting process," *id.* § 1867(d), the NMFS explained that "[a]ny permit issued by NMFS is a Federal action, and as such must comply with any and all applicable laws," Magnuson-Stevens Act Provisions; Experimental Permitting Process, Exempted Fishing Permits, and Scientific Research Activity, 74 Fed. Reg. 42786, 42787 (Aug. 25, 2009).

For instance, the agency explained that any EFP applications for conservation fishing—the practice of compensating vessels participating in scientific research through additional fish, an activity eligible for an EFP— "requires evaluation of the effects of this additional mortality on the affected stock(s) . . . to ensure that overfishing does not occur, consistent with National Standard (NS) 1, the NS1 Guidelines, and MSA section 303(a)(15)." *Id.* at 42786; *see also id.* at 42788 ("The mortality associated with conservation engineering work," an activity eligible for an EFP, "needs to be properly accounted for and analyzed, consistent with NS1, the NS1 Guidelines, and MSA section 303(a)(15)."); *id.* ("It is very important that the amount of fish taken during [conservation engineering projects] be kept to the minimum necessary to achieve a scientifically robust analysis while conserving the resource, and that any mortality is accounted for consistent with NS1, the NS1 Guidelines, and MSA section 303(a)(15), as well as other MSA provisions and other applicable laws, including the ESA.").

Likewise, as Amicus Curiae notes, in a prior EFP concerning red snapper, the NFMS has explicitly stated that the permit "does not exempt" participants from the requirements of the MSA, including the requirement under 16 U.S.C. § 1883(d), which prohibits the harvest of red

14

snapper for the remainder of the fishing year if the red snapper recreational quota is met, even if the EFP participants have allocation remaining. Environmental Defense Fund Am. Br. at 16 (citing NMFS, Gulf Headboat Collaborative Revised Exempted Fishing Permit (EFP) PERMIT NO.: 13-SERO-02 (Nov. 26, 2013), https://media.fisheries.noaa.gov/dam-migration/headboat_collaborative_efp.pdf [https://perma.cc/25RG-A9H3]). A prior red snapper EFP issued to Florida for the 2018 and 2019 fishing years contained the same explicit limitation. *See* NMFS, Florida Fish and Wildlife Conservation Commission Exempted Fishing Permit (EFP) PERMIT No.: 18-SERO-01 (Apr 17, 2018), https://media.fisheries.noaa.gov/dam-migration/gulf-efp-florida-lcamp-permit-18-sero-01.pdf [https://perma.cc/E48A-B28J]. Therefore, in addition to the relevant statutes, the Government' own practices indicate that EFPs must be consistent with the requirements of the MSA.

2. In Issuing the EFPs, the Government Acted Arbitrarily and Capricious

Because Section 1867 requires EFPs to be consistent with the MSA, as explained above, the NFMSA must consider whether granting an EFP application would lead to overfishing or implicate other conservation concerns. The regulations governing EFPs require the NMFS to do the same. *See* 50 C.F.R. § 600.745(b)(3)(iii)(B) (providing that a permit may be denied on the grounds that, based on "the best scientific information available, the harvest to be conducted under the permit would detrimentally affect the well-being of the stock of any regulated species of fish"); *id.* § 600.745(b)(3)(iii)(D) (providing that a permit may be denied on the grounds that "[a]ctivities to be conducted under the EFP would be inconsistent with the intent of this section, the management objectives of the FMP, or other applicable law"). Plaintiffs, however, contend that the Government granted the States' EFP applications without grappling with evidence that the four EFPs would lead to overfishing. The Court agrees; the Government "failed to consider

15

an important aspect of the problem" and thus "offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm Mut. Auto. Ins.*, 463 U.S. at 43.

In February 2026, the Government placed a notice on the Federal Register that it had received, and was considering, the States' four exempted fishing permit applications. Notice of Receipt of Applications for Exempted Fishing Permits, 91 Fed. Reg. 6827, 6827–32 (Feb. 13, 2026); Pls.' Ex. 10, ECF No. 7-10. In response to the notice, the Government received public comments, some of which expressed significant concern with the EFP applications. Plaintiffs focus on two of those comments, one authored by the Ocean Conservancy and the other by Slash Creek Waterworks, Inc. *See* Pls.' Exs. 11–12.

Both commenters argued that the proposed EFPs would undermine existing federal protections for South Atlantic red snapper by allowing substantially more fish to be taken than current limits permit. Pls.' Ex. 11 at 1–11; Pls.' Ex. 12 at 1–2. According to the commenters, the existing catch limits and overfishing thresholds are based on the amount of fishing-related mortality the stock can sustain and already reflect recent fishing levels.[8] Pls.' Ex. 11 at 2; Pls.' Ex. 12 at 2–3. The commenters further argued that, whereas the recreational red snapper season had recently lasted only one to three days, the EFPs would extend the season to as many as 39 days in Florida and 62 days in the other states, thereby substantially increasing fishing mortality. Pls.' Ex. 11 at 2; Pls.' Ex. 12 at 2. Thus, the commenters contended that the existing limits do not account for such dramatically expanded recreational seasons and would likely result in overfishing. Pls.' Ex. 12 at 2–3.

---

[8] According to the commenters, this threshold is defined by the fishing mortality rate during the 2021–2023 period. Pls.' Ex. 11 at 8; Pls.' Ex. 12 at 2. Because that 2021–2023 level is now the benchmark, any increase in fishing pressure above that benchmark would be considered overfishing. Pls.' Ex. 11 at 8; Pls.' Ex. 12 at 2–3.

Moreover, Ocean Conservancy argued that the States' EFP applications rested on an unsupported assumption that extending the red snapper season would spread fishing activity across more days and thereby reduce the number of fish caught each day. Pls.' Ex. 11. According to Ocean Conservancy, the States relied on that theory to argue that a substantially longer season would not materially increase overall red snapper harvest. *Id*. at 5. But Ocean Conservancy contended that the available evidence did not support that conclusion. *Id.* at 4–6. It argued that, for the proposed 39-day season to remain within existing catch limits, the daily catch rate would need to fall to less than five percent of the rate observed during the 2025 two-day season, and that none of the studies cited by the States shows anything close to such a dramatic reduction. *Id.* at 4–5. Ocean Conservancy further argued that the Gulf studies on which the States relied were not comparable to the South Atlantic because the fisheries operated under different conditions. *Id.* at 5–6. Based on those studies and recent catch data, Ocean Conservancy concluded that the assumption that a longer season would sufficiently reduce overall fishing impacts was unsupported by the evidence. *Id.* at 9–11. Despite these comments, the Government granted the EFPs without providing an explanation that addressed the significant conservation problems raised by the commenters.[9] *See Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by

---

[9] The Government attaches a declaration by the Assistant Secretary of Commerce dated May 18, 2026 (almost three weeks after the first EFP was granted), which offers further explanation behind the EFPs. But "[i]t is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). The Court may consider only "the materials that were before the agency at the time its decision was made." *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997).

the public." (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977) (per curiam)). Instead, in granting the EFPs, the NMFS stated:

> The proposed EFP applications state that the projects will not increase fishing mortality because recreational effort for snapper-grouper species already occurs year-round regardless of season length. The applicants cite past research, as well as state management of red snapper in the Gulf of America, which indicate that extended fishing seasons reduce overall fishing effort by preventing the "derby-style" effort compression seen in shorter fishing seasons.

Pls.' Ex. 5 at 2–3, ECF No. 7-5.

As noted above, the commenters raised serious doubts about the Gulf studies relied on by the States and their applicability to conditions in the South Atlantic. The commenters also indicated that even optimistic estimates premised on the Gulf studies would yield unsustainable results. Pls.' Ex. 11 at 4–6; Pls.' Ex. 12 at 2. Agencies must consider and grapple with "comments which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed" action. *Home Box Off., Inc.*, 567 F.2d at 36 n.8. The failure to explain why those studies were applicable to the South Atlantic, despite the flaws identified by commenters, "cast[s] doubt on the reasonableness of [the] position taken by the agency." *Id.*

Furthermore, the NMFS granted the States' EFP applications, despite the applications being incomplete. The regulations require "an applicant for an EFP to submit a completed application to the appropriate Regional Administrator or Director" and the "application package must include . . . [t]he species (target and incidental) expected to be harvested under the EFP, [and] the amount(s) of such harvest necessary to conduct the exempted fishing." 50 C.F.R. § 600.675(b)(2)(v). And "[a]n incomplete application . . . will not be considered until corrected in writing." *Id.* § 600.745(b)(2)(viii). Despite this requirement, the NMFS granted the incomplete

18

applications. *See* § 600.745(b)(3)(iii) ("an applicant . . . fail[ing] to disclose material information required" is a "ground[] for denial of an EFP").

The NMFS initially recognized this deficiency and requested that the applicants "throw out a number," for consideration, but Florida, for instance, refused, stating that "the EFP is not predicated on a number of fish, and for [NMFS] to request a number—even an estimated number—is inappropriate and unnecessary." Pls.' Ex. 6 at 2, ECF No. 7-6. The other States also refused, some expressing concern that any harvest number would be used to shorten the season. *See* Pls.' Ex. 7 at 1, ECF No. 7-7 (Georgia's EFP application) ("Georgia is apprehensive about providing a number for Red Snapper harvest that will be included in our EFP. . . . [Georgia's] greatest concern is the number will be used punitively to shorten the requested season."); Pls.' Ex. 9 at 1, ECF No. 7-9 (North Carolina EFP application) ("Concerning the harvest requirement in 50 CFR 600.745(b)(2)(v), [North Carolina] is concerned about producing a number of expected harvest for this 2026 EFP. . . . We are concerned that a number would be used punitively toward the state by either shortening the requested season, defining a regional quota, and/or establishing state allocations."); Pls.' Ex. 8 at 1, ECF No. 7-8 (South Carolina EFP application) ("In this EFP revision, [South Carolina] does not provide a specific expected harvest number."). The issue stems from the States' disagreement with the NMFS's use of its Marine Recreational Information Program (MRIP) data to calculate harvest numbers, which the agency considers the best scientific information available.[10] *See* Pls.' Ex. 6 at 8 (Florida EFP

---

[10] The NMFS's MRIP "is the state-regional-federal partnership that develops, implements, and continually improves a national network of recreational fishing surveys to estimate total recreational catch." NMFS, *About the Marine Recreational Information Program*, https://www.fisheries.noaa.gov/recreational-fishing-data/about-marine-recreational-information-program [https://perma.cc/VS4U-KNHM]. "These estimates are combined with commercial catch data and biological research to help scientists and managers assess and maintain sustainable fish stocks." *Id.*

application) (explaining that it disagrees with the use of MRIP data to estimate harvests); Pls.' Ex. 7 at 1 (Georgia EFP application) (same); Pls.' Ex. 8 at 4 (South Carolina EFP Application) (same); Pls.' Ex. 9 at 1 (North Carolina EFP Application) (same).

But the agency's own regulation requires applicants to provide this information and an application without it "will not be considered." 50 C.F.R. § 600.745(b)(2)(viii). It is "axiomatic . . . that an agency is bound by its own regulations." *Nat'l Env't Dev. Ass'n's Clean Air Project v. E.P.A.*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (citation modified). Although an agency may "amend or repeal its own regulations," it may not "ignore or violate its regulations while they remain in effect." *Id.* (citation modified). So, if an "agency fails to comply with its own regulations," the relevant action "may be set aside as arbitrary and capricious." *Id.* (citation modified). By granting the applications without the inclusion of harvest estimates, as required under the regulations, the Government acted arbitrarily and capriciously.

Finally, while the Court agrees with the Government that Congress, through Section 1867(d), authorized the NMFS to "create an expedited, uniform, and regionally-based process to promote issuance, where practicable, of experimental fishing permits," Gov't's Opp'n at 25 (quoting 16 U.S.C. § 1867(d)), the Court does not find that Congress gave the Government unbridled discretion to circumvent the MSA and fishery management plan framework through the EFP process. "Congress does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 515 (2018) (citation modified). "And it is more than a little doubtful that Congress would have tucked into the mousehole of [Section 1867(b)] an elephant that tramples the work done by [the MSA and the fishery management plans]." *See id.* As Amicus Curiae aptly observes, "nothing in [Section 1867(b)] . . . give[s] the [NMFS] general

20

authority to exempt fishing activities from any legal requirements . . . let alone indicate[s] that Congress meant for [EFPs] to become a vehicle to deregulate fisheries." Ocean Conservancy Amicus Br. at 15. As explained above, EFPs must "address" the "needs" identified under the MSA—not provide an escape hatch from them. Such needs include the overarching requirement that fisheries be managed to prevent and end overfishing.

### C.  Irreparable Harm

The Court must next determine whether Plaintiffs will suffer irreparable harm. The party seeking a preliminary injunction must make two showings to demonstrate irreparable harm. "First, the harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm. Second, the harm must be beyond remediation. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citation modified). Here, Plaintiffs assert that the EFPs will likely cause overfishing, setting back the red snapper rebuilding plan by many years. *See, e.g.*, Zales Decl. ¶¶ 14, 17, ECF No. 6-7; Oden Decl. ¶ 17, ECF No. 6-4; Cox Decl. ¶¶ 17, 19, ECF No. 6-5; Giambanco Decl. ¶¶ 20–22, ECF No. 6-6. Such a setback, they contend, hinders their long-term use and enjoyment of the ocean and its natural resources, as any overfishing inevitably leads to less access and more restrictions on the red snapper stock. Pls.' Mot. at 36; Oden Decl. ¶¶ 17–19, Cox ¶ 19; Zales Decl. ¶ 17. As fisherman with years, even decades, of experience, they have formulated deep bonds with the ocean and fish and "are profoundly affected by the arbitrary destruction of the resource caused by Defendants' action." Pls.' Opp'n at 38; *see also* Oden Decl. ¶ 29; Cox Decl. ¶¶ 26–27, 29; Giambanco Decl. ¶ 25. They assert that fishing "is a way of life," a kind of "existence," and integral to their "identity" and community. *See* Oden Decl. ¶¶ 23–33; Cox Decl. ¶¶ 26–35; Giambanco ¶¶ 24–25. For these fishermen who "know and care[] about the red

21

snapper," it is "painful and disturbing to watch" the "harm [to] the stock and [the] undo[ing] [of] years of progress." Cox Decl. ¶ 29; *see also* Giambanco Decl. ¶ 25–26. The Court concludes that Plaintiffs have met their burden to establish a likelihood of irreparable harm.

Plaintiffs' harm is certainly imminent, actual, and not theoretical. The history of the South Atlantic red snapper fishery demonstrates that overfishing has previously delayed rebuilding efforts despite existing regulatory restrictions. The NMFS initially adopted a rebuilding plan in 1991, but the stock failed to rebuild within the anticipated timeframe. In response, the NMFS in 2010 extended the rebuilding timeline from 15 years to 35 years, moving the target rebuilding date to 2044. *See* Amendment 17A, 75 Fed. Reg. 76,874–75. This history supports Plaintiffs' contention that additional, unaccounted fishing mortality risks further delaying stock recovery. *See W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 47 (D.D.C. 2020) (explaining that a movant may establish imminence by "provid[ing] proof that the harm has occurred in the past and is likely to occur again" (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985))). Moreover, as discussed above, the evidence at this stage reflects a likelihood that the extended recreational seasons authorized by the EFPs will increase fishing mortality beyond permissible limits and contribute to overfishing. Plaintiffs therefore have shown a credible risk that the EFPs will further delay the rebuilding plan, limit access, and prolong the restrictions on the red snapper stock.[11]

---

[11] The Government maintains that Plaintiffs' estimates concerning overfishing are speculative because they are based on the status quo and existing bycatch and discard information, which the States believe is unreliable. *See* Hr'g Tr. 26:06–11. But this misses the mark. The States have *refused to provide any estimate whatsoever* as to the number of fish they believe will be harvested as a result of the data collection activities they seek to exempt under the EFPs. Plaintiffs, and the public commenters, rely on the actual, best data the agency has at this point in time, which is certainly *less* speculative than the Government and the States' estimate— which is *no* estimate at all. *Id.* 25:09–27:04. And according to Plaintiffs' estimates—which use the best available data at this time and rely on logical deductions—overfishing is likely to occur.

Plaintiffs have also shown that such injuries are irremediable. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987) (holding that if an environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment). Indeed, the injuries here encompass the depletion of natural fishery resources, and "there is no way of rectifying that injury if, in fact, two months down the line . . . the court concludes that the agency has acted in . . . an illegal fashion." *See Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 221 (D.D.C. 2003) (quoting *Fund for Animals v. Glickman,* No. 99-cv-245, Tr. Hr'g Mot. for T.R.O at 58 (Feb 12, 1999) (granting injunctive relief because animal deaths cannot be rectified)). Animal mortality cannot be undone. *Sierra Club v. Martin*, 933 F. Supp. 1559, 1570–71 (N.D. Ga. 1996) (finding irreparable harm because there was no adequate remedy at law— "once the migratory birds are killed, they cannot be returned"); *see also Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993) (preliminarily enjoining a federal program which would have hunted 10 to 60 bison from a herd, as such an injury was permanent and not compensable in money damages). As noted above, overfishing can lead, and has led, to rebuilding efforts which extend for decades. And such an injury is certainly "permanent or at least of long duration," so as to be "irreparable." *See Amoco Prod. Co.*, 480 U.S. at 545.

Moreover, the ocean and its fisheries hold deep cultural significance for Plaintiffs, and the depletion of those resources threatens their way of life. *See United States v. Washington*, No. 19-01RSM, 2019 WL 5963052, at *5–6 (W.D. Wash. Nov. 13, 2019) (finding irreparable harm where additional fishing would strain a fishery that was "deeply ingrained in the cultural identities" of the plaintiffs and kept them employed in "deeply meaningful and rewarding work

23

that [was] a central part of [their] history, identity, culture, and spirituality"); *see also Colorado River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1440 (C.D. Cal. 1985) (finding irreparable harm where construction on riverbank threatened sites which were of cultural significance and integral to preserving plaintiffs' culture); *Hualapai Indian Tribe v. Haaland*, 755 F. Supp. 3d 1165, 1197–98 (D. Ariz. 2024) (finding irreparable harm where lithium exploratory drilling threatened a natural resource that was central to plaintiff's culture and way of life). Accordingly, Plaintiffs have met their burden to show that they will likely be irreparably harmed if the EFPs go into effect while the Court considers the merits of the case.

### D. Balance of the Equities and The Public Interest

Plaintiffs must also show that "the balance of equities tips in their favor" and that "an injunction is in the public interest." *Winter*, 555 U.S. at 20. "The balance of the equities weighs the harm to [Plaintiffs] if there is no injunction against the harm to the [Government and Defendant-Intervenors] if there is." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). If the movant seeks to enjoin the Government, the final two factors merge for the Government "because the government's interest *is* the public interest." *Id.* Both factors favor injunctive relief here.

The Government contends that the public interest favors allowing the EFPs to proceed because the permits are intended to address longstanding difficulties in accurately measuring recreational red snapper catch and discard data. Gov't's Opp'n at 32.  In particular, it asserts that the EFPs will allow the States to pilot new data-collection methods, including smartphone applications designed to improve reporting of recreational fishing effort, catch, and discards. *Id*. This information, the Government asserts, will benefit the fishery in the long term by improving future red snapper management. *Id.* at 32–33.

24

Defendant-Intervenors, on the other hand, contend that recreational anglers and businesses supporting recreational fishing will suffer economic harm if the EFPs are enjoined because these anglers and businesses invested in supplies and services in anticipation of Florida's recreational red snapper season opening. ASA & CCA Opp'n at 16–17. Like the Government, they also argue that enjoining the EFPs would delay the collection of fishing data intended to improve future stock assessments and management decisions. *Id*. at 17–18.

The Court does not doubt that improved data collection and fishery management serve important public interests.[12] But the asserted benefits of additional data collection do not outweigh the public interest in ensuring that the Government meaningfully considers whether the EFPs will result in additional red snapper mortality that exceeds allowable limits, the consequences of which would extend beyond the duration of these temporary recreational openings. *See Newby*, 838 F.3d at 12 ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." (citation modified)). Overfishing would undermine years of rebuilding efforts and would lead to additional restrictions affecting all participants in the South Atlantic fishery, including both commercial and recreational anglers. The conservation of public fishery resources and the prevention of irreversible environmental harm outweigh the temporary loss of additional recreational fishing days. Moreover, an injunction would not permanently foreclose the collection of improved recreational fishing data. Defendants remain free to pursue the proposed data-collection efforts after complying with the procedural and conservation requirements

---

[12] Nevertheless, the Court has reservations over whether an extended season would significantly improve the quality of the data concerning red snapper mortality, as the Government purports; the main driver of red snapper mortality is dead discards occurring outside the open season. *See* Hr'g Tr. 22:5–15, 24:09–26:05.

imposed by the MSA and the NMFS's own regulations. *Id.* ("There is generally no public interest in the perpetuation of unlawful agency action.").

And while the Court does not discount the reliance interests asserted by recreational anglers and related businesses, those interests are limited. The EFPs were issued less than a month before the season openings, and thus do not implicate substantial or longstanding reliance interests. Any short-term economic losses associated with delaying or forgoing the 39- to 62-day recreational seasons are outweighed by the public's strong interest in ensuring that the EFPs comply with the MSA and that fisheries are managed in a manner that prevents overfishing and protects the long-term sustainability of the stock. *See Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) (noting that there is an "overriding public interest" in the "importance of an agency's faithful adherence to its statutory mandate."). Therefore, the balance of equities and the public interest favor preliminary injunctive relief.

### E.  Injunction Bond

A district court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A recent D.C. Circuit panel clarified that "injunction bonds are generally required" when a court grants preliminary injunctive relief, even in cases in which the public interest clearly favors the injunction and the Government is the opposing party. *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam). District courts, however, have "broad discretion" when setting the amount of the required bond. *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).

The "proper" bond amount here is nominal. *See* Fed. R. Civ. P. 65(c). Courts in this District routinely require only nominal bonds from parties obtaining preliminary relief against the Government when the awarded relief will not impose an undue monetary burden on the enjoined parties. *See, e.g.*, *Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 32 (D.D.C. 2025) (requiring bond of $1.00); *Open Tech. Fund v. Lake*, 788 F. Supp. 3d 32, 39 (D.D.C. 2025) (requiring bond of $100). The Government in this case has not shown that preliminary relief will cause it any significant costs or injuries. *See* Gov't's Opp'n at 33 & n.15.

As for Defendant-Intervenors, any short-term economic losses they may incur as a result of the injunction are substantially outweighed by the public's strong interest in ensuring that the EFPs comply with the MSA and the agency's regulations, as noted above. Moreover, Defendant-Intervenors have made no attempt to quantify those alleged losses, asserting only in broad terms that enjoining the EFPs "would eliminate the economic benefits the EFPs [were] designed to provide." *See* ASA & CCA Opp'n Br., Guyas Decl. ¶ 22, ECF No. 20-1. Furthermore, to the extent that enjoining the EFPs prevents any further delay to the recovery of the red snapper stock, the injunction may, in fact, save the public and the parties money in the long term. In light of these considerations, imposing a significant bond, as Defendant-Intervenors request, would unduly burden Plaintiffs, impair their ability to seek judicial relief, and chill access to justice. *See* *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025). As such, and consistent with this Court's broad discretion under Federal Rule of Civil Procedure 65(c), the Court shall require Plaintiffs to post a nominal bond of one hundred dollars ($100.00).

\* \* \*

Because Plaintiffs have met their burden, the Court grants preliminary injunctive relief to maintain the status quo during the pendency of this action.[13]

### V.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction (ECF No. 6) is **GRANTED**; Ocean Conservancy's and the Environmental Defense Fund's motions for leave to file amicus briefs (ECF Nos. 15, 17) are **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  May 21, 2026                                                    RUDOLPH CONTRERAS
                                                                                        United States District Judge

---

[13] Plaintiffs, in the alternative, request a stay. *See* Pls.' Mot. at 1. Because the Court grants Plaintiffs' motion for a preliminary injunction, the Court need not address that issue.